MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

CONTINUATION SHEETS

E.     Ground five:  **Lack of Territorial Jurisdiction**

Supporting FACTS (state *briefly* without citing cases or law):

Hinkson was charged with a violation of Section 1114 of Title 18 U.S.C. This section, by
the very words of the statute, incorporate one of three associated statutes, i.e., §§1111, 1112 or
1113. Each of these statutes requires that the actor to be guilty of the crime of, murder at section
1111, or manslaughter at section 1112, or attempted murder or manslaughter at section 1113, be
physically present in/on a federal enclave.  This is stated in the statutes as: ... * * *whoever,
within the special maritime and territorial jurisdiction of the United States" and is a jurisdictional
bar to prosecution if not alleged by the government and not subsequently proven at trial.  At
Hinson's trial no proof was presented that either Hinkson, nor his accuser, Swisher, were in or on
any territory known as *"the special maritime and territorial jurisdiction of the United States"* ,
and in fact the contrary was proven.

As is shown in the detailed memorandum attached hereto, the government lacked
jurisdiction to charge or prosecute and the court lacked jurisdiction to entertain the prosecution
or to enter judgment against Hinkson and sentence him to any term of imprisonment.


F.     Ground six:   **Jury and Juror Misconduct**

Supporting FACTS (state *briefly* without citing cases or law):

Based on an Affidavit of Hoyt regarding his meeting with a juror Claudia Hanes (Haines)
following the trial, and statements made by the jury during trial, specifically the juror note sent to
the court questioning whether they should be considering the mental state of Hinkson, it is
evident that the jury was both illegally discussing the trial before the close of evidence and
argument, AND it was considering allegations not even presented.  At the time the jury sent the
aforementioned note to the court, there had been no discussion during trial of Hinkson's mental
state or possible diagnose of same. Ms. Haines revealed that she had an interest in law and
psychology and that she was knowledgeable and had read somewhat on these subjects. Also, Ms.
Haines revealed that before the trial she had met and was familiar with the wife of Judge Lodge,
one of the named victims in the case. Mrs. Lodge was/is an Idaho State Senator and Ms. Haines
supported her in her political career, but Ms. Haines did not think that the extent of her
involvement was important enough to reveal during Voir Dire examination. There were other
jurors who did not disclose information pertinent to their qualifications, such as the former
school teacher whose loved one had been subject to a murder-for-hire hit. As to matters of juror
misconduct that have not yet been discovered, defendant moves for discovery to obtain that
information in support of this 2255 Motion.


**Hinkson 2255 Motion Continuation Sheet # 1 of 3 as attached to Form AO 243**

The grounds for the claim(s) of juror or jury misconduct are further set forth in the accompanying memorandum in support of this, GROUND SIX.


G.    Ground Seven:    **Governmental Misconduct**

Supporting FACTS (state *briefly* without citing cases or law):

Sentence should be set aside under the Fifth and Sixth Amendments due to the denial of procedural due process and denial of the right to competent counsel of defendant's choice in light of governmental misconduct.  Without limitation to further enumeration, this misconduct was premeditated by the FBI which deliberately and with malice aforethought fabricated new (at that time) murder for hire crimes (plural).  The grounds for this are more fully set forth in the accompanying memorandum in support of this, Ground Seven.


H.    Ground Eight:    **Prosecutorial Misconduct**

Supporting FACTS (state *briefly* without citing cases or law):


Sentence should be set aside under the Fifth and Sixth Amendments due to the denial of procedural due process in light of prosecutorial misconduct caused by crimes committed by the prosecutors committed in the court room during defendant's trial.   The grounds for this are more fully set forth in the accompanying memorandum in support of this, Ground Eight.

These crimes include, without limitation, subornation of perjury by Prosecutor Sullivan arranging for Elven Joe Swisher to commit fraud and pull from his pocket a forged Form DD-214 by which Swisher claimed the right to wear certain US Military Medals, including the Purple Heart.   These gave Swisher extraordinary credibility in the eyes of the jury.

The crime of perjury by Swisher committed in defendant's case involved the exact same fabricated facts of combat heroism that Swisher testified about in front of an ALJ in his VA case during the year before defendant's trial in the above case. Swisher was prosecuted, convicted, sentenced and went to prison for his 2004 fraud using the same information in Case No. 07-cr-182-BLW.

The prosecutorial misconduct is that in defendant's case the prosecutors suborned the perjury with reference to both the testimony of Swisher, the wearing of the Purple Heart Medallion, and the testimony about said DD-214 being "certified" by the office of the Commandant of the US Marine Corps in Wash. DC when it was known to be a forged document.

US prosecutors Sullivan and Taxay never moved to strike nor corrected the misimpression created by them in the minds of the jury.

The prosecutors also committed the crime of misprision of a felony by failing to report said crime. As a result, it was the Inspector General of the United States who, on demand from the Secretary of the Veteran's Administration, insisted on prosecuting Swisher for fraud from perjury, forgery and theft of over $100,000 in VA benefits.

