# EXHIBIT A-1

Affidavit of Wesley W. Hoyt

State of Idaho     )
                      ss.
County of Idaho    )

I, Wesley W. Hoyt, the Affiant, a resident of 165 Deer Field Dr., Clearwater, Idaho 83552, County, Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state under penalty of perjury pursuant to 28 USC §1746 as follows:

1. I am an attorney licensed to practice law in the States of Idaho and Colorado, having been first admitted in 1972. I was one of the attorneys of record representing David R. Hinkson in the following Federal District Court cases in the District of Idaho: 02-cr-145-RCT (the "Tax Case") and 04-cr-127-RCT (the "Solicitation Case").

2. My co-counsel in 04-cr-127-RCT, attorney Thomas Nolan, of 600 University Ave., Palo Alto, California 94301 was not admitted to practice in Idaho. For him to practice in this court he needed an Idaho attorney to provide a *pro hac vice* admission for him.

3. Mr. Nolan was retained by Mr. Hinkson in November 2004 and we agreed that a primary objective was to obtain the military record of Elven Joe Swisher, a government's informant. Swisher had attached himself to WaterOz, Mr. Hinkson's business and found a way to profit from the association providing laboratory testing for the products starting in 2000. By 2002, Swisher was billing and receiving between $2,000 and $3,000 per month from WaterOz for testing its products. For WaterOz, product testing was essential as it ensured that the mineral content of the products matched the representations on the labels; compliance with the "branding" requirements of the law of such products was enforced by the FDA. In a 42 count Indictment which was issued in July 2002 in the Tax Case, but held for service until November 21, 2002, among other thing, there were counts alleging misbranding of Hinkson's WaterOz products. When that Indictment was served, Mr. Hinkson became aware that his products had been tested by an independent lab and found to be substantially less than the labels provided.

4. Background information had already been obtained on Swisher which included hundreds of pages of deposition testimony from other Swisher cases in 1996 to 1999 where he was accused of defrauding California doctors and other investors in a scam related to his gold mine and his purported secret gold processing formula. There also was the court file related to Swisher's 1980 prosecution for sexual assault of all three of his daughters when under 10 years old.

5. In November 2004, a nationally known investigator was hired to obtain Swisher's military record and together, we worked on locating that file. As it turned out, the Swisher military file could not be obtained as it had been sequestered by the Commandant's office of the US Navy and Marine Corps in Washington D.C. to facilitate a fraud investigation to determine if Swisher's claims of Korean War Era combat heroism were true.

6. Swisher, in order to obtain a financial benefit from the VA, claimed that he was a wounded and decorated combat hero. The specific allegation by Swisher was that he was in the Korean War, but when it was pointed out that his birthdate proved he was 13 when the Korean conflict started and 16 when it ended, the story was not believable. Swisher modified his story by claiming that he was wounded in a post Korean War secret mission as a member of an expeditionary force whose assignment it was to liberate prisoners of war held in secret prison camps in North Korea. Swisher claimed to have received multiple medals and awards for heroism but, because of the secret nature of the mission, he had not been allowed to talk about it and the fact of the awards and the underlying mission had been kept top secret by the military; hence, he claimed, he had been deprived of VA benefits.

7. The investigation by the Commandant's Office of the USMC ended with the report of a Colonel Dowling issued December 30, 2004. The conclusion was that all of Swisher's claims i.e., claims of combat, stories of having been wounded in action, being decorated for heroism and being entitled to VA medical benefits was a total fraud based on the forgery of his US military discharge document, a form DD-214.

8. Trial started January 10, 2005 and Swisher testified on January 14, 2005. Investigative efforts had not been able to locate his military file by that date because, as it turned out, it was being held in the Commandant's office. In his testimony, Swisher claimed under oath that the above items of combat heroism and awards were true and that the forged DD-214 was an authentic US Government document. Swisher even perjured himself to state that the copy held in his hand had been certified by the Commandant's Office of the US Marine Corps, which was not true, the certification came from the Idaho County, Idaho recorder stating that such document had been previously been recorded in that county.

9. The record arrived in the trial court several days later after one of the record keepers in the office of the National Records Center had written a letter explaining that Swisher's file did not contain any evidence that he had received medals. Swishers file showed that he had joined the Marines after the Korean conflict ended and that during his tour of service he had not been in combat or wounded but he had been court marshaled and reduced in rank from a corporal to a private first class. Before his discharge, he was injured in a motor vehicle accident in Bremerton, Washington and apparently was hospitalized for a short time. He did not acquire any VA benefits from this injury or from his military service.

10. By June 2002, some 45 years after his discharge from the Marine Corps, Swisher suffered a massive heart attack and almost died according to his and his wife's account. He received treatment in the VA hospital, Spokane, Washington. But, since he had not previously had any veteran's benefits granted by the VA, his right to receive free medical attention came into question. In order to provide for payment of his medical bills, he needed a story to explain why he was, so late in life, seeking benefits. It was not clear why, if he had been entitled to benefits since the late 1950s, he had not used them.

11. Swisher's medical bills were extremely large (over $100,000, see judgment in Case No. 07-cr-182-BLW) from his heart attack when he was near death and in a coma and in the ICU or otherwise bedridden for a large part of his stay throughout the summer of 2002. By September 15, 2002 he had open heart surgery to install a pacemaker (see Exhibit A, Affidavit of Swisher) and Swisher was fond of saying he had "died on the table".

12. In order to obtain payment of his medical bills from the VA, Mr. Swisher developed the above mentioned fraud story of a top secret mission and being wounded in combat in North Korea after the war to rescue POWs and the secret nature of the mission was supposedly what kept him from obtaining VA benefits previously. When this was presented to the VA in mid-2004, it was the grandiosity of the tale with all the medals he awarded to himself that first caught the eye of Ben Keeley of the Lewiston, Idaho Office, US Veteran's Administrat-ion. Swisher had even written a book about his purported courageous exploits in Korea from which he borrowed the story line and actual experiences of other decorated servicemen from WWII and the Viet Nam conflict and from movies such as MASH and its follow up TV series. In fact, Swisher's book, "A Marine Remembers", contains many direct quotes from the script of the movie "Sands of Iwo Jima" plagiarized as if those words were original to Swisher. On the list of awards were some of the highest and most prestigious medals the U.S. military has to offer, all spread out on of his forged DD-214 including the Purple Heart, the Bronze Star (twice), Silver Star and the Navy and Marine Corps Commendation Medal which had been created many years after Swisher was discharged from the service.

13. In spite of some of the more obvious mistakes, the VA had conditionally agree to pay Swisher's medical charges because of its internal rules required it to give the benefit of the doubt to veterans, provided there was some reasonable evidence of a valid claim. The VA reserved the right to investigate his claims of wounds, combat heroism, entitlement to military awards pending the investigation by the Commandant's Office of the US Marine Corps.

14. Swisher's background reveals that he concocted a number of extortion schemes against Mr. Hinkson and with each one he threatened, that if he did not get what he wanted, he would testify against Mr. Hinkson who then would spend the rest of his life in

prison. For instance, in a January 3, 2003 phone call to Mr. Hinkson, Swisher's extortion was, in exchange for not testifying in federal court that there was poison in his products, Swisher demanded $800,000 and a one-half interest in Mr. Hinkson's lucrative dietary supplement business known as WaterOz. Swisher had laced a sample of Hinkson's WaterOz potassium with cyanide and when Hinkson immediately turned down that extortion offer, Swisher sent the cyanide laden product to a lab for testing (Exhibits A-11 and A-14). Also, when he did not get what he wanted, the complaint of cyanide in WaterOz products was turned over to the FDA (Exhibit A-12). Because there never was any verification of that claim, the FDA did not act on it and no other such complaint has ever surfaced nor has any product user ever been harmed. Also, a few days after being turned down on the first extortion attempt, Swisher developed another extortion scheme by claiming that Hinkson had agreed to purchase from Swisher for $12,000 an out-of-date Atomic Absorption Machine and claimed Hinkson had agreed to buy it for that price (Exhibit A-10). Further, Swisher fraudulently claimed Hinkson owed him approximately $5,000 in past bills which had been paid by WaterOz (Exhibit A-13). By the summer of 2003 when these bills had not been paid, Swisher again threatened to testify against Hinkson, whom he said would go to prison for the rest of his life if his bills were not paid. In the office of Hinkson's lawyer, Britt Groom, and in front of Gregory Towerton (who later became manager at WaterOz) Swisher claimed that $10,000 was due and if not paid, he would testify and Hinkson would spend the rest of his life in jail (Exhibit A-9). In September 2003, Swisher claimed that on a visit to WaterOz, Mr. Towerton had frisked him, implying physical harm and potentially a lawsuit for damages, but there was no evidence of physical contact. Swisher's pattern had become established, he would make up a story which could result in financial gain to him and he would threaten some serious consequence that involved the legal system.

15. In December 2003, Swisher filed for and obtained a Temporary Restraining Order giving him control over the WaterOz factory by fabricating another story that required a week to unravel before the Idaho County District Court vacated the TRO, returning the control of WaterOz to those whom Mr. Hinkson had designated as his management team. Again, following his pattern, when the TRO was vacated and Swisher did not get what he wanted he escalated his demands and threatened more entanglement in the legal process. This time he demanded: $500,000 cash; 20 acres behind the WaterOz factory; a three-story building; and a Road Patrol road grader. Swisher did not obtain any of these items, but later in the Solicitation Case, he testified that Mr. Hinkson had given all of those items to him as a gesture of friendship.

16. In September 2003 Swisher had managed to have his attorney, Britt Groom, who also was Hinkson's attorney, hire Swisher as Hinkson's expert on dietary supplement products. Swisher testified in federal court at a hearing in mid-September 2003, but, never mentioned to anyone, prosecutors, FBI, IRS or court personnel that he had been solicited to murder federal officials. Swisher was paid $5,000 for that expert testimony.

