# EXHIBIT A-7

## Affidavit of Allen Brockmann

State of Idaho      )
                         ss.
County of Idaho    )

       I, Allen Brockmann, the Affiant, a resident of the State of Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state pursuant to 28 USC §1746, as follows:

1. I am currently a resident of 13828 4th Ave. West, Orofino, Idaho 83544.

2. I have known Elven Joe Swisher of Cottonwood, Idaho since 1957 when we were in the U.S. Marine Corps together.

3. In 2003, Joe Swisher contacted me and ask me to sign a letter regarding a "No Duty Chit" that kept him from marching with a rifle while in the Marine Corps.

4. I learned from Joe that he had a heart attack with a pacemaker installed about a year before he contacted me. Joe claimed he died on the operating table during surgery and had to be revived with a defibrillator.

5. When Joe Swisher approached me to sign the letter regarding thee No Duty Chit, he was still sick from the effects of the heart attack and surgery.

       I declare under penalty of perjury that the foregoing is correct this 04 day of April, 2012.

_Allen H. Brockmann_
Allen Brockmann

# EXHIBIT A-8

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. CR-O4-127-C-(RCT) |
| | ) |
| v. | ) |
| | ) Affidavit of Ben S. Casey |
| DAVID ROLAND HINKSON, | ) |
| | ) |
| Defendant. | ) |

I, Ben S. Casey, of Caldwell, Idaho, a juror in the trial of the above case which took place January 10-27, 2005, upon oath, depose and state as follows:

1.     I am over the age of eighteen years at the time of signing this Affidavit and I am qualified, competent and knowledgeable to provide the information set forth herein.

2.     I am aware that the Headquarters of the U.S. Marine Corps considers the "replacement" DD 214 military record to be a forgery, which record was produced by prosecution witness Elven Joe Swisher (which he waved in front of the jury stating that it was a "certified copy.")  I am also advised that Mr. Swisher did not participate in a secret mission, did not have combat experience and did not sustain injuries in Korea as he testified.

3.     I was surprised that Mr. Swisher was allowed to tell such lies which created the misimpression that he would be a good "hit-man" candidate based on having been a decorated combat veteran and having participated in secret post-Korean War rescue operations.  I am now informed such missions never occurred. These lies discredit him as a witness and therefore discredit the rest of his testimony.

4.     I relied upon the credibility of Mr. Swisher when I cast my vote to convict Mr. Hinkson of Counts Seven, Eight and Nine.

5.     If I had known that Mr. Swisher was not a credible witness as to his U.S. Marine Corps service in secret missions, or that he lied about having had combat experience, or that he was not entitled to wear a Purple Heart, or that the military record he waved in front of the jury as a "certified copy" of his DD 214 was a forgery, I would not have voted for a guilty verdict on Counts Seven, Eight and Nine.

FURTHER AFFIANT SAYETH NAUGHT.

Signed and sworn to under penalty of perjury this 2⁴ day of February 2005.

_Ben S. Casey_
Ben S. Casey

Affidavit of Ben S. Casey                                                                 Page 1 of 1

# EXHIBIT A-9

State of Idaho          )
                        ss.
County of Idaho         )

I, Gregory W. Towerton, the Affiant, General Manager of WaterOz, located at 1753 Stites Road, Grangeville, Idaho 83530 a resident of Idaho County, Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state under penalty of perjury pursuant to 28 USC §1746 as follows:

1. I married Marda Marie Hinkson June 29, 2002 after I moved from Washington, State. Matthew Hinkson, son of David R. Hinkson and David Hinkson, returned from their trip to Ukraine immediately before the wedding so that Matthew could serve as an usher.

2. After we were married and on or about June 30, 2002, David R. Hinkson (Marie's first husband) took all of their children on a month long driving vacation to Colorado, Nevada and California. They called us as they returned to Boise, Idaho approximately the last day of July 2002 and invited us, and my children who were living with me at the time, to come to Boise and meet them to participate in a waterpark experience.

3. I took Marie and my children to Boise, Idaho on or about July 31, 2002 and watched as the children played in the waterpark facilitates. I drove Marie and my children back to our home in Grangeville, Idaho on the night of July 31, 2002.

4. By the evening of August 1, 2002, David had returned his children to live with Marie and me at our home in Grangeville.

5. Early in the morning of August 2, 2002, David picked up his children to take them boating for the day at Dworshack Reservoir near Orofino. David returned his children from their day at the reservoir to my home in Grangeville by the middle of the evening on August 2, 2002.

6. I learned that David was set to leave early the next morning, August 3, 2002 on a business trip that would last about three months. The first leg of that journey was to Venezuela. I knew that the children would not see their dad for several months so that having him spend so much time with them in July and around the first and second of August was justified as far as the sharing of visitation time between Marie and David was concerned. As long as my wife approved of that arrangement, it was fine with me; and she did .

7. We heard from David periodically as he was in faraway places like Russia or the Ukraine and he did not return to Idaho County until the first of November 2002.

8. I learned that there had been a raid by some Federal Government agencies at David's house near his WaterOz factory on November 21, 2002. David was charged and then released on his own recognizance at that time.

9. David was in Idaho County and available to visit his children at Thanksgiving and Christmas 2002, although I am aware that he went to a health conference in Southern California in early December and was gone for about a week.

10. I learned that David was again arrested and put in jail in early April 2003 over a question of violation of conditions of his pretrial release.

