# EXHIBIT B



DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
3280 RUSSELL ROAD
QUANTICO, VIRGINIA 22134-5103

IN REPLY REFER TO:
1650
MMMA-4
3 0 DEC 2004

Mr. Ben Keeley, SVSO
State of Idaho Division of Veterans Services
821 21st Avenue
Lewiston, ID  83501-6392

JAN 10 2005

Dear Mr. Keeley:

   This is in further reply to your letter of January 23, 2004, to the Personnel Management Support Branch of this Headquarters, which was referred to the National Personnel Records Center, St. Louis, Missouri for reply regarding awards for Mr. Elven J. Swisher for his service while a member of the U.S. Marine Corps. Your letter was subsequently forwarded to this office for our review and comments concerning his award entitlement/verification.

   We have thoroughly reviewed the copy of the Certificate of Release or Discharge from Active Duty (DD Form 214) and supporting letter which you submitted on behalf of Mr. Swisher with your request. The documents you provided do not exist in Mr. Swisher's official file. The official DD Form 214 in his record of the same date was signed by Mr. Swisher and does not contain any awards information in box 26, and contains no "wounds" information in box 27. A copy of his official DD 214 is provided as the enclosure. Given this information we have reason to believe that the documents you submitted are not authentic.

   Specifically, the DD 214 you submitted on behalf of Mr. Swisher indicates that Mr. Swisher is entitled to the Silver Star Medal, Navy and Marine Corps Medal (Gold Star in lieu of the Second Award), Purple Heart, and Navy and Marine Corps Commendation Medal with Combat "V." However, our review of his official military records, those of this Headquarters, and the Navy Department Board of Decorations and Medals failed to reveal any information that would indicate that he was ever recommended for, or awarded any personal decoration.

   Additionally, the Navy and Marine Corps Commendation Medal, which is listed in block 26 of the DD 214 that you submitted did not exist at the time of Mr. Swisher's transfer to the Marine Corps Reserve in 1957. On March 22, 1950, a Metal Pendant was authorized for issue in connection with a Letter of Commendation and commendation ribbon. On September 21, 1960, the Secretary of the Navy changed the name of the award to the Navy Commendation Medal. On August 19, 1994, the Secretary of the Navy renamed the medal as the Navy and Marine Corps Commendation Medal. It is impossible that the approving officer could have signed an official document in 1957 indicating Mr. Swisher's entitlement to a personal decoration which did not exist in its present form until 1994.

Further review of Mr. Swisher's records reveals that he is not entitled to any service awards, including the Marine Corps Expeditionary Medal, for his service in the U.S. Marine Corps. Mr. Swisher's official military records failed to indicate any information that he served in Korea during the period when any awards were authorized. His records show that he was stationed at Camp Fuji and Yokosuka, Japan from March 4, 1955 to May 6, 1956.

There is no information in his military record or his medical record to substantiate his entitlement to a Purple Heart medal. His medical records show that on February 10, 1957, he was involved in a private vehicle accident near Port Townsend, Washington.

Marines who are recognized with a Navy and Marine Corps personal decoration for their performance, actions or meritorious service while involved in classified military operations may receive an award citation that contains non-specific information about the actions or service of the Marine. However, we found no evidence that Mr. Swisher was involved in any classified operations.

Given all of these facts, we must base our analysis on what is contained in Mr. Swisher's official military record, and not the documents you submitted on his behalf. Accordingly, since Mr. Swisher's official records do not support his entitlement to any awards, we will take no further action. His records will be returned to the National Personnel Records Center, and a copy of this letter will be filed in Mr. Swisher's official military records.

Sincerely,

K. B. Dowling

K. G. DOWLING
Lieutenant Colonel, USMCR
Assistant Head, Military Awards Branch
By direction of the
Commandant of the Marine Corps

Enclosure:  1. Certificate of Release or Discharge
                From Active Duty (DD Form 214)

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California 95301
In Propria Persona

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case #: CR-04-0127-S-RCT |
| Plaintiff, | ) |
| vs | ) DEFENDANT HINKSON'S MEMORANDUM ) IN SUPPORT OF <u>GROUND FOUR:</u> ) <u>INEFFECTIVE ASSISTANCE OF COUNSEL,</u> |
| David Roland Hinkson, | ) AS IS HEREBY APPENDED TO HINKSON'S ) MOTION TO VACATE THE CONVICTION |
| Defendant. | ) AND SENTENCE UNDER SECTION 2255, ) TITLE 28 U.S.C. |