Once convicted of fraud over using the same story, said conviction can be used by as evidence of the repeated pattern of fraud against defendant, which included Swisher's manifest intent to present testimony that would cause defendant to spend the rest of his life in prison so that Swisher would have an easier time stealing his business; which had been the objective of Swisher's extortion for several years.

The prosecutor's action in ignoring Swisher's fraud crimes of forgery and perjury had the effect of a cover-up protecting Swisher, the perpetrator in this case and ensured defendant's conviction when he was innocent.

Respectfully attached to and submitted with my petition for relief under 28 U.S.C. §2255 and is hereby signed under the penalty of perjury pursuant to 28 U.S.C. §1746, this 13th day of April, 2012.

David R. Hinkson

**Hinkson 2255 Motion Continuation Sheet # 3 of 3 as attached to Form AO 243**

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California   95301
In Propria Persona

U.S. COURTS

APR 1 7 2012

Rcvd _____ Filed _____ Time 2:15
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case #: CR-04-0127-S-RCT |
| | ) |
| Plaintiff, | ) **COVER PAGE FOR MEMORANDUMS:** |
| | ) DEFENDANT HINKSON'S |
| vs | ) MEMORANDUMS IN SUPPORT OF |
| | ) HINKSON'S MOTION TO VACATE THE |
| David Roland Hinkson, | ) CONVICTION AND SENTENCE UNDER |
| | ) SECTION 2255, TITLE 28 USC. |
| Defendant. | ) |
| | ) |

COMES NOW, David Roland Hinkson and by and through his own hand, respectfully submits the following memorandums, each one supporting one of the grounds for his MOTION TO VACATE THE CONVICTION AND SENTENCE UNDER SECTION 2255 OF 28 U.S.C.

Each memorandum is individually page numbered for ease of reading and referencing. Where exhibits are necessary, they have been appended immediately following the memorandum they are supporting.   For example, there are numerous affidavits supporting the claim of Newly Discovered Evidence, ground one and therefore as Exhibits are numbered A-1 through A-14.

Respectfully submitted this 13th day of April, 2012, under the penalty of perjury pursuant to 28 U.S.C. §1746, I hereby certify that the foregoing and the following memorandums are all true and correct to the best of my knowledge and belief.

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California   95301

## CERTIFICATE OF SERVICE BY MAIL

I hereby certify that a true and correct copy of the foregoing document was served on the following on this 17th day of April, 2012 by the following method:

| | |
|---|---|
| Wendy J. Olson, US Attorney for Idaho<br>Washington Group Plaza IV, Suite 600<br>800 East Park Blvd.<br>Boise, Idaho 83712 | [X] U.S. First Class Mail, Postage Prepaid<br>[ ] Facsimile: 208-334-1414<br>[ ] ECF Electronically Served |
| Michael Taxay<br>Attorney for the US Government<br>US Dept of Justice<br>601 D Street, NW<br>Washington, DC 20005<br>Email: michael.taxay@usdoj.gov | [X] U.S. First Class Mail, Postage Prepaid<br>[ ] Facsimile: 202-514-8714<br>[ ] ECF Electronically Served |

-2-

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California 95301
In Propria Persona

U.S. COURTS

APR 1 7 2012

Rcvd____ Filed____ Time 2:15
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

## UNITED STATES DISTRICT COURT DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case #: 1:04-cr-00127-RCT-1 |
| ) | |
| Plaintiff, ) | |
| ) | DEFENDANT HINKSON'S MEMORANDUM |
| vs ) | IN SUPPORT OF <u>GROUND ONE, NEWLY</u> |
| ) | <u>DISCOVERED EVIDENCE</u>, AS IS HEREBY |
| David R. Hinkson, ) | APPENDED TO HINKSON'S MOTION TO |
| ) | VACATE THE CONVICTION AND |
| Defendant. ) | SENTENCE UNDER SECTION 2255, TITLE |
| ) | 28 USC |
| ) | |

COMES NOW David R. Hinkson, by and through his own hand and hereby submits this MEMORANDUM REGARDING GROUND ONE, NEWLY DISCOVERED EVIDENCE, IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE UNDER 28 U.S.C. §2255.

For the reasons set forth in this Memorandum In Support of Motion to Vacate Conviction and Sentence Under 28 U.S.C. §2255, GROUND NUMBER ONE, the verdict and judgment must be vacated and the indictment dismissed because of the continuing stream of fraud by the prosecution's witness Elven Joe Swisher ("Swisher") who committed a fraud on the court which was not known to me or identified by me until he was convicted of fraud in his own case three years later.

All the EXHIBITS (1-16) attached hereto are fully incorporated herein by this reference as if they were fully set forth herein.