17. By trying to make it appear that Swisher and Hinkson had a close relationship, it was Swisher's intent to created a plausible story that Hinkson somehow would know of Swisher's personal military career details that Swisher had killed "many, too many" in combat. This then was the link to getting the jury to believe that Hinkson was close enough to his "best friend" Swisher to ask and then beg Swisher to torture-murder Hinkson's supposed enemies and their family members, women and children included.

18. After the November 21, 2002 raid on the WaterOz factory by the FDA and other federal agencies, it was discovered by Mr. Hinkson that the results of his WaterOz product testing as reported by Mr. Swisher for the past two years were bogus. From the evidence, it appeared that Swisher was not performing any testing but rather simply certifying, in writing, that the amount stated on the labels was the amount in the WaterOz liquid mineral product. On occasion, Swisher would send samples of WaterOz products out to be tested by other labs, in an effort to tie his reports to reality, but, Swisher was charging as if he was conducting all testing regularly, which itself involved a separate fraud.

19. According to the Affidavit signed by Mr. Swisher on January 3, 2003, (attached as Exhibit A), he blamed a WaterOz employee, Karl Waterman, alias "Chris Jon Paitreyot" for the low mineral content in products sold by WaterOz, and theorized that Chris had added just enough mineral concentrate to the samples delivered for testing at his Cottonwood, Idaho "laboratory" that the samples proved to be the same as the labeled amount in Swishers reports.

20. Mr. Hinkson maintains would be impossible for anyone to pour the exact amount of concentrate, used with a 1,500 gallon tank, into a 16 Oz bottle of product and come up with the exact label amount every time. With 22 bottles of product to be tested monthly, the possibility of that happening consistently over a two year period, would be statistically impossible.

21. Since that was Swisher's theory, Mr. Hinkson wanted him to put it in writing so he could not change it at another time. According to Mr. Hinkson, it was later that same day, January 3, 2003, after Swisher signed and returned the Affidavit dated January 3, 2003, that he called Mr. Hinkson and made an extortion demand in which he said he wanted $800,000 in cash to be paid by Hinkson and a one-half interest in WaterOz signed over to him or he would testify against Hinkson in Federal Court and as a result, Mr. Hinkson would spend the rest of his life in prison. In the January 3, 2003 extortion incident by Swisher, the threat was based on cyanide in the WaterOz products.

22. Both the extortion demand of January 3, 2003 as well as the demand for payment of Swisher's fraudulent overdue bill made at Britt Groom's office in July 2003 in the presence of Gregory Towerton carried with them the threat that Swisher would testify

Affidavit of Wesley W. Hoyt – Page 5

against Hinkson in federal court and as a result Hinkson would spend the rest of his life in prison.

23. There is a similarity between the different schemes by Swisher to collect something of value from Mr. Hinkson and the story by Swisher in the Solicitation Case. At first there was the threat to testify about cyanide in Hinkson's product in January 2003, then to testify against Hinkson in July 2003, both of which would, Swisher said, result in life imprisonment so the actual consequence of Swisher's testimony from the Solicitation Case, effectively life in prison, is not far off the mark of his stated goal from two years earlier. Although the reason for the testimony changed, the theme remained constant, it was that Swisher threatened to give fabricated, but very harmful testimony about Mr. Hinkson in federal court. When Mr. Hinkson refused to accept the offer of extortion, Mr. Swisher then, in the case of the cyanide, turned over a false report to the FDA, with no adverse effect on Mr. Hinkson. In the case of the murder-for-hire plot, Mr. Swisher was able to obtain a different result, as shown by the verdict in the Solicitation Case.

24. Mr. Nolan, who acted as lead counsel in the Solicitation Case was totally ineffective in his representation of Mr. Hinkson. Because he was confused about the counts it is no wonder that he did not understood this concept of extortion by Swisher, nor did he present any such evidence in Hinkson's defense.

25. As Mr. Nolan's co-counsel I was totally ineffective in my attempts to represent Mr. Hinkson in the Solicitation Case from lack of criminal trial experience in Federal Court.

26. Mr. Nolan, in his memorandums regarding the Solicitation Case stated that he was always "confused" by this case. (See attached, Exhibit D-1), correspondence from Thomas Nolan of January and February 2005).

27. Mr. Nolan stated in writing that he was confused about the counts, which he could not get straight in his mind during the trial. The trial record shows that Mr. Nolan was confused as to who the witnesses were, what they had to say, and why the testimony of each might be relevant to Mr. Hinkson's defense. For instance, on more than one occasion, Mr. Nolan referred to witness by the wrong name.

28. Mr. Nolan admitted in writing that he was confused about the Dowling Report proving that Swisher's claims as an injured combat veteran from the Korean War Era were bogus and said that he suspected the Gov't had it before Swisher's testimony, but he did not know how to go about proving it. Even though the date received stamp on that Report was January 10, 2005, it was faxed to an undisclosed location on January 13, 2005 and Swisher testified on January 14, 2005. (See attached Exhibit B, copy of the Dowling Report.)

Affidavit of Wesley W. Hoyt – Page 6

29. Mr. Nolan stated that he believed that there was no investigation of Swisher, when in fact on numerous occasions I asked Mr. Nolan to review the hundreds of pages in my files of Swisher's prior deposition and trial testimony in other cases where he was accused of fraud, including the case involving the TRO and takeover of WaterOz from December 2003 with hearings extended into February 2004. Mr. Nolan refused to review the investigative files containing information regarding Swisher and therefore, was not prepared to examine him when he was called as a witness in the Solicitation case. Mr. Nolan did come to Denver in November 2004 to meet with two investigators and the family of David Hinkson where a case plan was discussed. However, he took no active role in case preparation.

30. Mr. Nolan stated that he believed that there was no investigation of Swisher, when in fact on numerous occasions I asked Mr. Nolan to review the hundreds of pages in my files of Swisher's prior deposition and trial testimony in other cases where he was accused of fraud, including the case involving the TRO and takeover of WaterOz from December 2003 with hearings extended into February 2004. Mr. Nolan refused to review the investigative files containing information regarding Swisher and therefore, was not prepared to examine him when he was called as a witness in the Solicitation case. Mr. Nolan did come to Denver in November 2004 to meet with two investigators and the family of David Hinkson where a case plan was discussed. However, he took no active role in case preparation. Nolan mentions as if it was an important issue that he could not establish a financial interest in WaterOz for either Bellon or Swisher with which to impeach them because neither witness wouldn't admit it on the witness stand. But, although Nolan was told about the Bellon/Swisher takeover of WaterOz by Temporary Restraining Order, attorney Nolan refused to use that highly damaging information, showing the used of force to take what was not theirs, in order to impeach them. Again, Nolan was confused and missed the point that any reasonable attorney would have seen: that both witnesses, conspired to take over WaterOz by the force of a TRO and they succeeded for a short period of time. And that takeover gave them control, which is the same as a financial interest. And they used the takeover and financial interest to steal valuable assets of WaterOz while Mr. Hinkson was in jail and could not defend himself causing permanent damage to the business. There was evidence that Bellon contacted a business broker who would have testified that Bellon called within minutes of the issuance of the TRO and demanded that the broker to find a buyer for WaterOz; which explains how it was that Messers Bellon and Swisher were really going to "save the company" they had gained control over by TRO (i.e., they were going for a quick sale and obviously split the profits while Hinkson was in jail). What more would any attorney who met the standard of objective reasonableness need to know than Swisher and Bellon obtained a controlling interest in WaterOz by force through a TRO and thus had an expectancy of a financial interest in the business (albeit for only a few days until the TRO was vacated).

31. Mr. Nolan's statement that the prior lawsuits against Mr. Swisher was completely inaccurate because those files were available but he refused to look at them. In fact, Mr. Nolan would not ever sit down and look at any of the information I had accumulated in preparation for the defense of Mr. Hinkson, which included several hundred pages of Swishers depositions in three lawsuits from 1996-1999 involving Swisher's fraud of doctors who had invested in a mineral extraction process and/or mine claims; prior grand jury testimony before the indictment in the Tax Case; the documents related to Swisher's prosecution for raping all three of his daughters 1975-1980; the lawsuit papers, transcripts of trial and his deposition from the WaterOz takeover case that started December 3, 2003 and continued into February 2004.

32. Before and during trial, Mr. Nolan did not want to look at anything pertaining to the case against Mr. Hinkson; all he wanted to know on the few occasions that we met was, where was his check, and when he received his check, he left immediately from that meeting, did not take any information with him and never did any analysis other than read the pleadings and a summary of witness information which I had prepared. I was very concerned about the trial because Mr. Nolan would not engage in any pretrial case analysis.

33. While Mr. Nolan says that he felt that neither he nor I fell below "the standard," it was quite obvious to a knowledgeable observer that he and I both were operating below the standard in the community for competent representation of our client and that was based on the fact that Mr. Nolan willfully refuses to look at the file, other than a cursory look at the pleadings and a summary of the investigation of potential witnesses.

34. In aid of the defense of Mr. Hinkson's case, I rented a separate hotel room in Boise a week before trial and created an office where the bed was pulled out. Five tables were set up around the room which had 15 boxes containing all the information about the case which had been gathered. I was ready to give that information to Mr. Nolan chapter and verse, in minute detail if he wanted it, however, when he came to that room once before trial, all he wanted was his check and he left town. I, in consultation with Mr. Nolan, set dates and times for meetings so that Mr. Nolan and I could discuss the case and I could present him with document supporting points that needed to be raised; and each time I was fully prepared and ready to give him a full and detailed briefing. Nolan repeatedly missed those meetings or if he showed up, all Nolan wanted was his check and when he got it, he abruptly left town. I, on one occasion deliberately withheld the installment check due that day in an effort to engage Mr. Nolan in a discussion regarding several points needing his attention as lead counsel. He visibly became angry, demanded the check, refused to engage and stormed out when he received it. The point is that Mr. Nolan did not want to be bothered by any details of this case, such as advance preparation for the cross examination of Mr. Swisher.