11. In the spring of 2003, I received a phone call from David when he was calling his children to have phone visitation with them from jail. He asked me if I would be interested in working for WaterOz. I explained that I had a good job with the Idaho County Sheriff's Office with pension benefits etc., and so I would have to take a serious look at the opportunity at WaterOz to make it work for me. He invited me to go out to the factory on my day off and check it out. He said I could speak to Jeri Gray, the manager.

12. I had a further telephone discussion with David in mid-June 2003 and he referred me to his attorney at the time, Mr. Britt Groom, of Grangeville, Idaho, who agreed to answer some specific questions regarding WaterOz. I set an appointment and traveled over to Mr. Groom's office for that purpose by early July 2003.

13. At that appointment with Mr. Groom, a Richard Bellon, paralegal working for David Hinkson, also attended.

14. Shortly after I arrived, I heard shouting in the reception area of Mr. Grooms office and then saw the man who was yelling, who was later identified to me as Joe Swisher. Mr. Swisher, who appeared to be somewhat disabled, was enraged because he said David Hinkson owed him $10,000 that he claimed had not been paid and he was yelling at the receptionist insisting that this bill had to be paid right then. It became clear that the bill he was talking about was a past due amount he said was payable by WaterOz. Mr. Swisher was very upset and said that if Mr. Hinkson did not pay the bill he, Mr. Swisher, would personally go to Boise and testify against him and see that he spent the rest of his life in prison. I did not meet Mr. Swisher at that time as I felt he was too agitated to have a rational conversation with me, or anyone else.

15. From my years of training as an investigator in law enforcement for the US Government and as a deputy for the Idaho County Sheriff's Office, I could see that Mr. Swisher was using extortion tactics, threatening great harm in order to obtain some financial objective. If investigated, this conduct by Mr. Swisher was either extortion or blackmail.

16. I would have reported the threats to the Grangeville PD except Mr. Groom, the attorney for Mr. Hinkson and Mr. Bellon, the paralegal for Mr. Hinkson both assured me that they would take care of it and that there was some mistake and Mr. Hinkson did not owe the amount which Mr. Swisher claimed and I was assured that the attorney for Mr. Hinkson would handle it.

Swisher billed WaterOz $12,000 for the purchase of an outdated Atomic Absorption or AA Machine that David did not agree to purchase because WaterOz had already purchased an ICP machine. Subsequently, I learned that a third party claimed he owned the AA Machine which Mr. Swisher was trying to sell to David. This bill was disputed and never paid.

23. Until his visit in mid-September, I became aware that Swisher would not come inside WaterOz since he had been banned by Mr. Hinkson in January 2003. However, Mr. Swisher periodically stopped by to pick up minerals which were taken out to his vehicle and delivered to him. This was based on an arrangement he had made with Jeri Gray.

24. After Mr. Swisher was defeated in his takeover attempt with Mr. Bellon, he developed a new scheme to extort property from David involving the filing of a counterclaim in the TRO lawsuit, demanding the payment of $500,000 and delivery of title to property including a three story office building, 20 acres behind the factory and a Road Patrol road grader. These items were demanded by Mr. Swisher in the TRO lawsuit, which claims were resolved without any of these items being transferred to Mr. Swisher.

25. In his testimony on January 14, 2005 in the Solicitation trial against David, Swisher claimed that Hinkson considered him to be his "best friend" and alleged that as a demonstration of such friendship Hinkson had given him the following items of valuable property: (1) $500,000.00 in cash; (2) a three-story office building that was under construction and nearly finished, which Swisher claimed Hinkson said he "didn't need" (a building Hinkson was constructing as a call center for telephone sales and marketing personnel); (3) a "Road Patrol" road grader (Hinkson did not own a Road Patrol grader); and (4) Twenty 20 acres of real property behind the WaterOz factory (there was only a steep canyon behind the factory.) From my investigation of these matters I determined that these items of property had not been given to Mr. Swisher but were still in Mr. Hinkson's name, so that these statements were untrue, but served Mr. Swisher's plan to cause the jury to falsely think there was a close relationship between David and Swisher.

26. During my association with David, I saw no evidence that there had ever been a "friendship" between them. What I saw was a business relationship that failed because Mr. Swisher had not delivered accurate reports on WaterOz products. Evidence of hostility by Mr. Swisher toward David is found in the hostile takeover of WaterOz (by TRO) that lasted seven days in early December 2003. Messers Swisher and Bellon were working together to convince the Idaho District Court Judge that Hinkson's absence from WaterOz had created a void in management detrimental to the business.

27. In order to obtain the TRO, Swisher and a small group of co-conspirators fraudulently described business-related calamities so severe that the trial court was willing to give them an ex-parte TRO seizing possession of WaterOz in order to "save" the company from what Swisher portrayed as certain disaster affecting over 30 Idaho County jobs at the factory. When Swisher had achieved his goal of obtaining the TRO, he dismissed all employees loyal to David and declared himself the CEO of WaterOz.

28. Under Swisher's TRO and seven day management of WaterOz, valuable assets of the company were stolen including customer lists and trade secrets belonging to Mr. Hinkson's business, which valuable property rights were passed on to competitors. I learned that as soon as the TRO was entered, Mr. Bellon immediately called Dan Vaughn, a business broker and demanded that WaterOz be listed for sale.

Further Affiant sayeth naught.

I declare under penalty of perjury that the foregoing is correct this 15 day of April 2012.