Memorandum in support of Hinson's 2255 Motion to Vacate the Conviction and Sentence, Ground Four, Ineffective Assistance of Counsel. There may be additional facts developed during discovery and evidentiary hearing(s) in this 2255 proceeding and this memorandum is filed expressing the reservation of rights to more fully develop the facts and evidence surrounding the claim of IAC. The defendant is fully aware that IAC claims are generally not sufficiently developed in the trial record and need to be much more fully examined during a proceeding such as this instant matter.

Attorney Nolan's position is spread over several memos written over several days in late

January and early February 2005, right after trial. These memos are attached hereto as EXHIBIT D-1. Also attached are EXHIBITS D-2, Affidavit of Hoyt, and D-3. Affidavit of Towerton, AL:L OF WHICH are fully incorporated herein by this reference as if they were fully set forth herein.

**Summary of Attorney Nolan's failure to meet an objectively**

**reasonable standard of performance**

1. Attorney Nolan was always confused by this case and he admits it. He was confused about the counts, and he said so several times. He was confused as to who the witnesses were, what they had to say, and why their testimony was relevant, and why certain evidence was relevant to Hinkson's defense.

2. Attorney Nolan admits he was ineffective because he did not prepare for the trial and did not perform during trial because he was confused as to the Dowling Report of December 30, 2004, as to the witnesses and as to the various counts.

    a. The problem with Mr. Nolan was that he refused to review any files or do any analysis of the investigation that was available and then he did not pay attention to the accumulated information gathered for him to use in cross examination.

    b. Even when cross examination questions were written down in simplified form on 3 X 5 cards, designed to draw out exculpatory points from each witness, Mr. Nolan refused to ask those questions, because he was confused.

    c. On the one occasion when Mr. Nolan made a well-founded motion for mistrial, then withdrew it shortly afterward when pressured by the trial judge who was biased in favor of the government.

    d. After withdrawing that motion, Mr. Nolan refused to make any other motions for

mistrial, even though the trial record reflects other opportunities to do so. It was as if Mr. Nolan was frozen and would not defend Mr. Hinkson because of confusion.

3. Any decision that he might allege to have been tactical, had no tactical advantage to Mr. Hinkson but rather was in actuality a tactical decision unwittingly designed to help the Government win its case because of Nolan's confusion.

   a. There were hundreds of pages of Swisher deposition testimony from suits in 1996-1999 for fraud by Swisher related to his mining claims and a secret process for extracting gold which attorney Nolan refused to look at.

   b. There were many pages of Swisher's prior grand jury testimony which attorney Nolan refused to look at.

   c. There was an entire file regarding the prosecution of Swisher for raping all three of his daughters 1975-1980 when each of them was under 10 years of age; and proof that this child molestation case had ultimately dismissed through more fraud as engineered by Swisher, which attorney Nolan refused to look at.

   d. There was the file and lawsuit papers, including transcripts of trial and Swisher's testimony from the WaterOz takeover case of December 2003 through February 2004, which would have given Nolan insight into a direct fraud by Swisher against Mr. Hinkson in an effort to extort money and an interest in the WaterOz business which attorney Nolan refused to look at.

4. Attorney Nolan wrote that he thought he did not fall below "the standard of care," but at the same time and in the same memo he admits his poor performance was far below what is acceptable for a trial attorney.

a. Nolan admits that he was given a singular opportunity to take home Swisher's military file and look at it overnight, but he admits that he refused to review that file; although he gave pretense the next day to co-counsel and the defendant that he had done so. If that level of performance isn't falling below the Strickland standard, what is?

b. Nolan's admission that he willfully refused to even look at the military file, reveals a repeated pattern of deliberate neglect of relevant facts and information supplied by the defense team. See EXHIBIT D-2, Affidavit of Hoyt.

5. Attorney Hoyt rented a separate hotel room before the trial started, and created an onsite office; he had the bed pulled out of the room, set up two desks and 5 tables and had 15 boxes of defense materials which included all the above information. Attorney Hoyt, in consultation with Nolan, set dates and times for meetings with him and was fully prepared and ready to give a full and detailed briefing to Nolan. Nolan repeatedly missed those meetings, or on the rare occasion that he showed up, all Nolan wanted was his check and when he got it, he abruptly left town. See EXHIBIT D-2, Affidavit of Hoyt.