## SWISHER FRAUD

1.   This memorandum in support illustrates that Swisher's claims that David R. Hinkson solicited him to commit murder was a part of a continuing scheme of fraud, including a fraud on Hinkson and upon the court because his medical condition at the time he claimed to be solicited to murder for hire, he was either in a coma or unable to get out of bed from a heart attack and related conditions, which only his medical records will show. Discovery is needed to prove that it would have been impossible for Swisher to have received the solicitations he described in his testimony of January 14, 2005 and the record needs to be expanded to include all of Swisher's medical records for 2002 and 2003. See Defendant's motion to expand the record, filed contemporaneously with his 2255 motion.

   a.   Defendant needs to have discovery sufficient to obtain the information as to Swisher's health condition when he claims to have been solicited. See the following EXHIBITS: A-1, Affidavit of Hoyt; A-2, Affidavit of Hinkson; A-3, Affidavit of Ponomarenko A-4; Affidavit of Sandberg; A-5, Affidavit of Doty; A-6, Affidavit of Lewis; and A-7, Affidavit of Brockmann.

2.   Swisher was convicted April 9, 2008 of Fraud as it related to forgery of his Form DD-214, and perjury for testimony in a proceeding before the VA, prior to Hinkson's conviction in 2005, which is evidence that was not known at the Hinkson trial in January of 2005. The US Government knew that Swisher had committed fraud against the VA prior to his testimony in the Hinkson case, but because of governmental misconduct, it allowed Swisher to mount

the witness stand with a Purple Heart on his lapel and proffered him as a combat hero as mentioned in the prosecution's argument to the jury. The conviction of Swisher of fraud, demonstrates that the US Government and Judge Tallman both committed the crimes of subornation of perjury and misprision of a felony by offering and allowing Swisher to testify. However, it was not until Swisher's conviction for fraud that the newly discovered evidence was presented in such a fashion that defendant Hinkson could utilize it as a basis for this 28 U.S.C. § 2255 motion because Swisher's conviction was not known nor was it a part of the record in the Hinkson case. What is known was that Judge Tallman used his office as a judge to deliberately hide, conceal and cover up the truth of Swisher's fraud by finding that there was evidence in Swisher's military file that suggested he had served in Korea, and based on this completely fallacious finding, entered a ruling that the military file of Swisher could not be introduced into evidence. If introduced in evidence, as stated in the EXHIBIT A-8, Affidavit of Ben Casey, a juror in the Hinkson case, at least he, and probably the other jurors would not have voted to convict Hinkson on the Swisher counts.

3.    David Hinkson was out of the State of Idaho and part of that time was out of the USA when Swisher claims to have been solicited by him making it impossible for Hinkson to have been solicited Swisher as perjured himself stating. The record and proof of Hinksons absence from Idaho is found in his US Passport and records of the US Customs and Border Protection, which information was requested by defendant during trial, but which Judge Tallman erroneously refused to order the prosecution to produce. EXHIBIT A-1, Affidavit of Hoyt.

4.    Fraud in Business Practices

a.  Elvin Joe Swisher demonstrated a repeated pattern of fraud aimed at obtaining ownership of WaterOz prior to Hinkson's January 2005 murder solicitation trial. Swisher's target was to obtain ownership and control of Hinkson's lucrative ionized mineral business. On or about December 3, 2003 Swisher, Richard Bellon and others, participated in a takeover of WaterOz, by fraud and deception, and convinced the District Court of Idaho County and to issue a Temporary Restraining Order which gave them temporary control of the company. The objective of the co-conspirators was to strip the company of its assets and value and quickly sell it through a business broker and split the profits. EXHIBITS A-1, Affidavit of Hoyt and A-9, Affidavit of Towerton. Swisher and his cohorts succeeded in obtaining the TRO, took control of the business by deceit and outright lies to the court, and stripped out intellectual property in the form of the customer list and trade secrets before they lost control when the TRO was vacated one week later. Swisher had repeatedly stated that if he did not get what he wanted from Hinkson, that he, Swisher, would testify in Federal Court and Hinkson would spend the rest of his life in prison. EXHIBITS A-2, Affidavit of Hinkson, EXHIBIT A-9, Affidavit of Towerton. Swisher used this threat on January 3, 2003 with regard to a sample of WaterOz Potassium that he had poisoned with cyanide. EXHIBIT A-2, Affidavit of Hinkson. Swisher actually followed through with the first part of the January 3, 2003 extortion threat when he sent the poisoned bottle of WaterOz product to an independent lab for testing to confirm the presence of cyanide. EXHIBIT A-2, Affidavit of Hinkson and then

reported cyanide in WaterOz products to the FDA see EXHIBIT A-1, Affidavit of Hoyt.

b.    Swisher's mineral testing service, Northwest Analytical, was hired by Jeri Gray, manager of WaterOz to analyze the mineral content of Hinkson's liquid dietary supplements to make certain that the mineral content of the product was the same as stated on the label. However, as became apparent when he was terminated January 3, 2002, Swisher had committed fraud (a real pattern for this man) by either not performing any tests, but reporting content values consistent with the labels, or by incorrectly reporting test results on WaterOz products. Either way he billed for those false services and was paid $2,000 to $3,000 per month, another element of fraud. Prior to Ms. Gray hiring Swisher, Hinkson had been using the lab at University of Nevada Las Vegas (UNLV) to perform the testing, but acquiesced to Gray's recommendation to use Swisher's local lab, which she claimed would provide cost savings and faster turnaround.