35. Look, I know I was operating below the standard and could never have taken this case myself. Nolan, the great, was there to guide the proceedings, except he refused to provide any guidance. He says that opinion (not being below the standard) can be challenged...Yes it should be challenged.

36. Mr. Nolan's criticism about not getting the military record of Mr. Swisher in time to help with the defense of the case was simply not true. It was not learned until mid-January 2005 that the file had been sequestered in the office of the Commandant of the US Marine Corps because a confidential investigation was ongoing. All we knew was that throughout the fall of 2004, as we checked every week with the National Records Center, the file had been checked out by some undisclosed party and we would be notified when it was returned so that it could be subpoenaed.

37. The file was actually returned to the National Records Center about the time that Judge Tallman in the Solicitation Case issued his subpoena for it to be produced in his court room. The defense team had no way to obtain it because it was an arm of the US Government that was sequestering the file and another arm of that Government was prosecuting Mr. Hinkson and pointing the finger at the defense saying, see, you were not diligent, you should have obtain the file and your failure is not our fault. Even the Judge, another arm of that same Government joined in that criticism in his Order Denying the Motion for New Trial and made the same ridiculous assertion that somehow, the defense team was less than diligent for not coming up with Swisher's military record before trial when it was held by the Commandant's Office of the US Marine Corps in charge of the investigation into Swisher's fraud and criminal conduct.

38. After the trial started, and at the time Mr. Swisher testified, the best we could do (without the help of the two investigators who were hired) was to obtain a letter a Mr. Tolbert who stated that Mr. Swisher was not entitled to any awards. Even he said that he did not have the file in hand yet. All of this searching for the Swisher military record was conducted by my office without the help or support of Mr. Nolan. Because we were able to come up with the Tolbert letter during trial, we were able to request that the judge to subpoena it.

39. Mr. Nolen did not handle the management of trial issues according to the standard expected of a competent trial lawyer. He did not even meet with Mr. Hinkson, ever.

40. One of the most amazing admissions is that Nolan says he took Swisher's Military file home and then decided not to look at it...what is that? Was that below the standard?

41 Nolan says he could kick himself for not going after Swisher on cross...what is that? Was that below the standard?

42. Nolan implies he made a tactical decision to drop the Motion for Mistrial...what is that? Was that below the standard when he knows, as he said, that Swisher's credibility was the only issue in the case...What is that?

43. Nolan makes a big deal about the putative financial interest that either Bellon or Swisher had in WaterOz which he had trouble proving because they wouldn't admit it. But, he misses the point, both of them conspired to take over WaterOz and they succeeded for a short period of time. That takeover gave them control, which is the same as a financial interest. Bellon even had a business broker who would testify that Bellon called him 5 minutes after the TRO was issued and asked the broker to find a buyer for WaterOz. So that's how the dirty bastards were going to save the company, they were going to sell it and split the profits while David was in jail. What more do you need to know than Swisher and Bellon had a financial interest or at least an expectancy? They conspired to steal WaterOz and almost got away with it had it not been for....

44. Nolan was completely incompetent on this case, nothing he did was tactical, it was all incompetence from neglect and I would so testify.

Further Affiant sayeth naught.

I declare under penalty of perjury that the foregoing is correct this 16th day of April 2012.

_____
Wesley W. Hoyt

# EXHIBIT A-2

State of California   )
                  ss.
County of Merced   )

     I, David R. Hinkson, the Affiant, a resident of US BOP Atwater, California, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state under penalty of perjury pursuant to 28 USC §1746 as follows:

1. In early 2002 I traveled to Ukraine looking for a bottling plant to purchase where I could manufacture ionized mineral products for my business, WaterOz. My factory was then and still is located near Grangeville, Idaho. I am a prisoner and have no access to this information but my passport shows the exact dates of my arrival in Ukraine and return to the U.S.

2. After my return from Ukraine in early May 2002, I prepared for another business trip to Ukraine with my son Matthew who was helping me develop a data base of potential sites. Our departure from Idaho was planned for early June 2002 and we were going to spend three weeks looking for locations to convert into a WaterOz factory in Ukraine or Russia.

3. In early June 2002, the day before I left for Ukraine, while on a speakerphone with Elven Joe Swisher of Cottonwood, Idaho (of Northwest Analytical) it sounded as if he fainted or passed out shortly after I called him. During that call, Bob Sandberg, a consultant to WaterOz was in my office when Mr. Swisher suddenly quit speaking. We heard a thud and the sound of the phone receiver being dropped then silence. Moments later, a woman's voice could be heard screaming "Oh my God! Oh my God! Oh my God!" and then the phone hung up. I had met Mr. Swisher on a few occasions previously and knew that his company Northwest Analytical had been designated by Geri Gray, the manager of WaterOz, to do product testing. This incident with the phone going silent stood out in my mind as I was surprised that something this unusual would happen with a virtual stranger.

4. The next day after that short phone call with Mr. Swisher, I learned from Geri Gray that his wife had called to say her husband, had collapsed during the above mentioned phone call, becoming unconscious. I learned that Mr. Swisher had to be life-flighted from Cottonwood, Idaho, to Sacred Heart Hospital in Spokane, Washington. Ms. Gray did not expect Mr. Swisher to live and was concerned what company would be testing the WaterOz mineral products in the future.

5. Later that next day, my son Matthew and I left on the previously planned business trip for Ukraine and were gone for approximately three weeks. My passport and Matthew's passport show the exact dates of our arrival in Ukraine and return to the U.S. During my absence, I kept track of my WaterOz business by staying in touch with Ms. Gray by cell phone.

6. Matthew and I returned from Ukraine on the last day of June 2002. We both repacked our travel belongings then Matthew and I immediately departed with the rest of my children on a family vacation. We had decided to spend the month of July traveling by vehicle. On July 1, 2002, we immediately drove south through Utah and then into western Colorado. Before leaving on that driving vacation on the first day of July 2002, I learned that Mr. Swisher, who had been in the hospital, was still in a coma from his heart attack.

7. Our first stop on this July 2002 vacation was at my parents' home in Ouray, Colorado, where we spent the Fourth of July holiday (there was a bit of a disappointment because the Ouray town fireworks were canceled due to a forest fire). Then we drove to Las Vegas, Nevada, where I raised my children until 1997. We stayed in Las Vegas for a week visiting friends and participating in tourist activities there and then drove to California to visit theme parks and various attractions there through the remainder of July 2002. We completed this driving vacation on the last day of July 2002 when we arrived in Boise, Idaho. My ex-wife and her new husband and his children also converged on Boise at that time. All of us went to a local area waterpark that day and spent the night in Boise. The next day we all drove back to Grangeville on August 1, 2002.

8. While I was out of Idaho and on that family driving vacation for the month of July 2002, I communicated daily with Geri Gray by cell phone about WaterOz. She kept me informed as to business developments at the factory. Occasionally, she mentioned the condition of Mr. Swisher's health and the possible need to replace his laboratory with another testing facility if his health did not improve. I learned that Mr. Swisher had an assistant, Mr. Doug Sellers, who was conducting lab tests when Mr. Swisher was not available.

9. By the end of July 2002, my understanding was that Mr. Swisher was so gravely ill from his heart condition that he would not have been able to come to WaterOz to meet with me or anybody else, which was contrary to his testimony on January 14, 2005 during the trial of my case (Federal District Court Case No. 04-cr-127-RCT). Because I was not at WaterOz during the entire month of July 2002, no meetings between Mr. Swisher and me did or could have taken place. Upon my return, I also learned that when Mr. Swisher collapsed in early June 2002 while on the phone with me, his condition was so severe that he was almost died and was immediately transferred to a high risk center at the VA Hospital, Spokane, Washington. I had considered finding another independent laboratory because Geri Gray and I both were concerned that Mr. Swisher might die from his ailments; so I often inquired as to his long term possibilities and learned from Ms. Gray that Mr. Swisher was considering a pacemaker to solve his severe heart problems.

10. On August 1, 2002, the day I drove back to Grangeville, Idaho, from Boise, I did not meet with or speak to Mr. Swisher.

11. On August 2, 2002, early in the morning, I took my children for a day of boating to Dworshack, Reservoir, which is a 1-1/2 hour drive, one way, from Grangeville, Idaho,

located near Orofino, Idaho and we returned very late in the day. I did not meet with or speak to Mr. Swisher on August 2, 2002.

12. On August 3, 2002, I departed from Idaho by commercial air carrier out of Lewiston on my way to Venezuela to purchase diamonds associated with a new business venture. I did not meet with or speak to Mr. Swisher on August 3, 2002.

13. I was gone from the State of Idaho for the rest of the month of August 2002 after I left on August 3, 2002 and I did not meet with or speak to Mr. Swisher during the entire month of August 2002.

14. Previous to using Northwest Analytical for laboratory testing of WaterOz products, I had submitted WaterOz product samples for testing to the lab at University of Las Vegas, Nevada. Geri Gray switched to Northwest Analytical in 2001. The cost of testing by Northwest Analytical was supposed to be cheaper and the down-time between submission of our sample and the receipt of test results was supposed to be less than at the UNLV lab. Since Mr. Swisher's results were faulty according to subsequent product testing by an independent laboratory engaged by the FDA and since his pricing was exorbitant, there was no actual savings; ultimately, it cost me more to do business with Mr. Swisher than if I had stayed with UNLV lab.