_____
Gregory W. Towerton

# EXHIBIT A-10

**NORTHWEST ANALYTICAL, INC.**
Route 1, Box 166, Cottonwood, ID 83522
208-962-7190/Fax 208-962-5114

| Billed To | Address | Invoice No. | Date |
|-----------|---------|-------------|------|
| Water Oz | Route 1, Grangeville, Idaho 83530 | 41655 | 04/01/03 |

January 17, 2003

    Lease Purchase Agreement for lease/purchase of
    Perkin Elmer Atomic Absorption Spectrograph

    Price Agreed Upon  $12,000.00
    Payable @ $1,000.00 Per Month

    No Payments Received as of This Date

Amount Due and Payable          $12,000.00


TOTAL DUE This Invoice         $12,000.00

328

EXHIBIT
tabbies
_____

5

# EXHIBIT A-11

C1

336



# CHAIN OF CUSTODY RECORD

**NOTES:**
1) Ensure proper container packaging.
2) Ship samples promptly following collection.
*3) Designate Sample Reject Disposition

**Table I. — Matrix Type**

1 = Surface Water, 2 = Ground Water
3 = Soil/Sediment, 4 = Rinsate, 5 = Oil
6 = Waste, 7 = Other (Specify)

**Client:** Idaho Viatech Co.
**Contact:** Bob Suisse
**Address:** 121 Norris
       Hayward Rd. 83522
**Phone Number:** 208-961-7150
**FAX Number:** 208-961-5114

**POR #:**
**Project Name:** Witco 02
**Samplers Signature:** [signature]

**Lab Name:** SVL Analytical, Inc.
**Address:** One Government Gulch, Kellogg, ID 83837-0929
(208) 784-1258    FAX (208) 783-0891

| Sample ID | Collection | | Miscellaneous | | | | Preservative(s) | | | | | Analyses Required | Comments |
| | Date | Time | Collected by: (Init.) | Matrix Type From Table 1 | No. of Containers | Sample Filtered ? Y/N | Unpreserved (Ice Only) | HNO3 | HCL | H2SO4 | NAOH | Other (Specify) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. If Tank | 1/23/03 | 3:45 pm | SVL | 7 | 1 | Y | S | | | | | | cyd Potassium | |
| 2. | | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |
| 7. | | | | | | | | | | | | | | |
| 8. | | | | | | | | | | | | | | |
| 9. | | | | | | | | | | | | | | |
| 10. | | | | | | | | | | | | | | |

Relinquished by: _____ Date: ___ Time: ___    Received by: _____ Date: ___ Time: ___

Relinquished by: _____ Date: ___ Time: ___    Received by: _____ Date: ___ Time: ___

* Sample Reject: [ ] Return   [ ] Dispose   [ ] Store (30 Days)

White: LAB COPY        Yellow: CUSTOMER COPY        SVL-COC 1295

Page ___ of ___

**FOR SVL USE ONLY**
SVL JOB #

EXHIBIT

# EXHIBIT A-12

## 1. INTRODUCTION:

This case was referred to the OCI San Francisco Resident Office by the FDA's Seattle District Office (SEA-DO). WATER OZ distributes water products containing a variety of minerals throughout the United States, in addition to other products including ozone generators. Subsequently, this office was contacted by the Internal Revenue Service, Criminal Investigations Division, (IRS-CID) and was informed that they are conducting a criminal investigation of WATER OZ and DAVID HINKSON. On November 21, 2002, IRS-CID and OCI agents executed a search warrant at the WATER OZ manufacturing facility located outside of Grangeville, ID. DAVID HINKSON was also arrested at this time, based on a previous indictment for failing to file income tax returns, introducing misbranded and adulterated drugs into interstate commerce, and other related charges.

This is a joint case with the IRS-CID, Boise, ID, case number 930030015.

SA Blenkinsop makes reference to a Report of Investigation (ROI) for the period 04/30/03 to 7/29/03.

This ROI documents the discovery of a radio interview DAVID HINKSON gave, the criminal history of RICHARD BELLON, the use of cyanide at WATER OZ, and the rescheduling of the trial date.

## 2. DETAILS OF INVESTIGATION:

On August 4, 2003, SA Blenkinsop, after using a search engine on the Internet, located the web site "theotherradionetwork.com", which has posted an interview DAVID HINKSON gave on January 8, 2003. A "streaming" copy of this interview was copied onto two audio cassettes, which were subsequently inventoried as Item 1 on Certified Inventory of Evidence (CIE) form 124660.

During the interview, HINKSON makes a number of allegations including the fact that agents planned on murdering him during the execution of the search and arrest warrants executed on November 21, 2002. HINKSON also claims that Assistant U.S. Attorney Nancy Cook forged signatures on the grand jury indictment and on the search warrant.

During a court hearing on September 26, 2003, before U.S. District Court Judge Winmill, an individual identifying himself as legal assistant RICHARD BELLON, appeared with HINKSON's attorney Brit Groom. BELLON had previously been identified as the current manager of WATER OZ. A request was made with OCI's Investigative Analysis Branch (IAB) for additional information on BELLON.

According to information supplied by IAB, BELLON was convicted of assault on a federal officer in 1994, and was sentenced to five months in federal prison. In addition, BELLON has hundreds of thousands of dollars in outstanding federal tax liens. Appended at Attachment 1 is a Subject History Form for BELLON.