6. Attorney Hoyt admits (Affidavit of Hoyt) that he was operating below the standard and could never have taken on this case by himself. As lead counsel, Nolan was supposed to professionally guide and act as FIRST CHAIR IN THE DEFENSE TEAM, in the proceedings. The problem was he refused to provide any guidance, do any meaningful preparation or otherwise lead or even assist in developing the defense. Nolan admits that these allegations are true and that his statement that he did not operate below the standard is subject to challenge. For example, he never met with his client, David Hinkson, to help

prepare the defense, even a single time in advance of trial. See EXHIBIT D-1, Memos from Nolan, and EXHIBIT D-2, Affidavit of Hoyt.

a. It is amazing that Mr. Nolan admits that on the one occasion that he had the opportunity to take the Swisher's Military file home with him overnight, and willfully decided not to look at it. Such a failure to act is grossly below the standard expected of a reasonable defense attorney.

b. Attorney Nolan writes he could "kick" himself for not going after Swisher on cross examination. Such a failure to act is well below an objectively reasonable standard of attorney competence. ("I still kick myself for not going after him and cross examining him." See EXHIBIT D-1, pg 2, Memo from Nolan dated 1/31/05.)

c. Attorney Nolan implies he made a tactical decision to drop the Motion for Mistrial. Nolan stated that he knew the only issue in the case was Swisher's credibility. See EXHIBIT D-1, pg 5, Memo from Nolan dated Feb 11, 2005, so that armed with that knowledge, such a failure is well below an objectively reasonable standard of attorney competence.

d. Nolan mentions as if it was an important issue that he could not establish a financial interest in WaterOz for either Bellon or Swisher with which to impeach them because neither witness would admit it on the witness stand. But, although Nolan was told about the Bellon/Swisher takeover of WaterOz by Temporary Restraining Order, attorney Nolan refused to use that highly damaging information showing the use of force to take what was not theirs in order to impeach them, see EXHIBIT D-3, Affidavit of Towerton. Again, Nolan was confused and missed the point that any

reasonable attorney would have seen: that both witnesses, conspired to take over WaterOz by the force of a TRO and they succeeded for a short period of time. And that takeover gave them control, which is the same as a financial interest. And they used the takeover and financial interest to steal valuable assets of WaterOz while Mr. Hinkson was in jail and could not timely defend himself causing permanent damage to the business, EXHIBIT D-3, Affidavit of Towerton. There was evidence that Bellon contacted a business broker who would have testified that Bellon called within minutes of the issuance of the TRO and demanded that the broker find a buyer for WaterOz; which explains how it was that Messers Bellon and Swisher were really going to "save the company" once they had gained control over it by TRO (i.e., they were going for a quick sale and were obviously going to split the profits while Hinkson was in jail). What more would any attorney who met the standard of objective reasonableness need to know than Swisher and Bellon obtained a controlling interest in WaterOz by force through a TRO and thus had an expectancy of a financial interest in the business (albeit for only a few days until the TRO was vacated).

7. Nolan's criticism of the defense team for failing to obtain Swisher's military file was warranted and he, as the one directing the defense and the defense team completely failed Mr. Hinkson with regard to this matter.

8. Attorney Nolan was incompetent with regard to the defense of Mr. Hinkson in this case and attorney Hoyt is prepared to so testify as to these and other matters by which Mr. Hinkson was denied effective assistance of counsel by Nolan. See EXHIBIT D-2, Affidavit of Hoyt.

9. Attorney Nolan's conduct, both where it was wilful and where it was incompetent, was both unprofessional and below the Strickland standard of objective reasonableness. It also prejudiced Mr. Hinkson because he was unable to meaningfully assist in the preparation of his own defense and he was wrongfully convicted as a direct result of Nolan's ineffective assistance of counsel.

WHEREFORE, as a result of these failings Nolan's defense of Mr. Hinkson was structurally deficient, lacking adequate preparation, and without proper performance in the execution, denying Mr. Hinkson his IV Amendment right to counsel and a fair trial and prejudicing him thereby.