c.    Hinkson relied upon Swisher's company to test his minerals correctly and sent 22 samples for pre-testing before they were given to Hinkson's Ukrainian business associate, Roman Ponomarenko, on or about November 11, 2002 to hand carry to the Ukraine for lab testing there. Hinkson paid $1,000 to test what turned out to be mostly tap water because Swisher replaced the 22 samples with tap water even though he reported to WaterOz that all of them were exactly equal to label specifications in respect to their mineral content. Replacing the WaterOz product samples with tap water was another act of Fraud by Swisher to defeat the success of

WaterOz, *i.e.,* Hinkson's attempt at starting a new business abroad so that WaterOz would be less independent and more vulnerable to Swisher's planned takeover. It was December 26, 2002 when the report of the Ukrainian Laboratory was issued that revealed Swisher's deception. EXHIBITS A-2, Affidavit of Hinkson and A-3, Affidavit of Ponomarenko.

d.      It was not until November 21, 2002 that information concerning Swisher's fraud started becoming apparent from the indictment of Hinkson being served with the Indictment in the FDA product labeling case (02-cr-142-RCT). The FDA had hired an independent lab which tested the WaterOz products and discovered them to be below the mineral content described on the label, leading to misbranding charges. Those misbranding charges shed light upon Swisher's duplicity (*i.e.,* being paid for testing but not reporting the results correctly or simply not testing the product and fraudulently reporting product content the same as the label). Once the indictment was served, Hinkson realized that the actual content of some of his products was substantially below the amount listed on the label, constituting an FDA law violation, even though Swisher had for years represented them to be in compliance.

e.      Since Swisher had been hired and paid to prevent inconsistency in product mineral value versus the claim that the labels did not accurately reflect the content of the product was damaging to Hinkson's business and gave him an FDA criminal violation as the person in control of the business. As of November 22, 2002 when he met with Swisher at his lab, Hinkson was understandably quite concerned; as

Hinkson put it, "Swisher committed the FDA crimes I am charged with." EXHIBIT A-2, Affidavit of Hinkson.

f.    The day after the indictment was served on Hinkson, November 22, 2002, in a meeting at a rundown garage near Swisher's home in Cottonwood, Idaho (which Swisher called a "laboratory") Swisher defended his testing for which he had been paid thousands of dollars by WaterOz. Swisher speculated that Hinkson's employee, Karl Waterman, (who preferred to be known by his alias, "Chris Jon Paitreyot") must have been making the WaterOz products with less than adequate amounts of mineral concentrate. Then, Swisher theorized that Chris must have added just the right amount of additional concentrate to each sample to bring it up to exactly the label specification prior to delivering samples for testing. This was a logically impossible scenario because of the technical precision to measure the right amount of product, a variable which would cause each of the 22 samples to be different as the concentrate to be used was manufactured for large scale mixing in tanks of 1,500 gallons. See EXHIBIT A-15, Affidavit of Swisher dated January 3, 2003, A-2, Affidavit of Hinkson. However, it was Swisher, not any other party who was responsible and was paid for the testing. Not only was Swisher responsible for adequately testing and certifying the prescribed mineral content of WaterOz products sold in interstate commerce, but, on November 11, 2002, his lab performed the final analysis on 22 WaterOz samples which were hand-carried to Ukraine for lab testing in that country, see report from Ukrainian lab attached as an Exhibit to the Hinkson Affidavit, EXHIBIT A-2. As noted above, Hinkson paid $1,000.00 to the lab in

Ukraine to find out that most of his samples were essentially tap water. See EXHIBIT A-3, Affidavit of Ponomarenko.

5.   As an example of another fraud perpetrated by Swisher against Hinkson, Swisher billed Hinkson $12,000.00 for an out-of-date Atomic Absorption machine ("AA Machine") and falsely claimed in the bill that Hinkson had made a contract with Swisher to purchase that machine for $1,000.00 per month, see Northwest Analytical bill dated 01-17-2002 specifying the terms, then demanding immediate payment in full, EXHIBIT A-10. This bill was fraudulently generated by Swisher AFTER he was informed that Hinkson had purchased his own ICP testing Machine, a substitute for the AA Machine and a device which utilized FDA-approved technology, EXHIBIT A-2, Affidavit of Hinkson. When Hinkson decided to do all of his mineral testing "in house" on the new ICP Machine and cut Northwest Analytical out, Swisher was quick to develop a scam to defraud Hinkson in order to recover some of the $2,000 to $3,000 per month income loss that WaterOz had been paying.