15. From June 2002 to November 2002, my interest in Mr. Swisher's recovery was strictly related to whether his lab could continue as the facility designated to provide the product testing services for WaterOz as an independent lab in order to verify that the content of my products matched the representations on my labels. The testing was to establish that WaterOz products complied with the laws related to accuracy in branding and labeling of products sold in interstate commerce as regulated by the FDA. I was interested in knowing whether WaterOz could rely upon Mr. Swisher, or if I should look elsewhere for an independent lab. I had no interest in Mr. Swisher's health issues or personal circumstances except as they may have affected the qualification of his lab to provide testing. Mr. Swisher was not a person I ever called a "friend." I had met him in person twice before the barbecue at Mr. Bellon's home in November 2002 and we had a business relationship. His only tie to me was as a vendor of lab testing services to WaterOz.

16. Because I was often traveling outside of Idaho and did not have time to meet with vendors, such as Mr. Swisher, I relied upon information provided by Geri Gray and other employees. There was a WaterOz employee who was designated as the "mineral maker," a man named Karl Waterman, alias "Chris Jon Paitreyot" who regularly made the half-hour drive from the factory to Mr. Swisher's laboratory to deliver products for testing. "Chris," (as Mr. Waterman liked to be called) had been delivering WaterOz products to Mr. Swisher's lab for over a year. As of August and early September 2002, Chris was supposed to be keeping current on information as to Mr. Swisher's ability to continue testing my products because of his regular visits to Swisher's lab. (See Affidavit of Joe Swisher dated January 3,

2003 attached as Exhibit A-15.) In the regular course of business, I relied upon Chris to give Geri Gray that current information and relied upon Ms. Gray to keep me up to date as I traveled.

17. It was represented by Mr. Swisher to Chris Paitreyot and Geri Gray that Doug Sellers, a lab assistant, was capable of conducting testing of WaterOz products on the equipment at Northwest Analytical. Mr. Sellers showed Chris the only piece of testing equipment in Mr. Swisher's lab which was a very old and outdated Perkin Elmer Atomic Absorption Spectrograph machine ("AA Machine"). It turns out that this old and outdated machine was not acceptable to the FDA and could not deliver the precise testing results that were needed. Extrapolations were needed to compare sample results obtained from this AA Machine with the newer technology used by FDA approved labs which were using an ICP machine. After I purchased my own ICP machine, Mr. Swisher attempted to extort $12,000.00 from me by trying to pawn off his out dated AA Machine on me, as will be shown later. (Exhibit A-10)

18. During the period August 3, 2002 until November 2, 2002, I was away from the factory and out of the State of Idaho I relied upon my staff, including Geri Gray and Chris Paitreyot to effectively manage such matters as laboratory testing of WaterOz products in my absence. I had begun to feel confident in the ability of my staff to handle such matters which allowed me to stay away from the factory for longer periods of time to create new businesses.

19. As stated earlier, I left for Venezuela on August 3, 2002, returning to the U.S. after about ten days of investigating a new venture in the diamond business. From Venezuela, I went directly to Florida on or about August 13, 2002 where I attended a class in diamonds for two weeks.

20. By August 27, 2002, I traveled directly from Florida to Ukraine without returning to the factory or the State of Idaho; my passport shows the exact date of my arrival in Ukraine. Again, I stayed in touch with Geri Gray on a daily basis and, among other things, she indicated that the testing of WaterOz products was still being accomplished by Mr. Swisher's lab with Mr. Sellers often acting as our contact person.

21. When I returned to Ukraine in late August 2002 I met with physicians and officials who had expressed an interest in my ionized mineral products. A full schedule of appointments had been made by my translator, Roman Ponomarenko. I was to make presentations regarding my WaterOz products in numerous locations to various groups and because of the language barrier, I worked with Mr. Ponomarenko on a daily basis as we traveling between Russia and Ukraine attending these appointments. On or about the first of November 2002, I came back to the U.S. and Mr. Ponomarenko followed shortly thereafter to inspect the WaterOz factory in Idaho. (See Exhibit A-3, Affidavit of Ponomarenko.)

22. From August 3, 2002 until November 1, 2002, while I traveled outside the State of Idaho I had no meetings with nor did I speak to Mr. Swisher.

23. Even though Mr. Swisher testified that I met with him in "July or August" 2002 and supposedly at that meeting I solicited him to be a "hit man" to murder two federal officials and their families, it was impossible for such a meeting to have taken place given that Mr. Swisher was in a coma for at least part of the time and I was out of Idaho for most of that time as shown above. I did not meet with or speak to Mr. Swisher at any time during the months of July or August 2002 nor did I meet with Mr. Swisher at any other time to solicit him to murder the two above named federal officials or anyone else.

24. Also, in his testimony, I was accused of soliciting Mr. Swisher to torture-murder attorney Dennis Albers and family during the month of April 2002 (TR pps 995-996)

Since I was gone to Ukraine from Idaho in April 2002, as I was trying to find a suitable location for a bottling plant, it would have been impossible for me to have had that meeting or that conversation with Mr. Swisher. In fact, I did not meet with or speak to Mr. Swisher at any time during the month of April 2002 or at any other time to solicit him to murder Mr. Albers, his family or anyone else.

25. Because the prosecutors for the government in my case failed to notify me in advance of Mr. Swisher's testimony as to when and where it was that he claimed I supposedly solicited him to commit murder (see Case No. 04-cr-127-RCT, Superseding Indictment Dkt #37, Counts 7, 8 and 9 and allegations that "between about December 2002 and January 2003" supposedly I did "solicit, command, induce, and endeavor to persuade" EJS to kill federal officials), and because I did not learn until Swisher testified in trial when it was he said it took place in a meeting at WaterOz that I was supposed to have committed these crimes, I did not have the opportunity, in advance of trial, to prepare and present the above information in my defense. While I formally raised Alibi as my defense by motion before trial as required by Rule, which was denied, I was unable to anticipate what the exact testimony would be, therefore, I had no idea when it was that Mr. Swisher would state that I tried to solicit him.

26. The problem with Mr. Swisher's testimony is that he is a known sociopathic liar who regularly fabricates complex stories, such as when he sent my potassium product to an independent laboratory containing cyanide and falsely reported me as the source of the cyanide to the FDA (see Exhibits A-11 and A-13); also, he was prosecuted and convicted of forgery, perjury and theft of government property in Idaho Federal District Court, Case No. 07-cr-182-BLW. Because of the fictional story Mr. Swisher told about me in trial, asserting that I soliciting him, which story was revealed for the first time when he was on the witness stand, I was unable to prepare a defense to the charge in advance of trial. My right to advance notice of exculpatory information under the Brady doctrine was violated, because it would have been exculpatory if I had known that Mr. Swisher would claim that I solicited him when he was in a coma or when I was not in the State of Idaho.

27. After Mr. Swisher testified in trial I told attorneys Nolan and Hoyt that I had been out of Idaho at the April and July-August 2002 times Swisher stated that I solicited him. (See information expressed in this affidavit such as when I was in Ukraine seeking a site for a bottling plant or in Venezuela or on vacation.) My attorneys were not able , during trial and with no advance notice of Swisher's claims under the Brady doctrine, to obtain and organize the information of my complex travel schedule in time for me to make a presentation and testify in rebuttal. Without the ability to introduce the December 30, 2004 letter by Colonel Dowling of the Commandant's office of the US Navy and Marine Corps demonstrating that Mr. Swisher was lying about being a decorated combat veteran, and because the jury had been conditioned to believe Mr. Swisher's every word as a decorated combat veteran; the government was allowed, without rebuttal, to present Swisher as a super hero to the jury whose credibility was unassailable and he could not be challenged unless the foundation of his claim to "hero" status could be undermined with his own military record. I was ambushed by false information that was fabricated by Mr. Swisher, a witness who had specialized in developing an elaborate fiction to support his false claimed status as a decorated combat hero. Mr. Swisher was highly skilled at lying under oath (as proven by Mr. Swisher's conviction in Idaho District Court Case No. 2007-cr-182-BLW). This is a man who was convicted of forging government documents, stealing money from the government and committing perjury, all of which was proven by the U.S. Government as shown in the subsequent trial of Mr. Swisher for fraud against the VA where he was convicted of these crimes using many of the same lies he used against me. If these were lies in Case No. 07-cr-182-BLW, then by the doctrine of collateral estoppel, in my 28 USC §2255 case now pending, these statements which previously were lies, also should be recognized as lies in this case. If Swisher's statements had no credibility in Case No. 2007-cr-182-BLW because he was convicted of making false statements, then his statements in my case also should not have been given any credibility.

28. While I was in Russia and Ukraine, I learned that Mr. Swisher had undergone open heart surgery on or about September 15, 2002, to implant a pace maker and, as he himself would later say, his condition was so serious and he was so critically ill, that he "died on the table." Mr. Swisher's health prior to September 2002 was filled with periods when he was in a coma or so critically ill that he could not get out of bed. Certainly, it would have been impossible for me, or anyone else to have solicited Mr. Swisher when he was in a coma or in the hospital critically ill and that is why, in support of my 28 USC §2255 motion I need to be able to subpoena Mr. Swisher's medical records. Once Mr. Swisher revealed in trial when it was that he claimed that I solicited him in trial, my attorneys did not have an adequate opportunity to subpoena his medical records that would have proven Swisher's complete and total disability at the very time that he claimed to have been solicited by me making it impossible for the alleged solicitation meeting to have taken place.

29. About his own health, Mr. Swisher reported the severe problems he was having in 2002, and his statement regarding his health and his open heart surgery on September 15, 2002 in his Affidavit that was signed January 3, 2003 (see Exhibit A-15, paragraph 11) makes it clear

that he was unavailable to receive solicitations to murder anyone as of that date, and, in fact, given the history, it is clear that his health history as would be shown in his medical records, leading up to that surgery, from June 2, 2002, clearly would be evidence that he was lying about being solicited by me in July or August 2002 and again in December 2002 or January 2003.