SA Blenkinsop subsequently reviewed the Eastern District of California's case file for details of BELLON's conviction. BELLON was convicted of two separate unrelated assaults on federal officers, one of which required medical attention for the officer. BELLON was also convicted of 26 U.S.C. § 7212(a), Forcible Interference; and, 26 U.S.C. § 7212(b) Forcible Rescue of Seized Property. This information regarding BELLON's assault convictions was forwarded to the United States Marshal's Service in Boise, ID.

437

EXHIBIT

EXHIBIT A-13

**NORTHWEST ANALYTICAL, INC.**
Route 1, Box 166, Cottonwood, ID 83522
208-962-7190/Fax 208-962-5114

| Billed To | Address | Invoice No. | Date |
|-----------|---------|-------------|------|
| Water Oz | Route 1, Grangeville, Idaho 83530 | 41679 | 05/27/03 |

Attention:  Geri
                     Rich
                     Brit

Previous Balance as of February 14, 2003, Invoice No. 41620      $ 2,297.00

Payment of April 28, 2003                                                              $    738.00

Balance Due from Invoice No. 41620                                           $ 1,559.00

Previous Balance as of March 28, 2003, Invoice No. 41654      $ 3,936.00

TOTAL DUE This Invoice                                                             $ 5,495.00

### *This Debt is long overdue!  If a payment is not made immediately, we will regrettably be forced to take other action.*

329



6

# EXHIBIT A-14

## *Joe Swisher*

304 GARRETT
(208) 962-7190

ROUTE 1, BOX 119
COTTONWOOD, IDAHO 83522

February 2, 2003

S.V.L. Analytical, Inc.
One Government Way
P.O. Box 929
Kellogg, Idaho 83837

Attention: Dave

Dear Dave:

Enclosed please find water sample as previously discussed. Would you please test for cyanide and potassium and fax results to me at 208-962-5114. Please send originals via U.S. Mail as before. Thank you.

Please charge to our Idaho Mining and Development account.

Sincerely,

Joe Swisher

JS/b

Enclosures



335

16

# EXHIBIT A-15

## Affidavit of Joe Swisher

I, Joe Swisher, being first duly sworn on my oath, deposes and says:

1. I am familiar with all the facts contained in this Affidavit and I am competent to testify to those facts of my own knowledge.

2. From about August 1, 2001 through September 15, 2002, I periodically worked with a man who called himself, Chris Jon Paitreyot.

3. It was my understanding that Chris Jon Paitreyot worked for WaterOz and was responsible for adding the minerals to the tanks and manufactured the mineral concentrates that were added to the tanks.

4. Mr. Paitreyot represented himself as a chemist and told me his job at WaterOz was to make the mineral concentrates, mix the mineral concentrates in the tanks and make sure the product was tested before bottling.

5. Mr. Paitreyot brought me samples of what he call finished concentrates and products on a regular basis.

6. Mr. Paitreyot hand delivered samples to a laboratory I work for located at 605 Peasley, Cottonwood, Idaho.

7. Most of the samples delivered by Mr. Paitreyot tested within normal limits (excepting concentrates, of course).

8. In July of 2002, I personally took samples at the WaterOz factory of tank solutions. Testing indicated that the tanks had been diluted with well water and the elements were much lower than required.

9. I immediately called for a meeting with Mr. Paitreyot and others and reported what I believed was sabotage of the product. I suggested security measures and Mr. Paitreyot informed me he would make sure the product was as stated on the labels.

225



**EXHIBIT**

tabbies

10. Thereafter, Mr. Paitreyot made a number of trips to the Cottonwood lab facility with many samples. By mid-September, the samples Mr. Paitreyot was bringing to me checked higher and most were within normal limits.

11. On September 15, 2002, I experienced a complete heart block which resulted in the insertion of a dual pacemaker.

12. Mr. Paitreyot called me on a weekly basis to see how I was doing and to determine when I might be back in the lab and be able to pick up plant samples.

13. On or about November 11, 2002, Mr. Paitreyot called me to check on my condition. He wanted to know how I was feeling and when I could resume testing. I told him that I would be back to resume testing in a week.

14. On or about November 18, 2002, I learned that Mr. Paitreyot had disappeared. I was surprised to learn that he had left town.

15. I went by the WaterOz factory on November 18, 2002 and picked up samples for testing.

16. On or about December 15, 2002, as I finished testing the products, I discovered that nearly all of the samples were short of mineral and the amount of mineral actually in the bottles did not match the displayed amount of mineral as appearing on the label.

17. Pursuant to testing batches that were delivered by Mr. Paitreyot to our laboratory, prior to November 15, 2002 and rerunning the tests after he left town, I can only conclude the samples Mr. Paitreyot delivered to me had been altered to read extra high and these samples were not reflective of the product that had been bottled at the plant. I believe Mr. Paitreyot was the only person who had the access necessary to do this. It is my conclusion based upon testing that the product was probably sabotaged by Mr. Paitreyot.

Affidavit of Joe Swisher                    -2-

18. I believe he left town because he knew I would resume testing of the products by the end of that week.

19. It is my belief that tampering was done by Mr. Paitreyot to make our laboratory testing match the stated amounts on the labels.

Furthermore, your affiant saith naught.

Dated this _0 3_ day of January, 2003.

_Joe Swisher_
Joe Swisher

Subscribed and sworn to before me this _3rd_ day of January, 2003.