6.   In another attempt to defraud Hinkson, Swisher (also in January 2003) started sending billing statements for allegedly past due amounts (which had been billed and paid previously) from five months earlier – from as far back as September 2002 – see EXHIBIT A-13 billing statements from Northwest Analytical that commenced in January 2003. The so-called "past due" bills accumulated until they exceeded $5,000.00. See summary billing of May 2003, EXHIBIT A-13. The bills for the purchase of the outdated AA Machine and the accumulated "past due" bills were disputed and never paid by WaterOz because they were not actually due or payable. Finally, after a year of demanding payment, Swisher turned the disputed bills over to his lawyer, who dropped the matter as baseless.

7.   Swisher's Fraud on the Court

    a.   In his testimony in this instant matter, on January 14, 2005, Swisher claimed that Hinkson considered him to be his "best friend" and alleged that as a demonstration of such friendship Hinkson had given him the following items of valuable property: (1) $500,000.00 in cash; (2) a three-story office building that was under construction and nearly finished, which Swisher claimed Hinkson said he "didn't need" (it was in fact a building Hinkson was constructing as a call-center for telephone sales and marketing personnel); (3) a "Road Patrol" road grader (Hinkson did not own a Road Patrol grader); and (4) twenty 20 acres of real property behind the WaterOz factory (the acreage behind the factory was just a very steep canyon.)  Further, as a way of demeaning Hinkson to the jury, Swisher claimed that Hinkson lived in a "trailer", see EXHIBIT A-13, tax statement for Hinkson's house, a six-bedroom manufactured home, set on a concrete foundation with a walk-out basement, being held in fee simple title subject to a $250,000 standard bank home loan financed mortgage of the type that is not applicable to a trailer.

    b.   The above lies were a part of Swisher's plan to portray a close relationship with Hinkson to convince the jury that they had been "best friends" – to explain how it was that Hinkson might approach him, even beg him, to be a hit man.  The absence of truth behind Swisher's claims is staggering.  What best friend gives his entire accumulated assets to someone whom he had met on a chance face-to-face meeting a few years before and with whom he had only one very short phone call before

November 2002? EXHIBITS A-2, Affidavit of Hinkson, and A-4, Affidavit of Sandberg.

8. While Swisher and his so-called "lab" had been fraudulently billing and was paid by WaterOz for the prior two years, and supposedly testing the content of the WaterOz product, Hinkson had spent no time with Swisher who served as a mere vendor during that period. EXHIBIT A-2, Affidavit of Hinkson. Hinkson asserts, and other knowledgeable witnesses have stated that Hinkson and Swisher were not even "friends" let alone "best friends" see EXHIBITS A-2, Affidavit of Hinkson, and A-9, Affidavit of Towerton. Even Swisher in his own Affidavit dated January 3, 2003 gave no clue as to this "best friend" relationship. EXHIBIT A-15, Affidavit of Swisher.

9. Proof that Swisher was lying about this so-called "friendship" with Hinkson is found in the fact that he participated in a hostile takeover of WaterOz, by a TRO. Swisher and Richard Bellon, working with Lonnie Birmingham convinced an Idaho District Court Judge that Hinkson's absence from the business had created a void in management detrimental to the business.

    a. Swisher fraudulently described business related calamities so severe that the trial court was willing to give them an ex-parte order seizing possession of the business in order to "save" the company from what Swisher portrayed as certain disaster (after all, over 30 jobs in rural Idaho County depended on that business).

    b. When Swisher had achieved his goal, he threw out all personnel loyal to Hinkson and declared himself the CEO of WaterOz. Under Swisher's seven-day "management,"

customer lists and trade secrets of Hinkson's business were immediately stolen and passed on to competitors. See EXHIBIT A-9, Affidavit of Towerton.

c.    Within minutes of being presented with evidence that (1) there was an effective management team designated by Hinkson which had been running WaterOz, (2) that there was no likelihood of waste; (3) that the employee's jobs were secure; and (4) that Swisher and his collaborators were the authors of fraud, deceit, and thievery of Hinkson's property, the Court vacated the TRO and returned the management of the company to Hinkson's team. Unfortunately, permanent damage was done to WaterOz which has had a crippling effect on the company ever since. EXHIBIT A-9, Affidavit of Towerton.

10.    Even though he was in jail awaiting trial on criminal tax charges, Hinkson was able to demonstrate that Swisher had defrauded him and more importantly, committed a fraud on the State Court.

11.    On another occasion, also while Hinkson was in jail, Grangeville, Idaho attorney Britt Groom insisted that Swisher be designated as Hinkson's expert witness in a Boise Federal District Court hearing in the fall of 2003 in the FDA case. While Swisher was paid for testifying on Hinkson's behalf, he did not disclose or report Hinkson's alleged murder-for-hire solicitations, even though he had ample opportunity to do so while in the presence of Federal prosecutors.