30. It was not true that Mr. Swisher was my "best friend" as he testified. Before the barbecue at the home of Richard Bellon in early November 2002, I had encountered Mr. Swisher twice in person, both of which were chance meetings, one in 2000 at the law office of attorney Britt Groom in Grangeville, Idaho the other at a restaurant. Then, I had spoken to him briefly on the phone in early June 2002. At the meeting in attorney Groom's office Mr. Swisher was very interested in my mineral products and what they might do for him. He explained at that time about his occupation and that he had performed assays of mineral samples for gold miners and that he had an Atomic Absorption machine in his laboratory. After that conversation, Mr. Swisher convinced Geri Gray that he could more efficiently test WaterOz minerals than the lab at UNLV. As a result she designated his lab for the purpose of testing my mineral products.

31. Other than the a chance encounter and the phone call in early June 2002 prior to seeing him at the home of Richard Bellon in early November 2002, I had not had any other meetings or other direct communications with him, and he was certainly not my "best friend," nor did I consider him to be a friend; he was little more than a stranger as a vendor of services to my company.

32. Other subjects that Mr. Swisher lied about on the witness stand include: 1) when he said I had previously given him $500,000.00–which I did not– 2) that I had agreed to give him my three story office building that was under construction because, as Swisher claimed, I "didn't need it"–when that building was designed to be a call center for telephone sales and marketing personnel that I was planning to hire in connection with a telemarketing campaign I was about to launch; 3) he testified that I had agreed to give him a "Road Patrol" road grader–when I did not own a Road Patrol; 4) he said that I lived in a trailer–when my house was a six bedroom manufactured home, set on a concrete foundation with a walk-out basement, and I held fee simple title subject to a $250,000 standard bank home mortgage that could never apply to a trailer. All of these lies were a part of Swisher's plan to create an atmosphere of familiarity in order to falsely convince the jury that he and I were "best friends."

33. Mr. Swisher's two most significant lies were the ones associated with his claims of combat heroism and that I had asked him to kill people because supposedly I knew he claimed to be a combat hero who had killed "many, too many". The combat heroism created the false impression in the minds of the jurors that he was a wounded and multi-decorated Korean Era, combat veteran who, as a hero, should command their respect so that they should believe in him and all the words that emanated from his lips on the witness stand. By

stating that he told me he had killed "many, too many" in combat, which he did not, he created the false impression that I was impressed with his combat record sufficient to motivate me to seek his service to kill federal officials. However, if the jury had been told the truth and knew that Swisher's claims of medals for heroism were false and that he never had the opportunity to share his claims of heroism with me, they certainly would not have believed that I solicited Mr. Swisher. Since Mr. Swisher was convicted of felony perjury, forgery and theft of government property for telling the exact same lies to the VA about his combat heroism, and those lies were used to fleece the US Government out of over $100,000 in VA benefits, that conviction should now stand as collateral estoppel against any Swisher evidence being admitted in my case. If no Swisher evidence was to be admitted in my case, then the Swisher Counts would have to be dismissed. Swisher's motivation for lying in my case is connected to his need to keep up appearances to support the prior lies he told the VA in seeking financial benefits coupled with his own selfish purposes when he unsuccessfully tried to extort money and half of my WaterOz business from me. Let me emphatically state again that I never had any conversation with Mr. Swisher where I asked him to kill federal officials or anyone else and I had no idea that he claimed to have killed human beings until I heard his testimony in trial.

34. Other Swisher lies included the fact that, when Mr. Swisher took the witness stand, he wore a Purple Heart medallion which he was not entitled to wear, and was subsequently convicted of wrongfully wearing; but which he lied about in my case and produced a forged DD-214 on the witness stand to bolster his claim to rightfully wear such a medallion (see Swisher's subsequent conviction for wearing, among other medals, the Purple Heart, when he was not wounded in combat, see Idaho Case No. 07-cr-182-BLW ). Thus, his false portrayal of himself as a combat hero and his false portrayal of me as a depraved person seeking to have him torture innocent women and children was invented by Swisher out of thin air because those things never happened. I only had contact with Mr. Swisher on a few occasions, and he did not testify that I attempted to solicit him on those occasions; rather he chose to accuse me of soliciting him at times when it was impossible for us to have had such a meeting. He fabricated meetings that never occurred at times when I was out of the country or at least out of the State of Idaho and times when he was in a coma or deathly ill from his heart attack and with his medical records and my passport, it can easily be shown that such meetings could not have occurred. Mr. Swisher then said that at those meetings I supposedly demanded or even begged him to kill other human beings which never happened.

35. There were three times in 2002 that Mr. Swisher falsely claimed I approached him to kill people: the first was in April 2002 when I was in Ukraine, supposedly, I approached him to kill Dennis Albers and his family . (See TR, Pg 996-998); which, I did not do; but the effect on the jury of the false story that I wanted him to torture innocent women and children was so horrible and shocking that it had a "shock wave effect" on the jury. Programming the jury to believe Swisher implicitly and to believe the worst possible conduct from me was a very clever ploy for getting the jury to believe that I solicited Swisher to murder three federal officials. That I wanted Mr. Swisher to torture to death the innocent women and children in

the Albers family in front of Mr. Albers and that he was to be the last to die, having witnessed the death of his loved ones, was so very shocking that it caused the jurors to reach out to the trial judge with a note expressing their concern that I was mentally ill and to ask the court if they, the jury was to consider insanity. The jury was never informed that Mr. Swisher was an experienced liar and forger who had defrauded the government of over $100,000 with similar lies. The jury was never informed that Mr. Swisher's statements were part of a vindictive plan of extortion, to steal from me as shown below. The jury was hoodwinked into believing the false and fraudulent story of Mr. Swisher, who it turns out is a sociopathic liar.

36. The second time I supposedly contacted Mr. Swisher to have him commit murder was when he testified that I solicited him to kill Assistant U.S. Prosecutor Nancy Cook and IRS Special Agent Steve Hines and their families, in July or August of 2002. (See TR, p. 1004). July and August 2002 was a time when Mr. Swisher was hospitalized either in a coma or was otherwise so sick he could not get out of bed from his heart attack; and July and August 2002 was a time that I was either on vacation with my children in either Colorado, Nevada and California or on a business trip, but in all events, I was not in the State of Idaho, which means that it would have been impossible for either of us to have participated in a meeting where I supposedly solicited him to murder others, per his testimony.

37. In December 2002 or January 2003, Mr. Swisher testified that I solicited him to kill the same prosecutor (Cook) and IRS agent (Hines), and their families as noted above and added Federal District Judge Edward J. Lodge . (See TR, pps 1005-1007). The meeting he described could not have happened because he was still too sick recovering from his heart attack, confined to a wheel chair, unable to climb the stairs to my second floor office and I did not speak to Mr. Swisher except by phone during that time. I had no meetings, in person, with him in either December 2002 or January 2003. My next phone call with him concerned the lab tests in Ukraine on December 27, 2002 to inform him that the tests on WaterOz products hand delivered by Mr. Ponomarenko showed no significant mineralization in the 22 samples (see Ukrainian Lab Report, Exhibit A-16) .

38. Then on January 3, 2003, after I received a copy of his signed Affidavit (Exhibit A-15), I took his call, and he attempted to extort $800,000 from me and a one-half interest in WaterOz; and when I did not agree to give him what he wanted and I had banished him from WaterOz for trying to blackmail me over the cyanide he put in the sample of WaterOz Potassium, he then commenced a campaign to cause me financial injury and damage. The first type of damage he tried to inflict was when he sent a sample of my product to the SVL Analytical Laboratory in Kellogg, Idaho, asserting that the product was being sold by WaterOz with cyanide in it (see Exhibits A-11 and A-14). Then, he tried to cause me further financial damage by printing up a number of invoices that fabricated fees for services he had never rendered with charges that he purported I owed to his Northwest Analytical totalling over $5,000.00. Then he fabricated a contract that supposedly obligated me to purchase his old, out-of-date (technically deficient) AA Machine for $12,000.00 in response to learning

that I had purchased my own ICP machine and I would now be doing all of my own product testing "in house" at WaterOz.

39. If I did not pay up the extortion money and sign over half of my business, Mr. Swisher's threatened to testify against me in Federal Court which he said would cause me to spend the rest of my life in prison. That threat made January 3, 2003, was actually carried out when, on January 14, 2005, Mr. Swisher testified that I solicited him to murder the Albers family, Nancy Cook and her family, Steve Hines and his family and Judge Lodge. By ratcheting up the stakes and inventing such a horrific story of solicited torture murder with high profile targets and by bolstering his credibility, pretending to be a national war hero, the government was able to capture the imagination of the jury and succeeded in getting the equivalent of a life sentence imposed against me. And all of this was based on Mr. Swisher's lies, for which he was subsequently convicted (07-cr-182-BLW). As a matter of res judicata or collateral estoppel, the lies used in his own case for which he was convicted should be used against him in my case under 28 USC §2255 case.

40. If the credibility as a national war hero is removed from Swisher's statements, and if the jury had known that the dates and times Mr. Swisher claimed meetings with me when he was solicited were false, no jury would ever have convicted me of such horrendous crimes that had no foundation because the "dots" or points of his story just did not connect. In 2002 Mr. Swisher was too sick to have anyone solicit him–including me–especially when he was in a coma, and I certainly could not have solicited him when I was out of the State of Idaho, especially when I was in Ukraine and Russia.

41. I was in Russia and Ukraine with Mr. Ponomarenko who was considering working with me in a strategic business alliance with WaterOz for the sale and distribution of WaterOz products in Ukraine and Russia. In order for him to better understand how WaterOz products could be manufactured in Ukraine or Russia, he obtained a US visa and agreed to travel to the U.S.A. and came to the WaterOz factory so that he could become schooled in the day-to-day operations of the business.

42. On or about November 1, 2002, I left Ukraine to return to the U.S.A. On November 2, 2002, Mr. Ponomarenko flew from Kiev to Seattle-Tacoma Washington airport and then to Lewiston, Idaho, where I picked him up; and we traveled to the WaterOz factory.