_Manly C. Forodesor_
Notary Public in and for the State of Idaho
Residing at Cottonwood, Idaho, therein.
My commission expires: _7-16-2003_

# EXHIBIT A-16

Ministry of Health  Ukraine

**Kharkov State Medical University**
Subsidiary Company
**Testing Center**

61022, Kharkov -22
4, Lenin pr. Room 155
Tel. 40-5459, 40-2657

Attested by MOH of Ukraine
Certificate No. 164 dated 29 Jun.2000
Accredited by State Standard Committee of Ukraine
Register No. UA 6.001.H.499 dated 02 Nov. 1999

# PROTOCOL
## OF STATE SANITARY AND HYGIENICAL EXPERTISE
### No. 372/VTS-12.02 dated 24 December 2002.

1. <u>Name and area of usage of the product:</u> 1) concentrate for making mineral water "WaterOz Concentrate"; 2) Mineral Waters "WaterOz".

2. <u>Materials and compounds manufactured by:</u> "WaterOz" company, U.S.A.

3. <u>Ordered by:</u> representative of WaterOz company in Ukraine. Ponomarenko R.J.

4. <u>Samples manufacturing (submission) date:</u> November 2002

5. <u>Analysis made:</u> from 20 Dec. 2002 till 28 Dec. 2002.

6. <u>Type of analysis:</u> Measurement of concentration of chemical elements

7. <u>Analysis Data</u>

| Name of Product | Concentration, mg/liter (ppm) | |
|---|---|---|
| | Concentrate | End Product |
| 1 | 2 | 3 |
| 1. Boron | | |
| 2. Iodine | | |
| 3. Sulfur | | |
| 4. Gold | 242,5 | 61,0 |
| 5. Silver | 505.000,0 | 103,5 |
| 6. Platinum | 12.500,0 | 51,0 |
| 7. Indium | | |
| 8. Potassium | 198.000,0 | 887,0 |
| 9. Calcium | 270.000,0 | 332,5 |
| 10. Lithium | 14.300,0 | 4,8 |
| 11. Magnesium | 100.000,0 | 570,0 |
| 12. Manganese | 280.000 | 40,0 |
| 13. Cobalt | 116.400,0 | 114,4 |

423

**EXHIBIT**

123

| 14. Chromium | 5.000,0 | 25,0 |
|---|---|---|
| 15. Tin | 225.000,0 | Traces |
| 16. Copper | 42.500 | 100,0 |
| 17. Iron | 118,4 | 1,8 |
| 18. Zinc | 99.000,0 | 168,0 |
| 19. Selenium | | |
| 20. Vanadium | | |
| 21. Molybdenum | | |
| 22. Water of Life | | |
| - Calcium | 72.000,0 | 802,5 |
| - Chromium | 15,8 | 15,8 |
| - Copper | 3,45 | 3,45 |
| – Magnesium | 355,0 | 318,0 |
| - Silver | 0,3 | 0,3 |
| – Platinum | 17,5 | 17,5 |

NOTE: Water of Life sample contains other unknown elements that influence the results of quantitative analysis.

Head of
Testing Center
Kharkov State Medical University
Doctor of Medicine, professor

/Signature/          V.O. Korobchansky

/Signature/          T.O. Ivanenko

Head of Sanitary and Hygienic
Laboratory, Doctor of
Pharmaceutical Sciences

[Oval Stamp:
Ministry of Health of Ukraine
Kharkov State Medical University
Testing Center
No. UA6.001.H.499]

Official translation made by
"MOST Translation Services"
Subsidiary of "Infor" Private Company
Kiev. Ukraine. Date: 26 Dec. 2002

124

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California 95301
In Propria Persona

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case #: CR-04-0127-S-RCT |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT HINKSON'S MEMORANDUM |
| vs | ) IN SUPPORT OF <u>GROUND TWO: JUDICIAL</u> |
| | ) <u>BIAS AND JUDICIAL MISCONDUCT</u> AS IS |
| David Roland Hinkson, | ) HEREBY APPENDED TO HINKSON'S |
| | ) MOTION TO VACATE THE CONVICTION |
| Defendant. | ) AND SENTENCE UNDER SECTION 2255, |
| | ) TITLE 28 USC. |
| | ) |

Memorandum in support of Hinson's 2255 Motion to Vacate the Conviction and Sentence, Ground Two: Judicial Bias and Judicial Misconduct.

I, David Roland Hinkson, the defendant herein, am a person who is **actually innocent**, a person who has been wrongfully imprisoned and falsely convicted of crimes that never occurred, and who has been sentenced to prison for effectively the rest of my natural life for crimes that I did not commit.

1.  I was convicted solely because of the testimony of E.J. Swisher, a proven government perjurer. His testimony was the sole meaningful evidence against me and without help from the bench, the government would never have been able to sustain its case.

2.  I have obtained the information shown herein that it was impossible for me to have solicited Swisher together with other errors that deprived me of my Constitutional rights in the trial thereof. The proof now shows that Swisher fictionalized the crime of torture-murder for hire as a part of his plan of extortion and out of spite and malice, or for other reasons known only to Swisher, against me because he could not extort money out of me nor could he intimidate me into signing over a one-half interest in my WaterOz business (see Affidavits attached to my § 2255 Motion filed contemporaneously herewith).

    a.  Swisher's medical records were withheld by the government and their ability to subvert the path of justice was sustained by Judge Tallman in his rulings.

    b.  Swisher's perjury was known to both the government AND to Judge Tallman from at least (if not before) the presentation of the Dowling Report, which identified Swisher as a liar, a fraud and a perjurer. Judge Tallman's ruled to exclude the OFFICIAL military record of witness Joe Swisher. Judge Tallman deliberately misinterpreted Evidence Rule 608(b) and ignored a recent revision of said rule to curb the very misapplication as being postured by Judge Tallman.