12.    An additional lie told by Swisher, that is significant in proving his intent to defraud Hinkson, occurred when Swisher testified that he attended a barbeque with Hinkson and his "Russian" business partner at the home of Richard Bellon in September, 2002. The barbecue actually

occurred on November 10, 2002. EXHIBIT A-2, Affidavit of Hinkson. This statement was an outright lie and not a mere mistake of date, because Swisher knew that his heart surgery of September 15, 2002 which prevented him from attending a barbecue (or anything else) at any time in September. As described in Hinkson's Affidavit, this event took place on Sunday, November 10, 2002. The September date was significant to Swisher's plan to defraud because had it been accurate, it would have demonstrated Swisher's regular contact with Hinkson and Swisher's availability to perform as a hitman, as opposed to the reality that Swisher was sick, so sick he was near death in September both before and after the surgery, as shown by Swisher's own Affidavit, EXHIBIT A-15, dated January 3, 2003 and by Swisher's medical records, the production for which will be needed in discovery and by expanded record. As Swisher himself has said, he "died on the table." The proof that such a meeting could not have occurred in September 2002 is found in paragraph 11 of Swisher's own Affidavit signed January 3, 2003 that clearly states that on September 15, 2002, he was undergoing surgery for implantation of a double pacemaker. EXHIBIT A-15, Affidavit of Swisher.

13. If Mr. Hinkson is allowed to subpoena Swisher's medical records in discovery, they will show that Swisher underwent open heart surgery to insert the pacemaker on September 15, 2002 and, as he has said openly to many people, he "died on the table" in that surgery. Certainly, Swisher would not have been a candidate for Hinkson to solicit to murder people in July or August 2002 or December 2002 and January 2003 as he was sickly then and could not get out of his vehicle on his own power, EXHIBIT A-5, Affidavit Doty. His medical records will prove his disability and medical status. No jury would have believed that a

complex, brutal and very violent torture-murder plot involving spouses, children and the federal officials, could have been carried out by a man who was for all practical intents and purposes confined to either bed or a wheelchair, wearing adult diapers, unable to even care for himself. No jury would have believed that Hinkson would have made solicitation overtures to such a creature.

14. **Hinkson's Travel Prevented Him From Soliciting Murder**

a. The other substantiating factor as to why Hinkson could not have attended a barbecue with Swisher in September 2002, is that Hinkson was outside the USA and traveling in the Ukraine on business at that time, as various self-authenticating documents such as his passport, can attest to, if defendant is allowed discovery.

15. **Swisher's Fraud As to Solicitations**

a. Swisher deliberately did not select dates of actual meetings with Hinkson to purport that a solicitation occurred, such as the barbecue at the Bellon home on Sunday, November 10, 2002 or the "come to religion" meeting held November 22, 2002 at Swisher's rundown garage and laboratory in Cottonwood, Idaho where witness were present. Rather, Swisher invented dates so that no one else could have witnessed the events so as to create a credibility issue between himself and Hinkson over whether the meeting occurred; thereby establishing a bogus "he said/she said" conflict, where

if Swisher portrayed himself as a wounded combat hero, and obtained unassailable credibility thereby[1], his word would more than likely prevail.

b. Unfortunately for the government, the dates selected by Swisher were those when either Swisher or Hinkson or both could not have held a meeting at the WaterOz factory in the Grangeville area of Idaho. Consider also that a person in a wheelchair could not have climbed the stairs to hold such a meeting in Hinkson's office at WaterOz as Swisher perjured himself by claiming.

c. Swisher was not counting on the fact that Hinkson had an extensive travel schedule in 2002 that took him out of Idaho and sometimes out of the country,[2] and Swisher's own medical records disqualified him from such a meeting or from being physically able to perform the duties of a hitman; i.e., he was so sick that he was either in a coma, or bedridden and unable to get up, or strapped into a wheel chair on diapers with a catheter and bladder bag — hardly the picture of a ferocious hitman, capable of performing torture-murder on a collection of potentially a dozen people, considering family members who were supposedly part of the targeted individuals.

d. There are three supposed meetings in 2002 when Swisher claimed Hinkson solicited him to commit murder. With the story of solicitation for torture-murder of attorney Albers and family supposedly occurring in April 2002, Swisher set the stage for the

---

[1] Porter v. McCollum, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009), cited here for the proposition that courts, including the US Supreme Court acknowledge that military veterans, especially decorated ones, are generally accorded very high credibility by juries.

[2] The fact that Swisher didn't know that Hinkson was both out of the country and gone from Idaho on other travel only proves that he was not in frequent contact with Hinkson, and was, in fact, not in contact with Hinkson at all, on any subjects, much less the alleged solicitation.

later solicitations to kill federal officials. He triggered juror outrage by claiming that Hinkson had demanded that the federal officials be killed "in the same way" as proposed for the Albers family: the jury was programmed to believe that Hinkson was a heartless mass murdering-serial killer; and, a fact, if true, would have been a correct characterization.

e.    However, as to the April 2002 time frame, Hinkson had gone to the Ukraine to scout the purchase of a bottling plant and was not in Idaho, which means the meeting could not have taken place. See EXHIBIT A-4, Affidavit of Sandberg and EXHIBIT A-2, Affidavit of Hinkson. Without the evidence of the April solicitation as Rule 404(b) evidence of prior bad acts, the case against Hinkson lacked the horror factor needed to shock the jury into a guilty verdict. Such evidence would have been inadmissible except that Swisher had committed fraud (perjury) and claimed that he was conducting meetings regarding murder when instead his life was hanging by a thread and he was wrapped up in medical procedures, unable to get out of bed or even walk.