43. On or about November 4, 2002, I gave Mr. Ponomarenko a tour of the WaterOz factory. He saw the processing of the minerals and purification of the water the bottling plant and met some of the WaterOz staff, including the mineral maker Chris Jon Paitreyot (alias, Karl Waterman) and the plant manager, Geri Gray.

44. One of the purposes of Mr. Ponomarenko's trip was to take back to Ukraine 22 samples of WaterOz products for independent laboratory testing in Ukraine so that local regulators would have local verification of the content of these products.

45. Mr. Ponomarenko's objective was to obtain official approval of WaterOz products for sale in Ukraine and Russia—which approval was conditioned upon the results of local laboratory testing abroad. It was anticipated that with such approval we could begin sales in that part of the world.

46. When he arrived, I informed Mr. Ponomarenko that my Idaho testing was done at a laboratory known as Northwest Analytical, a half-hour's drive from the factory.

47. On or about November 4, 2002, Mr. Ponomarenko was present when I called Northwest Analytical on a speaker phone and had a conversation with the wife of the proprietor, Barbara Swisher, and his lab assistant, Doug Sellers. From this conversation, it was clear that Mr. Swisher was not available for discussion because he was still recovering from open heart surgery. Mr. Sellers stated he could run tests of WaterOz products, which would take only a few days if products were delivered to the lab.

48. To learn as much as possible about making WaterOz products, Mr. Ponomarenko felt he should view the laboratory where testing was performed. I arranged for Chris Paitreyot to take him along when the product samples were delivered to Northwest Analytical for testing.

49. On or about November 5, 2002, Mr. Ponomarenko rode with Mr. Paitreyot to Cottonwood, Idaho, and met with Mr. Swisher at Northwest Analytical. It was reported to me by Mr. Ponomarenko that the so-called "lab" was actually in a rundown building with an overhead garage door, next to a private home in an economically depressed residential area. Mr. Ponomarenko was concerned that this facility did not appear to be a professional lab, nor did it compare to other scientific labs he and I had seen in Russia and Ukraine.

50. That evening, I was informed by Mr. Ponomarenko that Mr. Swisher was in a wheel chair, that he was pale and sickly looking. I was shocked to learn these things because my business depended upon accurate testing by a laboratory, and such a condition-report did not inspire confidence in Mr. Swisher's ability to deliver accurate testing.

51. At that time I resolved to purchase for the factory an ICP machine that was the latest technology for analyzing minerals such as were manufactured by WaterOz. The problem was that such machines were over $100,000 new, and I needed to find a used one that would cost less. Ultimately, I found a used ICP machine and purchased it for $30,000, which would eliminate the necessity of sending WaterOz products to an outside lab.

52. When Geri Gray informed Mr. Swisher that WaterOz no longer needed his lab because we purchased our own ICP machine, he became openly hostile and vile with her, demanding that I purchase his old, outdated AA Machine, which Ms. Gray told me I would not do. In order to extort money from me, Mr. Swisher issued a false invoice (Exhibit A-10) which asserted that I had agreed to purchase his AA Machine for $12,000.00 which I did not do

(which invoice was disputed and never paid by WaterOz, and no further action was taken by Mr. Swisher).

53. Mr. Swisher also issued numerous false invoices (Exhibit A-13) in February 2003 asserting that there were past due and unpaid charges from as far back as September 2002.

54. One of the most vicious attacks by Mr. Swisher was his accusation that I had put cyanide in my products to cause great harm to the users of WaterOz minerals. Mr. Swisher is the one who put the cyanide into a sample of WaterOz Potassium which he sent, by regular US mail to an independent lab in Kellogg, Idaho (SVL Analytical). That bottle of Potassium had a large quantity of cyanide in it that, not only could it have caused damage if a person drank it, but that amount of cyanide if spilled from a broken bottle during shipping, could have caused serious injury or death. Mr. Swisher made it appear that the cyanide came from my factory, when it came from his mineral assay operation (see Exhibit A-11, SVL Analytical Chain of Custody Record attached which shows that Swisher was the originator of the WaterOz sample that had cyanide in it and Mr. Swisher's cover letter of February 2, 2003, requesting analysis confirming that there was cyanide in the potassium).

55. On or about November 6, 2002, I spoke with Mr. Bellon on a speaker phone when Mr. Ponomarenko was present. Mr. Bellon invited us to come to his home for a noon meal and barbecue the next Sunday. The rest of that week was spent in meetings with Mr. Pono-marenko concerning the development and sale of WaterOz products in Ukraine and Russia.

56. On or about Sunday, November 10, 2002, Mr. Ponomarenko and I arrived at the Bellon home at roughly 11:00 a.m. After about 30 minutes, a Ford Explorer arrived driven by Barbara Swisher. She asked if two individuals could help Mr. Swisher out of the car because he was too sick to get out by himself.

57. Mr. Bellon and Mr. Ponomarenko assisted Mr. Swisher so that he could get from his vehicle to his wheelchair. Mr. Swisher had to be strapped into the wheelchair to keep him from falling out, and his skin color was very pale. He was wearing diapers and had a catheter tube and bag hooked to his leg and was very sickly looking. He was not in the sort of physical shape that one would expect from a hit man.

58. November 10, 2002, was a warm day, allowing us to spend time comfortably on an outside deck at the Bellon home. While having the meal, Mr. Swisher gave the history of his illness and how he had been in a coma, had died on the operating table during surgery and had to be revived with a defibrillator. Mr. Ponomarenko discussed the possibility of establishing a WaterOz factory in Vinnitsa, Ukraine. After we had eaten barbecued chicken for lunch, Mr. Bellon brought out a 22 rifle, a shot gun and a bird launcher.

59. Mr. Ponomarenko took turns shooting at clay pigeons with Mr. Bellon. Mr. Swisher shot at the clay pigeons from his wheelchair. He could not shoot standing up as he was

strapped in by a seat belt to his wheelchair and too weak to sand up. After the clay pigeon, shooting Mr. Ponomarenko and I returned to my home.

60. At my January 2005 trial, Mr. Swisher testified that this event of shooting clay pigeons during a social gathering at the Bellon home occurred in September 2002 rather than November. However, that was simply untrue and impossible for two reasons: first, Mr. Ponomarenko and I were half a world away in Ukraine conducting presentations regarding WaterOz products in September 2002; and second, because Mr. Swisher was having open heart surgery on September 15, 2002 (see Affidavit Swisher, Exhibit A-15, paragraph 11) and according to his own account of his health history he "almost died on the table," so that it was apparent that he was not in any condition to have been at an outside barbecue firing guns at clay pigeons at any time in September 2002.

61. On or about Monday, November 11, 2002, I arranged for Mr. Ponomarenko to ride with Mr. Chris Paitreyot to the Northwest Analytical Laboratory. He was to pick up the 22 samples of WaterOz products to go to Ukraine that had supposedly been tested by Swisher's lab. Again, he was testing for confirmation that the mineral content was consistent with the amount as reported on the labels. Once the test results were confirmed at Northwest Analytical, Mr. Ponomarenko had agreed to take these samples to a Laboratory in Ukraine for independent testing (see copy of Ukrainian lab results Exhibit A-16).

62. On or about November 12, 2002, I drove Mr. Ponomarenko to Lewiston, Idaho, so we could fly together to Minnesota and then to New York to visit some WaterOz distributors. From New York, he went back to Ukraine with the 22 samples and I returned to Idaho.

63. On November 21, 2002, I was in my bed in my house at 5:45 a.m. when my home and factory were raided by 50 agents of the U.S. Government, involving three agencies, the FBI, the FDA and the IRS. I was arrested and released on my own recognizance. I was informed that some of the charges were based on independent laboratory analysis which had been ordered by the FDA. That analysis determined that WaterOz products were misbranded because the mineral content of the product actually was lower than on the amount stated on the WaterOz label.

64. Three days before the raid, Chris Paitreyot did not show up for work at WaterOz. From all appearances, Mr. Paitreyot disappeared right before the raid as if he had advance knowledge that it was about to happen.

65. On or about November 22, 2002, I went to Mr. Swisher's laboratory with Lonnie Birmingham (the replacement mineral maker for WaterOz since the disappearance of Mr. Paitreyot) demanding to know why an independent tester working for the FDA showed that my products were deficient in mineral content as compared to Swisher's testing, which had always shown that the mineral content of my product was always consistent with the WaterOz labels. Since I had been charged with the crime of selling in interstate commerce

my WaterOz products, which the government claimed were misbranded and since WaterOz was paying Mr. Swisher to test the product to prevent this very thing from happening, I wanted answers from Mr. Swisher.

66. Mr. Swisher was still in a wheel chair, sickly looking, with the edges of his diapers showing at his waist and with a bladder bag hanging from his leg. I was told by Mr. Swisher that Northwest Analytical had properly tested all WaterOz products given to them and consistently found them to have substantially the same content as shown on the labels. Mr. Swisher theorized that since Chris Paitreyot had disappeared right before the raid, he must be the one who was trying to create trouble for me with the FDA. (See Exhibit A-12) Mr. Swisher theorized that it was Chris who added mineral concentrate to samples just before presenting them to Northwest Analytical so that from the tests it would appear that the content of the products were in compliance with WaterOz labeling; when in fact, he had sabotaged the product so that the minerals in the large mixing tanks at the factory were had a lower amount of mineralization. Because at that point I did not trust Mr. Swisher, I asked him to put his statement and theory in writing and he agreed to sign an affidavit to that effect (see Exhibit A-15).