        i.  Judge Tallman fabricated information from the bench as to the content of Swisher's military file in order to create a fact, i.e., the existence of evidence that Swisher went to Korea, when such evidence did not exist in Swisher's military file. Then Judge Tallman relied upon that false finding of fact to

make his ruling that excluded the exculpatory evidence contained in Swisher's military file that would have saved me from a conviction. If the jury had learned that Swisher was lying to them about his combat hero status, they would not have believed him when he said that I was soliciting him to torture-murder federal officials and the Albers family.

ii.    In that erroneous ruling, Judge Tallman showed a reprehensible lack of judicial conscience and an amazing amount of brashness when he decided that exculpatory evidence impeaching the direct trial testimony of Swisher could not be introduced because supposedly – but incorrectly – it concerned an out of court matter which was a collateral subject.

iii.   The point is that the government is the one that opened the door to this subject in its opening statement by identifying Swisher as a combat hero. Then, it was Swisher's own testimony by falsely wearing on his lapel an unearned Purple Heart Medallion without authorization, that identified him as a wounded combat veteran. Combined with his other falsely claimed military awards, which he backed up with a forged DD-214. Swisher was the prosecution witness who had obviously been prepared by prosecutor Sullivan in advance to pull that forged DD-214 from Sullivan's pocket when Swisher was asked on cross, 'by what authority' he was authorized to wear the Purple Heart. At that moment, prosecutor Sullivan pulled his copy of that forged DD-214 from his pocket to show to the trial court and jury clearly indicating that he also was in on the scam.

iv.    When asked why he had not disclosed that document in advance, prosecutor Sullivan asked Attorney Hoyt, in a sneering tone, "Why should I?" Judge Tallman did not admonish the prosecution for its complicity in the crime that was being committed in his presence; the crime was the felony subordination of perjury and knowing presentation of a forged document, these crimes constituted a fraud on the court and on Mr. Hinkson (remember, Swisher was convicted for perjury April 10, 2008 for saying exactly the same thing before a federal ALJ in the context of his VA application for benefits); then to compound the crime, Judge Tallman and the prosecutor went on to commit the crime of misprision of a felony by failing to have Swisher prosecuted for his perjury and forgery. Eventually, Swisher was prosecuted, because the Inspector General of the United States, upon complaint of the Secretary of the Veteran's Administration insisted that he be prosecuted for the same crimes that were committed by Swisher before a Administrative Law Judge in a VA hearing in 2004, which all happened before my trial. And the US Attorney for the State of Idaho refused to bring the prosecution so that a special prosecutor had to be designated from the State of Montana in order to prosecute Swisher in Idaho because the government and Judge Tallman conspired, as a part of the payoff to Swisher, not to prosecute him for his crimes committed in the court room in my case. And, even though Swisher was prosecuted, tried and convicted of three felonies totaling 30 years plus a misdemeanor of theft of valor, he ultimately received a soft sentence of one

year and one day from the Idaho District Court Judge who refused to look at or review 30 petitions from U.S. former military who were Idaho citizens who were outraged that Swisher had defrauded them for years with his claims of Korean War Era combat heroism and Swisher was again allowed to get off easy because he was assigned to a "country club" prison where he complained that his bed was too hard for the few months he was incarcerated. Not much of a slap on the wrist for a man who had spent his lifetime perfecting the art of fraud.

c.    Judge Tallman repeatedly engaged in improper coaching of the prosecution attorneys to assist them in obtaining a conviction; he was practicing law from the bench and was not serving a judicial function when he was so engaged and that certainly was not conduct becoming of a truly neutral arbiter. (See trial record.)

3.    It was the prosecution who brought up the subject of Swisher being a combat hero in opening and therefore it was not invited error by the defense. It was Swisher who testified by wearing the Purple Heart that on direct examination constituted testimony of being wounded in battle, which was consistent with the prosecution's theory that he was supposed to have had an impressive military record on a secret mission. Such was the theory of the prosecution, not the defense. The government's theory was that it was Swisher impressive award laden combat service record that supposedly enticed me to solicit him to kill other human beings; but, the first time I ever heard of this story was when Swisher testified in trial. The facts of this case and the conviction of Swisher in his own case absolutely prove that this entire story was concocted out of whole-cloth and was perjured testimony in front of the jury. If this had

been proven before a reasonable and rational judge would have stricken the Swisher testimony or ordered a mistrial *sua sponte*. Judge Tallman himself concocted a story to support Swisher's lies. Judge Tallman found that the hostilities in Korea has never officially been terminated (TR pg 1124, ll 13-21) which was false, and went on to make another false finding of a fabricated fact that supported Swisher's fraud when Judge Tallman claimed that Swisher's military record, which was sitting in front of him (on the bench in front of him at the time) had information that indicated Swisher had served in Korea and that it was possible for him to have gone on a secret mission, even after the Dowling Report specifically provided that Swisher did not. *See Ex B*  Especially when Swisher's official military record was being reference by Tallman was subsequently proved exactly the opposite. This malicious fabrication can only have been done to allow perjured testimony to stand, to prevent the jury from discovery of the truth and to assist the prosecution in suborning said perjury and thereby materially helping to insure my conviction.

a.      Under the case of <u>Porter v. McCollum, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009)</u>, the US Supreme Court recognized that American juries give high credence to an individual with an honorable military service record.