f.    As to the time period of "July or August of 2002" which Swisher attested was the time that Hinkson supposedly solicited him to kill two federal officials, Cook and Hines, Swisher was bedridden and may have been in a coma for much of that time following his massive heart attack in early June that left him disabled for months until his pacemaker was installed on September 15, 2002. See EXHIBITS A-15, Affidavit of Swisher dated January 3, 2003; A-9, Affidavit of Towerton; A-4, Affidavit of Sandberg; and, A-2, Affidavit of Hinkson.

g.    Not only was Swisher unavailable to meet with Hinkson and unavailable to be solicited by Hinkson but Swisher was unable to meet because of his health disabilities. Very importantly, Hinkson was traveling out of Idaho during most of the time period, except for one brief two and a half day period, when Hinkson did a fast turnaround between a family vacation and boarding a plane that would take him out of the country on a business trip on August 1, 2 and 3. EXHIBITS A-2, Affidavit of Hinkson, and A-9, Affidavit of Towerton. The details of the vacation and the follow up business trip are contained in the Affidavits just cited, confirmed by the departure date as stated on his passport, which is being held by the US Department of State in Washington D.C. and can only be released in discovery upon a written Order of this Court.

h.    The two and a half day turn around in Idaho, between the month-long driving vacation from June 30, 2002 through August 1, 2002 leaves no doubt that Hinkson could not have attended a meeting with Swisher who was confined to bed and near death recovering from a very serious heart attack (see Swisher medical records to be subpoenaed in discovery in this 2255 proceeding).

i.    On the return side of Hinkson's driving vacation, at the end of July, Hinkson drove his children from Boise to Grangeville on Thursday, August 1, 2002 and prepared his boat for a trip to Dworshack Reservoir the next day. Early the following morning, Hinkson left Grangeville to make the 1½ hour drive to Dworshack Reservoir and spent the day boating with his children, returning after dark. The next morning, having re-packed overnight, Hinkson left early for Lewiston, Idaho to fly to Caracas,

Venezuela to launch a new diamond buying & selling business. The window of opportunity for a meeting that might have included the solicitation described by Swisher was not only remote, it was impossible. EXHIBITS A-2, Affidavit of Hinkson, and A-9, Affidavit of Towerton.

j.   After Hinkson flew out of Lewiston, Idaho at approximately noon of August 3, 2002 he was away from Idaho for almost three months, or until November 1, 2002. On approximately November 1, 2002, Hinkson returned to Idaho and the WaterOz factory with a prospective Ukrainian business partner, Roman Ponomarenko EXHIBIT A-3, Affidavit of Ponomarenko. Hinkson's itinerary included a ten day trip to Venezuela and then a return to Florida where he attended a two-week class on diamonds. Without returning to WaterOz or Idaho Hinkson left Florida and flew to Ukraine to meet Mr. Ponomarenko who served as his translator.

k.   Hinkson was on a business and professional tour of Russia and Ukraine, speaking to groups of doctors and government officials interested in WaterOz products. Hinkson also was tracking sites where he might be able to locate a bottling plant for local manufacture of his product. After Hinkson returned to Idaho and his factory on approximately November 1, 2002, he saw Swisher at the Bellon home for a barbecue on November 10, 2002. Swisher, who was still very sick, had to be lifted out of his vehicle into a wheel chair and strapped down so that he did not fall over from weakness. Swisher who was catheterized with a bladder bag hanging from his leg had the edges of his diapers showing, casting the image of a pathetic figure rather than one capable of extreme violence as a robust, combative, and vicious hitman.

l.  Swisher's physical condition did not change much during December 2002 or January 2003, see EXHIBIT A-5, Affidavit of Doty. In fact, Swisher's fellow US Marines reported that as of the summer of 2003, he was using a cane, unable to engage in physical activity and continued to be catheterized from the heart attack he suffered a year before; see EXHIBITS A-6, Affidavit of Lewis and A-7, Affidavit of Brockmann.

m.  As to December 2002, Hinkson was in Southern California at a health conference. Swisher was too sick to get out of his own vehicle and certainly could not have climbed the stairs to Hinkson's office. In fact, according to Debbie Doty, he was too sick to get out of his vehicle and come in to pick up his own products, EXHIBIT A-5, Affidavit of Doty, which she had to take outside and load into his car as he sat there detailing his complaints regarding what ailed him.