67. At the meeting of November 22, 2002, at Mr. Swisher's lab, he mentioned for the first time that he thought there was cyanide found in at least one of the WaterOz products. He took the lid off a sample of potassium and said it smelled like cyanide (I later learned that cyanide has no smell). Little did I know that two months later, Mr. Swisher would actually mail that bottle to a laboratory in Kellogg, Idaho (see Exhibits A-11 and A-14). I informed Mr. Swisher that the only person I knew using cyanide was him and that was in association with his gold assaying business. I then demanded to know who had added cyanide to my product. In his opinion, he said he believed that the federal government put the cyanide in the potassium when they raided the factory. He claimed that he had not added the cyanide but suggested that if the FDA obtained that information (Exhibit A-12), I would be in deep trouble with the government. Although I felt intimidated by Mr. Swisher's statements about the cyanide at that time, he did not attempt to extort money or property from me; apparently, he was preparing me for the extortion that was to come later.

68. Mr. Swisher told Doug Sellers to put a bag of bromine in my truck and informed me that I should pour bromine over the ground where he expected me to dump out the potassium to cover up any cyanide. Because there never was any cyanide in any of my products (except the sample held by Mr. Swisher), I did not dump any out on the ground and did not use any bromine, as there was nothing to cover up.

69. On or about December 26, 2002, it was reported to me that the 22 WaterOz samples had been tested in Ukraine and I learned that some of the samples did not show adequate signs of artificial mineralization. In fact, I was told that some of these samples appeared to be no more than tap water. At that point, it appeared to me that someone, possibly Mr. Swisher and or Chris Paitreyot had sabotaged my efforts to have comparative parallel tests of

WaterOz products in USA and in Ukraine. It appeared that some of my products had been diluted after the November testing at Northwest Analytical, or that the results reported by Northwest Analytical were not accurate. I was informed that all 22 tests of product samples taken by Mr. Ponomarenko to Ukraine, which cost me $1,000.00, were of no value and the test would have to be repeated.

70. On or about December 27, 2002, I called Mr. Swisher to inform him of the Ukrainian lab test results and asked him to immediately sign and send me the affidavit we had discussed earlier.

71. Mr. Birmingham went to Mr. Swisher's lab on Friday, January 3, 2003, to deliver product for testing, picked up Mr. Swisher's Affidavit (see Exhibit A-15) and brought it to me at the WaterOz office.

72. Later in the day of January 3, 2003, after I obtained the Affidavit from Mr. Swisher, I was paged by Geri Gray on the overhead speaker and took a call from Joe Swisher. He told me that he wanted me to pay him $800,000 in cash and to give him a one-half ownership interest in WaterOz or, he threatened he would testify against me in Federal Court. He said I was already in trouble with the FDA because they suspected that there was cyanide in the WaterOz products. He said if he testified against me, I would go to prison for the rest of my life.

73. I refused this offer of extortion by Mr. Swisher and informed him never to contact me again and that he was not welcome in the WaterOz factory.

74. Immediately after I hung up with Mr. Swisher, I paged all of my employees on the overhead speaker and informed them that Swisher was a blackmailer, a liar and a thief and no one at the factory should ever talk to him again. I called Geri Gray, told her the story and informed her that no one was to take any more of his calls.

75. Swisher began a campaign of billing WaterOz for extortionate amounts that were not due or owing (see Exhibits A-13). He billed for conferences that did not occur and services that were not rendered, running up a bill of over $5,000.00 in charges that were not owed, pretending that there were past due bills from four months earlier that had not been paid.

76. Mr. Swisher billed me for the purchase of his AA Machine that I never agreed to purchase. The stated price was $12,000 (see Exhibit A-10) but was never discussed with me. This bill came out after Geri Gray told Mr. Swisher that WaterOz had already purchased an ICP machine and no longer needed his services.

77. I subsequently learned, but was not aware at the time, that Geri Gray continued to give products to Mr. Swisher against my wishes. Mr. Swisher would come by the factory and not come in. Ms. Gray would have employees, such as Debbie Doty (A-5) carry product out to

Mr. Swisher's car. There was an improper alliance between Mr. Swisher and Geri Gray that still has not been disclosed to this day, but I am concerned that she was working behind the scenes with Mr. Swisher to destroy my company and cause me to go to prison so that she and Mr. Swisher could steal my business.

78. I did not ever solicit Mr. Swisher to kill anyone, and his statement that I did was a total lie and part of his extortion scheme to take property from me.

79. The lead counsel in my case, Mr. Thomas Nolan never met with me or allowed me to participate in my own defense. When he took the military records file home with him to review, he allowed me and the others on the defense team to believe that he had studied it and was knowledgable about its contents.

80. This whole case was about Mr. Swisher's greed and he was trying to set me up with something so he could steal my business WaterOz. If it was not deliberately approving my products as to mineral content matching the labels which were sold short of the full amount because of him and I got in trouble with the FDA, it was cyanide that he, from his mining assay lab put in a sample of WaterOz product and sent it off to an independent lab to determine what he already knew, that it contained cyanide. He was always going to testify against me and I was going to prison for the rest of my life. So, he finally made up a big enough lie that in January 2005 when he testified, I ultimately was convicted of crimes I did not commit and in fact never happened, but he was right, I was sentenced to essentially life in prison for crimes he made up and he testified against me in federal court.

Further Affiant sayeth naught.

I declare under penalty of perjury that the foregoing is correct this 13th day of April 2012.

David R. Hinkson

EXHIBIT A-3

Affidavit of Roman Ponomarenko

Republic of Ukraine )

                ss.

City of Kiev        )

I, Roman Ponomarenko, the Affiant, a resident of Ukraine, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state under penalty of perjury pursuant to 28 USC §1746 as follows:

1. In early 2002, David R. Hinkson came to Ukraine looking for a bottling plant for his ionized WaterOz mineral products.

2. After several meetings earlier in the year 2002, on or about October 22nd I met with Mr. Hinkson in Kiev, Ukraine, regarding the bottling and marketing of WaterOz products in Russia and Ukraine.

3. In order for me to better understand how these products would be manufactured in Ukraine or Russia, I agreed to travel to the U.S.A. and come to the WaterOz factory near Grangeville, Idaho, so that I could observe the day-to-day operations of Mr. Hinkson's business.

4. On or about November 1, 2002, Mr. Hinkson left Ukraine to return to the U.S.A. On November 2, 2002, I flew from Kiev to Seattle-Tacoma Washington airport, and then to Lewiston, Idaho where Mr. Hinkson picked me up, and we traveled to Mr. Hinkson's factory.

5. On or about November 3, 2002, I toured the WaterOz factory near Grangeville, Idaho with Mr. Hinkson. I saw the processing of the minerals and purification of the water and met some of the WaterOz staff, including the mineral maker Chris John Paitreyot, a paralegal named Richard Bellon and the plant manager, Jeri Gray.

Affidavit of Roman Ponomarenko - Page 1 of 4

6. One of the purposes of my trip was to pick up samples of WaterOz products for independent laboratory testing in Russia so that the regulators in Ukraine and Russia would have local verification of the content of these products.

7. My objective was to obtain official approval for the sale of WaterOz products in Ukraine and Russia which approval was conditioned upon the results of local laboratory testing.

8. Mr. Hinkson informed me that his testing was done at a laboratory, Northwest Analytical, near the WaterOz factory, that was run by a man named Joe Swisher, who had been given the job of product testing by the general manager of WaterOz, Jeri Grey.

9. On or about November 4, 2002, I was present when Mr. Hinkson called Northwest Laboratories and I listened on a speaker phone to a conversation with Mr. Swisher's wife, Barbara, and a lab assistant named Doug Sellers. From this conversation, I learned that Mr. Swisher was recently released from a hospital after open heart surgery and was not available for our discussion because he was still recovering. The lab assistant stated he could run tests of WaterOz products which would take only a few days if products were delivered to the lab.

10. To learn as much as possible about making these products, I felt I should view the laboratory where testing was performed. Mr. Hinkson arranged for Chris Paitreyot to take me along when he delivered the product samples to Northwest Analytical for testing.

11. On or about November 5, 2002, I rode with Mr. Paitreyot to Cottonwood, Idaho and arrived at Northwest Analytical and what was referred to as a "Laboratory". I was surprised that the so-called "lab" was actually in a rundown building with an overhead garage door, next to a private home in an economically depressed residential area.

12. I learned that Mr. Hinkson had never seen this "lab" and did not know how to get there. I was concerned that this lab did not appear to be a professional lab, nor did it compare to other scientific labs I had seen in Russia and Ukraine.

Affidavit of Roman Ponomarenko - Page 2 of 4

13. It was at the November 5th visit that I met Mr. Swisher for the first time. He was strapped down in a wheel chair, his skin color was very grey and he looked sick. He told me that he had just had open heart surgery. He informed me that his lab assistant, Doug Sellers, would have all 20 of the samples tested before I departed on Monday, November 8, 2002.

14. As I talked with Mr. Swisher he coughed frequently and looked very pale. I noticed the edges of a diaper and he had a bladder bag hanging from his wheel chair. It seemed to me that he belonged in the hospital.

15. That evening, I informed Mr. Hinkson about the rundown condition of Mr. Swisher's Laboratory and how pale and sick he appeared. Mr. Hinkson was shocked to learn these things because his business depended upon accurate testing by a laboratory.

16. On or about November 6, 2002, I overheard Mr. Hinkson speaking with Mr. Bellon on a speaker phone. I heard Mr. Bellon make an invitation to come to his home for a Sunday meal.

17. On or about November 7, 2002 (Sunday), Mr. Hinkson and I arrived at the Bellon home about 11:00 in the morning. After about 30 minutes a Ford Explorer arrived driven by a woman whom I later learned was, Mr. Swisher's wife, Barbara. She asked us to help Mr. Swisher out of her car as he was too sick to get himself.

18. Mr. Bellon and I assisted Mr. Swisher so that he could get from his vehicle to his wheelchair. Mr. Swisher's skin color was still pale and he still had the catheter tube and bag hooked to his leg. When we lifted him out of the vehicle, we could perceive that he was still wearing diapers.