b.      Because of this fraud on the jury, it is certain that unless rebutted, Swisher's credibility was enhanced to the point that it was unassailable (without proof of his fraud as to his military career). That is, using his military record against him, to impeach his credibility was not collateral at all, because it dealt with a specific lie told by Swisher under oath, in the presence of the jury which was predicated on, **and key** to, the government's theory of the case.

c.   Thus, such testimony was outside the prohibition of Rule 608(b) which had previously been amended to prevent misapplication in instances just such as this; the difference between a specific instance of lying that was not admissible is that such a lie was told outside the court room, and thus was to be considered as collateral. Because introduction of Swisher's military record would have impeached Swisher on his bogus claim as a wounded combat veteran who had supposedly attracted me to hire him to commit murder. It is clear that, Judge Tallman didn't want Swisher's testimony impeached and so he had to find a way, bogus though it was, to exclude Swisher's military record, the absolute proof that he was lying.

d.   Under Porter, there is recognition that such a witness obtains the status of an unassailable super hero in the eyes of the jury, whom the jurors would treat favorably, and may not suspect them of lying. Therefore, the jury was likely to accept everything Swisher said, including the lies he told about me as if I was some depraved psychopath who was begging him to torture-murder women and children.

4.   Additionally, it turns out that at the very time that Swisher perjured himself and said he had been solicited by me in 2002, he was in a coma, or bedridden from a heart attack and was intubated for over a year from early June 2002 at all the times he said I was soliciting him (See Affidavits attached to Memorandum Supporting Ground One). During those times, I was out of Idaho and in fact, was out of the USA. Being intubated he was absolutely incapable of having any such communications with anyone about soliciting him for murder and his medical records would show those dates (discovery of these medical records is needed to prove the exact dates of medical treatment and physical condition). From the date

of his June 2002 heart attack to July 2003, Swisher was disabled and even though he was not in a coma, the evidence is that he was strapped in a wheel chair, with a catheter and bladder bag, wearing diapers and unable to lift himself into or out of his own vehicle and finally, by July 2003, had worked himself up to walking with a cane. As to those times, which would be shown on his medical records, he certainly was not in a position that anyone, me, the jury, or any rational person, would have considered him capable of committing the act of murder.

5. Judge Tallman, who has been an advocate for the prosecution throughout all proceedings against me, does not have the objectivity to see that it was impossible for me to have solicited Swisher at the times suggested by him. Nor does Judge Tallman have the objectivity to allow discovery or hold an unbiased evidentiary hearing at which Swisher's medical records can be subpoenaed to determine the circumstances as to each event when he says that I solicited him, such as when I was traveling out of the State of Idaho for up to 90 days at a time trying to start a new business or looking for a place to locate a second factory. Such evidence would show that Swisher was in a severe and a disabled health condition when he claims to have been solicited and was completely unavailable to participate in such a meeting; so that the transactions for which I was convicted could not have occurred.

6. It is like DNA evidence that once presented, it shows the defendant's complete and total innocence. However, Judge Tallman must be removed from this case as he has proven himself to be unreliable as an objective arbiter of any information favorable to me, no matter how strong or exculpatory to my circumstances because of his manifest bias for the government and prejudice against me. The point is that if he would make up information

that did not exist in Swisher's military file in order to find that there was evidence Swisher may have gone to Korea in order to keep said file from the jury, it is not unreasonable to assume that he will make up other information in the §2255 hearing to keep out exculpatory evidence.

7.    While the conviction of Swisher was not previously available for use in my case because the conviction had not yet occurred, an objective court reviewing my motion under § 2255 must now consider the effect of those Swisher's lies upon my conviction. If they were lies in 2004 before the VA and he told the same story in my case, then they were lies that constitute fraud on me, the court and the jury. However, if Tallman is assigned the task as reviewer, then it is likely his foregone conclusion will be not to look objectively at this evidence, but to find an excuse to sustain his earlier erroneous position. Where, in all of western jurisprudence, is it acceptable for the trial judge to review his own errors on appeal? This concept of propriety goes back even before *Marbury v. Madison.*[1]

---

[1]    The second point requires showing that the law of nature itself fit Coke's approach in Bonham's Case and called for application of the rule that no man should act as judge in his own cause to the facts of the case. The broader problem is to ascertain what powers over statutes Coke was asserting in his report of the case. My argument is that far from announcing a new or controversial approach to statutes, the case illustrates a common feature of both the law of nature and the English common law. There is no doubt, in the first place, that acting as a judge in one's own cause had long been regarded as a violation of the law of nature. At another place in his works, Coke himself repeated the point, writing: "[I]t is also against the law of nature for a man to be judge in his own proper cause." – ARTICLE: BONHAM'S CASE, JUDICIAL REVIEW, AND THE LAW OF NATURE, Winter, 2009, 1 J. of Legal Analysis 325, by R.H. Helmholz

    This was not something he had invented. The rule was found in the Digest of the Roman law, in the Codex, and also in the medieval canon law. From the Middle Ages and into the early modern era, the proceduralists of the *ius commune* repeated it as axiomatic. It was equally recognized by everal precedents in the English common law. – ARTICLE: BONHAM'S CASE, JUDICIAL REVIEW, AND THE LAW OF NATURE, Winter, 2009, 1 J. of Legal Analysis 325, by R.H. Helmholz, Published in *Oxford Journals* and available at this URL: http://jla.oxfordjournals.org/content/1/1/325.full.pdf+html?sid=d406d950-4af8-429a-8d78-5b9c0b47478c