16.  In January of 2003, Swisher came to WaterOz to pick up products given him by Jeri Gray and he was in no condition to climb stairs to meet with Hinkson and again was dependent upon WaterOz staff to bring his products out to his vehicle, see EXHIBIT A-5, Affidavit of Doty.

a.  Swisher was persona-non-grata at WaterOz for his attempt to extort money along with a half ownership interest in Hinkson's company, see EXHIBIT A-2, Affidavit of Hinkson, so that he could not come into the factory after January 3, 2003.

b.  In fact, according to Hinkson, Swisher threatened that if he did not pay over $800,000 and sign over a **half interest** in WaterOz, he, Swisher, would testify against Hinkson and Hinkson would spend the rest of his life in prison. Although

Swisher was referring to the crime of adulterated products (cyanide in WaterOz potassium), by which Swisher was planning to set up Hinkson for a further FDA violation, the threat demonstrates that Swisher was considering using perjured testimony as a means to destroy Hinkson's business life; see EXHIBIT A-2, Affidavit of Hinkson, and EXHIBIT A-14, Swisher Letter of February 3, 2003 transmitting the sample of "WaterOz Potassium" laced with cyanide to an independent lab in Kellogg, Idaho for testing; also see EXHIBIT A-11, Lab Record of cyanide laced material and see FDA report, along with EXHIBIT A-12, FDA Investigation Notes, the full report of which needs to be obtained in discovery, showing that Swisher made good on part of his threat to expose WaterOz for allegedly selling adulterated products which notes a report of cyanide in a WaterOz product.

17. Given the repeated pattern of lies, forgery, fraud and perjury, by Swisher before the federal hearing officer in his VA matter, and his repeated attempts to take over the business of WaterOz by fraud, stealth and deception, a clear motive exists for lying about the grandiose, extremely violent, torture-murder-for-hire scheme portrayed by Swisher in the solicitation case. It also shows that Swisher, on at least two occasions, telegraphed his intention to used perjured testimony against Hinkson as a means to enforce his extortion attempt, which is the ultimate weapon described by Swisher, testimony against Hinkson in Federal Court, and as used in the solicitation case on January 14, 2005.

18. For some of, or all of, the foregoing, the fraud committed by Swisher on Hinkson and this court, it is clearly demonstrated that Swisher was attempting to wrest control and ownership of WaterOz away from Hinkson, was attempting to benefit thereby in material and valuable

ways, and that his testimony, in its entirety should be stricken, completely discredited and ignored.

19. No reasonable jury would have ever believed Swisher had these facts been allowed to be present to them at trial.

20. **Government complicity in Swisher perjury**

   a. Swisher was convicted of forgery, perjury, and theft of government property in a District of Idaho Case, No. 07-cr-182-BLW with a guilty verdict being entered on 4/10/2009, well after the appeals to the 9th Circuit were heard in this matter of US v Hinkson.

   b. At the time of trial, the government came into possession of the "Dowling Report", an official, self-authenticating, government document. A document which **proved at that time** that Swisher had perjured himself in the Hinkson trial by his claims of combat valor and awards from his military record.

   c. The government knew that their star witness, Swisher, was a liar, and that he'd perjured himself during his testimony at trial. By failing to move to strike their own witnesses testimony based on the Dowling Report as proof of perjury, the government prosecution team suborned Swisher's perjury as it was used by the government extensively during their closing arguments and elsewhere during the trial AFTER receipt of the report. In so doing, the government prosecution is actually guilty of misprision of a felony, *i.e.,* the failure to report criminal conduct that occurred before their very eyes and by their authority. They were co-conspirators and committed a crime by having Swisher testify or at least failing to move to strike his

testimony when they obtained the Dowling letter. The government certainly knew someone in the prosecution business, and should have had Swisher charged for his perjury, forgery and fraud in the Hinkson case, as he was in the VA case 07-cr-182-BLW.

    d.    That Swisher was proven a liar by the Dowling Report is bad enough. However, the fact that Swisher was proven guilty of the same perjury (falsifying his military records) during his own trial, is now the ultimate in newly discovered evidence, because it is the conviction of that fraud that was lacking at the time of Hinkson's trial, which would have disqualified Swisher as a credible witness in the Hinkson case. All testimony of Swisher from the Hinkson case was suspect as perjury and because it was pervasive and inextricably connected to all the other aspects of the Swisher counts, and all such testimony should be should be stricken from the record now in this §2255 proceeding and the case dismissed.

    e.    In fact, that is what the government should have done, upon learning that Swisher was a liar from the Dowling Report, it should have moved to strike all of Swisher's testimony. The Government's failure to have done so then does not prevent this court from doing the right thing now. Striking all of the Swisher testimony means that the Swisher counts in the Solicitation case must be dismissed, with prejudice.

21.    As proof that the credibility of Swisher, as fraudulently established through the display of Military combat decorations and the statements elicited by the prosecution, did in fact have a significant and detrimental effect on the verdict, is established by EXHIBIT A-:8, Affidavit of Ben Casey, appended hereto. Mr. Casey's testimony is clear and unequivocal: **Mr. Casey**

**would not have found Hinkson guilty had he known that Swisher lied about his military service and combat records.**

FOR THE REASONS set forth above, the conviction and sentence on the Swisher Counts, 7, 8 and 9 in this case should be vacated and the matter remanded for a new trial or dismissed with prejudice.