19. Sunday, November 7, 2002 was a warm day allowing us to spend time comfortably on an outside deck at the Bellon home. When we had eaten barbecued chicken for lunch, Mr. Bellon brought out a 22 rifle, a shot gun and a bird launcher.

Affidavit of Roman Ponomarenko - Page 3 of 4

20. I took turns shooting at clay pigeons, but Mr. Hinkson did not. Mr. Swisher shot at the clay pigeons from his wheelchair. He could not stand up to shoot as he was strapped by a seat belt to his wheelchair.

21. After spending a few hours visiting with Mr. Swisher and his wife, Barbara, and speaking with Mr. Bellon and Mr. Hinkson, there was nothing said that would have indicated that Mr. Swisher had been Mr. Hinkson's "best friend."

22. On or about Monday, November 8, 2002, I rode with Mr. Chris Paitreyot again to the Northwest Analytical Laboratory. Mr Sellers handed me the twenty samples of the WaterOz products claiming they had been tested and were consistent with the labels. These were the samples I was going to take to the Laboratory in Ukraine for independent testing.

23. On or about November 9, 2002, I rode with Mr. Hinkson to Lewiston, Idaho so we could fly to Minnesota and then to New York to visit some WaterOz distributors. And from there, I went back to Ukraine.

24. The products I carried from Mr. Swisher's lab were tested in Ukrainian laboratory and showed no signs of artificial mineralization; in fact, these samples appeared to be something like a tap water.

Further Affiant sayeth naught.

I declare under penalty of perjury that the foregoing is correct this _9_ day of April, 2012.

Roman Ponomarenko

Affidavit of Roman Ponomarenko - Page 4 of 4

EXHIBIT A-4

# Affidavit by Robert Preston: Sandberg

State of Idaho      )
                          ss.
County of Idaho    )

1.  I, Robert Sandberg, the Affiant, a resident of the State of Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state pursuant to 28 USC §1746, as follows:

2.  I am currently a resident of Idaho County at 148 Lee Road, Harpster, Idaho 83552.

3.  During late summer of 1996 or early 1997 a third party introduced me to David Hinkson by giving me his telephone number in Las Vegas.  As David and I had many common interests, we kept in touch ever since our first conversation on the telephone.

4.  Soon after that conversation, David mentioned he was going to move up north to some property he had bought In the Grangeville, Idaho area on the Camas Prairie near where I live in Harpster, Idaho.   We made plans to meet and visit in person when David arrived in the area.  However, even before we met in person, at his request, I was able to help Dave find a good "water witch" (the late Bud Goodwin) who dowsed the location of the well that now supplies the factory and David's house site.

5.  I graduated from BYU Hawaii, cum laude (with Honors), with a Bachelor of Science degree in Biology with minors in Chemistry, Physics and Mathematics.  I then graduated from the University of Hawaii School of Medicine with a Master's Degree in Pharmacology and two years of medical school.  I also have had a lifelong interest in many other healing modalities including nutrition, herbs, massage, hyperbaric oxygen, electronics, magnetism free energy research and many others.  My background gave me a unique perspective and David found me to be a useful consultant in a number of areas.

6.  Because I had lived in the Grangeville area for a number of years, I was able to recommend some good workers for constructing David's factory buildings, staffing his factory and office as well as special projects.  I recommended many people to staff David's business and he hired all of them on my recommendation.

7.  I have never been an official employee of WaterOz or David Hinkson.  I always functioned as a consultant on various projects where my special expertise was useful to David and to those who worked with him. In mid-March 2002, just before he left on one of his trips to Russia and Ukraine, David asked me to assist in moving Mr. Brian Sutcliffe and his family of Hurricane, Utah to the Grangeville area. Mr. Sutcliff was a master electrician and master machinist electrician with many special skills whom David wanted to hire to work at WaterOz.

8.  David indicated that Mr. Sutcliff would be ready to move in a few weeks and David told me to use his white diesel truck and his gooseneck trailer to load up their stuff and haul them north. David said he probably would be out of the country when Mr. Sutcliff was ready, that I should pick up the truck and trailer at WaterOz and drive it down to Utah.  By the third week in April, Mr. Sutcliff was ready to move to North Central Idaho so I borrowed David's truck and trailer from the WaterOz factory and headed down to the Hurricane, Utah area.

9.  I parked the trailer at Mr. Sutcliff's apartment for several days to allow him time to pack it and then I drove David's truck and trailer, along with Mr. Sutcliff's belongings back to the Grangeville area.  The trip should only have taken two days, but later on the second day, I was not feeling well, I had the worst stomach ache in my life and even had to stop along the road to vomit a couple of times.

10.  The stomach ache was getting progressively worse and I had to stop for the night in Riggins, Idaho.  In the morning, I continued on to Grangeville and on to the WaterOz factory, but I was feeling sicker all the time (I later found out it was from appendicitis).  I arrived at WaterOz to return David's truck and trailer just after David had returned from Russia and Ukraine on May 2, 2002.

11.  I was able to introduce David to Brian Sutcliffe and then went home. At midnight I got a ride to the Saint Mary's Hospital in Cottonwood, Idaho where the diagnosis was confirmed as a ruptured appendix and I underwent surgery the next morning which was the beginning of a seven day hospital stay.  Except for the times that David was gone and during the second week of May, 2002 when I was hospitalized, and for a few weeks

after that, I spent a significant amount of time with David at the factory or on the phone. I also spent time with various employees who worked there in the offices and factory and on construction projects, and, therefore, I was around enough to know of David's comings and goings and specifically when David was away on business.

12.  On one occasion. on or about June 2nd, 2002, I dropped by the office to visit with David, whose office was on the second floor, and noticed he was on the speaker phone, with Elven Joe Swisher, a person I had not previously met or seen at the WaterOz factory and with whom I had never interacted before. I learned that David was paying Joe Swisher to tests of WaterOz products for label compliance purposes in Cottonwood Idaho. As David just finished making a statement, Joe Swisher apparently collapsed because, after a thud and the clattering sounds of the phone falling on the floor or desk, Joe fell silent and we could hear a woman's voice saying: "Oh my God" several times, and then the phone went dead. Later I heard that Joe Swisher was unconscious as he was taken to the hospital (St. Mary's Hospital in Cottonwood, Idaho) and shortly thereafter, because of the serious, life-threatening nature of his condition, Joe was life-flighted to Spokane where they had the facilities to handle the most serious medical emergencies. My follow-up inquiries indicated that Joe was in a coma and had open heart surgery and was disabled for a long while after this.

13.  Soon after that, David left for Russia with his son Matthew and after that trip he was gone on a family vacation road trip for the month of July. Upon his return from the road trip, David went to Venezuela then returned to the U.S. and went directly to a seminar in Florida for the first three weeks in August. After that, near the end of August, David went to the Ukraine to meet with his translator, Roman Ponomarenko, about starting a WaterOz factory in Russia or the Ukraine. David did not return to his home and factory until November 2002, when he brought Mr. Ponomarenko with him for a short stay. David left again as Mr. Ponomarenko was taking samples of WaterOz products to the Ukraine for testing overseas in order to start a business in that part of the world. Then, David returned to the factory shortly before the raid when he was arrested.

I declare under penalty of perjury that the foregoing is true and correct this 10th day of April, 2012.

Robert Preston: Sandberg

# EXHIBIT A-5

Affidavit of Debbie Doty

State of Idaho     )
                 ss.
County of Idaho    )

     I, Debbie Doty, the Affiant, a resident of the State of Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state, under penalty of perjury pursuant to 28 USC §1746 as follows:

1. I am currently a resident of 4330 U.S. Highway 13, Stites, Idaho 83552 and employed as a personal caregiver for the disabled and as a caregiver, I am familiar with the appearance of those who are near death.

2. On April 2, 2002 I became employed with WaterOz, a dietary supplement company that produces ionized mineral water at its factory near Grangeville, Idaho.

3. Prior to April 2, 2002, I worked as a waitress in area restaurants, where I had waited upon Elven Joe Swisher and his wife from time to time.

4. On the occasions when I waited on Mr. Swisher and his wife there was nothing about his appearance to indicate he had a health problem in contrast to his appearance when he came to the WaterOz factory in December 2002 and January 2003.

5. A few days before Christmas 2002 and again in late January 2003, Mr. Swisher, who was driven by his wife, came to the WaterOz factory to pick up sample products.

6. It was my task to take the bottles of WaterOz liquid minerals from the office to Mr. Swisher's vehicle as he was unable to come into the factory.

7. When I spoke with him both times, I could see that Mr. Swisher looked quite different from when he had been my restaurant customer and I observed that his facial complexion was ashen grey looking like someone close to death.

8. In the first conversation I had with Mr. Swisher in December 2002, he apologized for not coming into the factory to pick up the WaterOz mineral samples because he was catheterized and needed someone to lift him out of the vehicle into a wheelchair.

9. In the second conversation in late January 2003, Mr. Swisher indicated to me that he hope to get back on his feet again someday, but I observed that he was in poor health, his color was still grey and he was very weak and still needed a wheelchair.

     I declare under penalty of perjury that the foregoing is correct this 27th day of March, 2012.

Debbie Doty

# EXHIBIT A-6

## Affidavit of David Lewis

State of Idaho      )
                     ss.
County of Idaho    )

      I, David Lewis, the Affiant, a resident of the State of Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state pursuant to 28 USC §1746, as follows:

1. I am currently a resident of 205 Hill Rd., Orofino, Idaho 83544.

2. I met Elven Joe Swisher of Cottonwood, Idaho after he became acquainted with Joe Volk in July of 2003.

3. Joe Swisher was using a cane for support and had a bladder bag as a result of a heart attack when a pacemaker was installed.

4. From my observations, Joe Swisher was in poor health in 2003 when I met him and he was unable to engage in physical activity.

      I declare under penalty of perjury that the foregoing is correct this 04 day of April, 2012.

_David Lewis_
David Lewis