8.    As proof that the jury believed every word spoken by Swisher, the jury sent a note to the

judge shortly after Swisher's testimony while, still in the prosecution's case-in-chief, that

asked the trial court if Swisher had done a mental evaluation of Hinkson; and wanted to

know if "we" i.e., the jury should be considering insanity.  That note reads:

> "Your Honor, I don't know if this is allowed for me to ask; but can
>
> Mr. Swisher be asked about the mental capacity of Mr. Hinkson?  Did
>
> he do a clinical evaluation of Mr. Hinkson?  Is David Hinkson on
>
> medication?  Is Mr. Hinkson mentally ill?  Are **we** or are **we** not
>
> supposed to consider his mental capacity?"

9.    It is clear that the jury had deliberated and decided that I was guilty.  The jury wanted to

know if Swisher had examined me.  The indication is that the jury had determined my guilt

at that point in the trial and were ready to move onto the sanity hearing, which was not an

issue in this case.  In fact, Swisher was psychologist and if approached to murder someone

he had a legal and ethical duty to report it contemporaneously, not two years later.  It appears

the jury had engaged in deliberations[2] by illegally discussing this case and had made a

decision, that Hinkson was guilty, even before all the prosecution evidence was in and

certainly before the defense had a chance to present its evidence.  The point here is that Judge

Tallman, if he had been acting as a neutral trial court judge, rather than as an extension of

the prosecution, should have, *sua sponte*, declared a mistrial at that moment as a result of

---

2Even if it should be determined following an examination of the jurors under oath in an evidentiary
hearing in this matter that only the one juror, Mrs. Haynes had been considering these matters, it is
still proof of juror misconduct requiring a mistrial.  It is absolutely impermissible for a juror to
consider either matters outside of what has been presented in court, it is equally impermissible for
a juror to be considering such facts prior to the close of evidence.

manifest juror misconduct: i.e., the jury had not followed Judge Tallman's instructions and were discussing the case among themselves and had deliberated and made a decision. The facts show I did not get a fair trial with a jury that had already made up its mind.

10. Further, Judge Tallman improperly deprived me of representation by the counsel of my choice. Judge Tallman, in response to the phony allegations by the FBI in mid-trial, which asserted that my attorney, Wesley W. Hoyt, was involved in a plot (see Dkt #242-49) to murder twenty-two (22) individuals, including him, as the sitting judge, ruled that my attorney, Wesley W. Hoyt, had to withdraw from my case because he had an "irreconcilable" conflict of interest.

    a. The problem was the FBI agent had concocted a scam against me by getting inmate Chad Croner assigned to my jail cell in Ada County. The FBI plot was to have Croner sit in the cell with me and four other inmates long enough so that he could claim that I solicited him to murder people.

    b. That FBI plot backfired when attorney Hoyt obtained affidavits from all the other inmates who said I never talked to Croner and he never talked to me, except once about a tax issue. The space was so small everyone knew everyone else's business as were all confined in the same cage with Croner who sat silently on the top bunk and did not participate in any conversations.

    c. Each of the other inmates testified by affidavit, under oath that a conversation between Croner and I regarding my case never happened, which frustrated the FBI's attempt at creating another fraudulent crime to accuse me of.

d.     Being frustrated that an attorney would have the unmitigated temerity to prove that the FBI was suborning perjury and deliberately concocting fraudulent plots against me, they decided to attack Mr. Hoyt and accuse him of the same shop-worn murder for hire business they had been throwing at me for years, and Judge Tallman let the government get away with this blatant nonsense when any non-biased judge or neutral observer would have immediately seen that the FBI (government) was inventing stories and suborning perjury.

11.    Because I was improperly denied the counsel of my choice by Judge Tallman's erroneous ruling to exclude my counsel from representing me, I was not represented by effective counsel. If it is true that attorney Hoyt had an irreconcilable conflict of interest, then he was incapable of representing me and I was not represented as of the middle of my trial when the FBI 302 was delivered to him accusing him of participating in a murder-for-hire plot. That means that the denial of the New Trial Motion and sentencing were erroneous because of Judge Tallman's ruling.

12.    Judge Tallman was seen having private contact with a prosecution witness just before that witness testified. From the public hallway, Judge Tallman's chambers can be seen and when the door is open, a person in the hallway can see into the center of the chambers. Immediately before he testified, the key prosecution witness, Swisher, was seen exiting from Judge Tallman's chambers, and was seen gesturing "goodbye" to Judge Tallman and Tallman to him as Swisher slipped into the hallway. The US Marshals had required all parties in the hallway to either leave the area or to advance into the court room and the courtroom door was closed. Swisher was seen exiting from the hall door to the private chambers of Judge

Tallman by attorney Wesley W. Hoyt, see EXHIBIT B, Affidavit of Hoyt, attached hereto and fully incorporated herein by this reference, that at the very moment Swisher was exiting from Judge Tallman's chambers, attorney Hoyt was exiting from the men's room, which was across the hall and in plain view of the door to Judge Tallman's chambers. There is no excuse for Judge Tallman having a private conference with any prosecution witness Swisher or others, prior to testimony especially one which is a proven government perjurer. It was reprehensible conduct and should be the basis for recusal and a new trial,

FOR THE FOREGOING REASONS, the conviction and sentence in this matter should be vacated forthwith.