# EXHIBIT D-1

| INNER | **MEMO** |
|-------|----------|
| OFFICE | |

| To: | Andy Parnes |
|-----|-------------|
| From: | Thomas J. Nolan |
| RE: | Hinkson Post Trial |
| Date: | 1/31/05 |

Andy,

I've been thinking about this case 24 hours a day since it went to the jury. I have a number of thoughts. I want to get them off my chest and into your hands so that I can start thinking about something else.

It's actually very complicated. The verdict creates a lot of issues. First of all, I'd like to have it very much solidified that you are taking over the case regarding post-trial motions and the sentencing of both the tax and solicitation cases because I think that you need to be the captain of this operation until it gets resolved. I think I can play an important role in it, and hopefully the client will still want me to play an important role. It really needs your skills to get this thing under control. I think you should get a retainer so that you feel comfortable you are going to get paid. Not that there has been any real problem with me. I have to get my bill together. I know money is a little tight, but they have been really good about money so far.

Obviously it comes down to Swisher. I really don't feel that a very good investigation was done of Swisher. I thought that they would do a much better investigation. I think the investigators dropped the ball. I heard from Wes at one point that the investigator promised to get the request for the military records. I don't think they ever did a request to determine whether Swisher had law suits. There was just very, very little done on Swisher. I think one of the weaknesses or possible vulnerabilities

was able to establish the facts through FBI Agent Martin. I don't think the Court would have necessarily done anything. It was too subtle of an issue at that point. We should send a letter to the prosecutor reiterating and talking about how I think they have an additional duty to come forward with anything they know about Swisher's credibility, did know, or any impeachment they had.

Another problem you're going to have is getting the military records. The judge never gave us a copy of them because he was concerned about publicity and privacy. He did let me take them out of the courtroom for an evening. But I didn't look at them. I made my decision without looking at them. They are an exhibit. I'm fairly confident that the Court will give them to you to review. Let me tell you a few things I remember about them. Other than the letter and the false document, they looked fairly ordinary. There was an indication he was injured when he was in Washington. I believe his rifleman proficiencies were not all experts, even though he said he fired expert. They might have been. He was demoted from corporal to PFC. We don't know on what grounds he was demoted. It was an Article 115 criminal violation. They were actually very bland and very ordinary. There's not much I can say about them other than they certainly didn't look like they involved any kind of secrecy. I think that had we had them either self authenticated or somebody who knew about military records, things might have been handled differently. I still kick myself for not going after him and cross examining him. I'm reworking it in my mind of how I could do it differently. I also realize he was a very, very difficult witness. He could just say anything at anytime without much of a concern. He is clearly somebody who really doesn't care about the oath, in my opinion. Once you have a chance to review his materials and his testimony, you will get some idea of that. He was hard to pin down and some ways charming.

Another random thought. We should look at the sentencing guidelines and see what we can do about doing a full workup, maybe having Jim Missett or Paul Berg or somebody do a real complete workup. Dr. Doyt was fine, but he really isn't a forensic psychiatrist – very weak. I like him. I would certainly send somebody to him for

We need an investigation of Swisher by a good investigator. I think one investigator ought to control it. I think it should be well thought out as to who you have do the investigation. I think possibly Bellon will be the weak link. Maybe he will come forward and admit that Swisher had an economic interest in WaterOz which could make a big difference.

The other thing that I think is very significant, and yet I haven't looked at it, is that in the closing argument, the prosecutor, knowing that the evidence of Swisher's testimony was only relevant and only pertained to what he told Hinkson his background was in terms of military and killing people and not to what his background actually was, said that "David Hinkson knew that Swisher had killed people." I objected. I think that it was inappropriate for him to use the word knew. I think knew means that it is true that he was rather than he said he was. Maybe I'm wrong, but I think that that's the term. I think that was asking the jury to assume a fact not in evidence that Swisher was a military veteran who had killed people in combat. I don't know whether that's enough or not.

That's enough for my thoughts right now. Please feel free to share this memo with anybody. Please try to solidify your relationship over the case as soon as possible if you're interested. I very much appreciate you getting me involved in this case. It was a real pleasure to work with Wes and the Hinksons. I don't think the battle is over yet.

rd

| INNER | **MEMO** | |
|---|---|---|
| OFFICE | | |

| To: | Andy Parnes and Wes Hoyt |
|---|---|
| **From:** | Thomas J. Nolan |
| **RE:** | Social History |
| **Date:** | 2/2/05 |

Andy and Wes,

I think we have to pay a lot of attention to 18 U.S.C. 3661 in that there's no limitation placed on the information concerning the background, character and conduct of a person convicted of an offense for the purpose of opposing appropriate sentence. This would encourage me to consider hiring a person to assist Andy in doing a full social history with psychological tests and psychiatric evidence to help us in this case.

rd

| To: | Hinkson File |
|-----|--------------|
| From: | Thomas J. Nolan |
| RE: | Hinkson Post-Trial Thoughts Part 2 |
| Date: | February 11, 2005 |

Basically the conviction rests on the credibility of Swisher, and in particular on a particular statement, I think, that Swisher made, which was that David pled with him to kill these people. I think that because they acquitted him of the Swisher counts that did not have that statement. They hung up on Harding – I believe because of the issue of the money. And yet, in Harding's case, they had two witnesses talking about money, but they obviously showed inconsistency. In the Swisher count, though, it was the one where he said that he pled with him, and so the behavior with Harding... Anyway, I just feel that it comes down to – they had to believe Swisher beyond a reasonable doubt as to that one statement. If it hadn't been for that one statement, there would have been an acquittal with Swisher.

Now maybe I'm wrong because I got confused on the three counts, but it basically means that the credibility of Swisher is the key to the entire case. Our inability to attack his credibility by impeaching him with collateral matters, which the prosecution pays a lot of attention to, and which is basically a rule that is rarely adopted – in this particular case...

Anyway, I think the Government has information, and I think they had information at the time they got that document in the morning showing his military records. I think they came up with a letter that they may have had on the same day, but I'm confused, where there is an indication that that record was false. I may be confused on the dates, but looking at the faxing – we're talking about the 13th and 14th of

January, before... well basically, the day Swisher took the stand, I'm pretty sure. I think the letter was faxed to them on the 13th. I think that their Brady obligations increase substantially as a result of it all coming down to Swisher. I think that it makes any kind of Brady violation prejudicial because it all comes down to Swisher. One of the problems is that the judge might agree, but if he gives us a new trial on Swisher, then he'll definitely let the Government retry on Harding on the counts that the jury hung up on. We don't yet know that I am aware of what the count is, but you can tell me after I do this dissertation if you know what the count was. And that jeopardizes – that means a whole new trial, a whole new expense, and the chance of him being convicted of two separate individuals soliciting, which could substantially increase the sentence. But, the Court, I think, made errors in restricting our examination and not making efforts to get the military records. I think the more fruitful area, however, is with the prosecutors and what they know.

I'm concerned about something, though, and that is – I think that because it all hinges on the credibility of Swisher and because we did not do a particularly good job of investigating Swisher, I believe that we hired investigators that were going to do the kind of investigation... I remember Wes and I talking to them about what they were going to do and they didn't do it. And they didn't follow through with the military records. I then made a tactical decision which may not have been the right tactical decision. I think that somebody, in looking at a new trial motion, should be free to challenge both Wes's and my competency in terms of how we handled the preparation and investigation and examination of Swisher. Now, I don't think Wes and I fell below the standard of care. I think we did meet the standard of care, but I think that David should have an opportunity to challenge that, to at least present that to the Court and have the Court make that decision – that we're not the ones to make the decision as to whether we met the standard of care because we have a conflict in that. That's one of the reasons why I really, really, really think that responsibility for the new trial motion and sentencing should be taken away from both Wes and me and given to Andy. I also think that we should try to figure out how we can use the psychological evaluation to effect the sentence under the post-

*Booker* situation. I have a good article I can send to both of you on that. Also, who do we hire as an investigator? I think we have to hire a completely different independent investigator to go after Swisher to see what we can dig up in terms of new evidence. I'm afraid that much of what we can dig up is stuff that we could have dug up before trial, so it goes to ineffective assistance of counsel, unless we can break through the conspiracy of the people who were taking over WaterOz and get some testimony that there was a financial interest for Swisher at that time.

Anyway, these are my thoughts. I feel very strongly about them. I'll get them typed up and send them to everybody.

End of memo.

TJN/lm

# Nolan, Armstrong & Barton, LLP

THOMAS J. NOLAN \ MICHAEL W. ARMSTRONG \ DANIEL L. BARTON

NICOLE M. RYAN \ DIANE DE SEVE

February 14, 2005

Wes Hoyt
333 W. Hampden Ave., Suite 500
Englewood, CO 80110-2335

David Hinkson
c/o Wes Hoyt
333 W. Hampden Ave., Suite 500
Englewood, CO 80110-2335

Roland Hinkson
P.O. Box 5
Ouray, Colorado 81427

Dear Wes, David and Roland,

I am writing this letter because both Wes and I represent David and Roland has been assisting Wes in this case.

This letter is attorney-client confidential and should not be revealed to anyone without David Hinkson's permission.

I have tried since the day of the verdict and non verdict to take advantage of the opportunity to extricate David from this situation. I think there is real hope to have some significant positive benefits come from what has occurred.

I have made it very clear this will not happen unless you rely upon a very experienced criminal practitioner, someone who is intimately familiar with federal criminal law and procedure and the complexity and difficulties that this case presents.

I am sorry to say that both Wes and Roland got the idea that I want Wes removed as attorney for David. That is not the case. I also fully acknowledge that I am not the best person to do this work. There are people far better than I am at this kind of work. It is a very complex area of the law.

600 UNIVERSITY AVENUE \ PALO ALTO, CALIFORNIA 94301-2076
FACSIMILE \ (650) 326-9704
EMAIL office@nablaw.com
INTERNET: www.nablaw.com
TELEPHONE \ (650) 326-2980

I do, however, believe that I have the respect of the judge and the court staff in this matter and can play an important role if that is your desire. I cannot play that role unless Wes gives up the primary responsibility for the motion for new trial and the sentencing in this and the tax matters.

I truly believe that Wes is a very fine lawyer and an incredibly hard worker. He is very dedicated to David's case and very knowledgeable on all the facts in this matter. However, Wes is not capable of doing the job that is necessary at this point in time. He has too many responsibilities regarding David, his family and the company. He has too little experience in federal criminal practice. In some ways, he is too close to the client.

At the present time, I am still on the payroll earning $400 an hour pursuant to the fee agreement. If you want to end that, I suggest we immediately file a substitution of attorney so that I can withdraw as counsel for Mr. Hinkson. You can still proceed with having a new lawyer come in and be responsible for the motion for new trial and sentencing. When I say responsible, I want to make it clear that Wes would be signing, along with that lawyer, the pleadings. Wes would be the attorney of record for Mr. Hinkson. It doesn't change any of that. It does, however, put someone else in the position of being the quarterback of the motion for new trial and the sentencing. This is essential, in my opinion.

I have said this on many occasions. I have put it in memorandums. I attach my thoughts on sentencing for your benefit. I also attach to this letter a copy of an article on the post Booker situation that will be involved in the sentencing issue. I encourage and hope that you do some of the things that I suggest, but I don't have confidence that they will be done unless Wes allows someone to come in who can do the job in this matter.

I've sent the bill to all of you. I've detailed it out. I'm a little concerned because the last time I spoke with Wes he started to make statements that indicated he was less than willing to meet the obligations that have been made in this matter. I expect the obligations that have been made to be fulfilled. I would be more than happy to cease putting in additional time on this matter as quickly as possible. We should resolve the issue by agreeing to a figure that I am owed and figuring out a way to assure the payment of that in a reasonable manner.

I am not saying or doing these things because I have any hostile feeling towards either of you. It has been a real pleasure to work with you. It is a very difficult situation that I came into with very little time for preparation. I think Wes was let down by the investigators in this matter. I have tremendous respect for all three of you.

I think that if you were to look up the way in which Mr. Quatrone was treated in New York by a federal judge, you might get some idea of the range of mistreatment that can occur in federal courts with federal judges.

I think that focusing on recusing the judge or government misconduct at this point as being the problem is short sited. I think there are a number of problems. Many of them do involve the government not getting us information and material that could be very beneficial. I think with a good competent post-trial federal criminal practitioner that you will be quite surprised at what can be discovered.

There simply is not going to be enough time; It has been over two weeks since I first raised this issue. The phone call was promised for Friday. To the best of my knowledge, that phone call never took place; No decision has been made. No drafts have been circulated. There has been no attempt to plan and strategize in a meaningful way. As far as I am concerned, it is leading to disaster for David.

I have made my position clear. I would like to get this resolved as soon as possible so that I do not continue to incur additional expense for David and that I don't, by my presence, create a problem for David's new trial or sentencing.

Very truly yours,

Thomas J. Nolan

TJN/rd
Encls.
cc: Andy Parnes

# EXHIBIT D-2

# EXHIBIT D-3

| | |
|---|---|
| State of Idaho | ) |
| | ss. |
| County of Idaho | ) |

I, Gregory W. Towerton, the Affiant, General Manager of WaterOz, located at 1753 Stites Road, Grangeville, Idaho 83530 a resident of Idaho County, Idaho, being over the age of 18 years and competent to testify, according to my own personal knowledge, upon oath, state under penalty of perjury pursuant to 28 USC §1746 as follows:

1. I married Marda Marie Hinkson June 29, 2002 after I moved from Washington, State. Matthew Hinkson, son of David R. Hinkson and David Hinkson, returned from their trip to Ukraine immediately before the wedding so that Matthew could serve as an usher.

2. After we were married and on or about June 30, 2002, David R. Hinkson (Marie's first husband) took all of their children on a month long driving vacation to Colorado, Nevada and California. They called us as they returned to Boise, Idaho approximately the last day of July 2002 and invited us, and my children who were living with me at the time, to come to Boise and meet them to participate in a waterpark experience.

3. I took Marie and my children to Boise, Idaho on or about July 31, 2002 and watched as the children played in the waterpark facilitates. I drove Marie and my children back to our home in Grangeville, Idaho on the night of July 31, 2002.

4. By the evening of August 1, 2002, David had returned his children to live with Marie and me at our home in Grangeville.

5. Early in the morning of August 2, 2002, David picked up his children to take them boating for the day at Dworshack Reservoir near Orofino. David returned his children from their day at the reservoir to my home in Grangeville by the middle of the evening on August 2, 2002.

6. I learned that David was set to leave early the next morning, August 3, 2002 on a business trip that would last about three months. The first leg of that journey was to Venezuela. I knew that the children would not see their dad for several months so that having him spend so much time with them in July and around the first and second of August was justified as far as the sharing of visitation time between Marie and David was concerned. As long as my wife approved of that arrangement, it was fine with me; and she did.

7. We heard from David periodically as he was in faraway places like Russia or the Ukraine and he did not return to Idaho County until the first of November 2002.

8. I learned that there had been a raid by some Federal Government agencies at David's house near his WaterOz factory on November 21, 2002. David was charged and then released on his own recognizance at that time.

Affidavit of Gregory W. Towerton – Page 1

9. David was in Idaho County and available to visit his children at Thanksgiving and Christmas 2002, although I am aware that he went to a health conference in Southern California in early December and was gone for about a week.

10. I learned that David was again arrested and put in jail in early April 2003 over a question of violation of conditions of his pretrial release.

11. In the spring of 2003, I received a phone call from David when he was calling his children to have phone visitation with them from jail. He asked me if I would be interested in working for WaterOz. I explained that I had a good job with the Idaho County Sheriff's Office with pension benefits etc., and so I would have to take a serious look at the opportunity at WaterOz to make it work for me. He invited me to go out to the factory on my day off and check it out. He said I could speak to Jeri Gray, the manager.

12. I had a further telephone discussion with David in mid-June 2003 and he referred me to his attorney at the time, Mr. Britt Groom, of Grangeville, Idaho, who agreed to answer some specific questions regarding WaterOz. I set an appointment and traveled over to Mr. Groom's office for that purpose by early July 2003.

13. At that appointment with Mr. Groom, a Richard Bellon, paralegal working for David Hinkson, also attended.

14. Shortly after I arrived, I heard shouting in the reception area of Mr. Grooms office and then saw the man who was yelling, who was later identified to me as Joe Swisher. Mr. Swisher, who appeared to be somewhat disabled, was enraged because he said David Hinkson owed him $10,000 that he claimed had not been paid and he was yelling at the receptionist insisting that this bill had to be paid right then. It became clear that the bill he was talking about was a past due amount he said was payable by WaterOz. Mr. Swisher was very upset and said that if Mr. Hinkson did not pay the bill he, Mr. Swisher, would personally go to Boise and testify against him and see that he spent the rest of his life in prison. I did not meet Mr. Swisher at that time as I felt he was too agitated to have a rational conversation with me, or anyone else.

15. From my years of training as an investigator in law enforcement for the US Government and as a deputy for the Idaho County Sheriff's Office, I could see that Mr. Swisher was using extortion tactics, threatening great harm in order to obtain some financial objective. If investigated, this conduct by Mr. Swisher was either extortion or blackmail.

16. I would have reported the threats to the Grangeville PD except Mr. Groom, the attorney for Mr. Hinkson and Mr. Bellon, the paralegal for Mr. Hinkson both assured me that they would take care of it and that there was some mistake and Mr. Hinkson did not owe the amount which Mr. Swisher claimed and I was assured that the attorney for Mr. Hinkson would handle it.

Affidavit of Gregory W. Towerton – Page 2

17. Mr. Hinkson had been continuously asking me to go to work for him at WaterOz each time he called to speak to his children. By mid-August 2003, I decided to take a look at what the job would entail and I went to WaterOz and talked to Jeri Gray and other employees. Based on my observations I decided to take Mr. Hinkson up on his offer to work for him at WaterOz.

18. September 1, 2003, I accepted a position with WaterOz as a manager of plant production and left the Idaho County Sheriff's Office. In mid-September, at the factory, when he was preparing to act as an expert witness for Mr. Hinkson, I met Mr. Swisher who was walking very slowly and needed to rest often during his tour of the WaterOz facility (Mr. Swisher stated he had severe arthritis and was still not fully recovered from his heart surgery). During this visit Mr. Swisher stated that he had been injured while in the Marines and serving in the Korean war. I was informed by Jeri Gray that he still demanded payment of a bill of about $5,000 that he claimed was past due. I was told that the bill was for WaterOz product testing to comply with labeling requirements of the FDA and had been paid previously. After Swisher's visit to WaterOz I learned that he claimed I had frisked him during the visit; which was a false accusation by Mr. Swisher.

19. It was about mid-September that I began to hear from Mr. Bellon that he had an agreement to be partners with David in the WaterOz business. When I spoke to David about the idea of Mr. Bellon having a partnership interest in WaterOz, David denied it saying that Mr. Bellon was trying to take his business from him. I learned that Messers Bellon and Swisher each were attempting to get half the business from David. David said that he had not signed any documents giving any interest to anyone, especially Messers Bellon and Swisher.

20. In late September 2003 went to a hearing in Boise at the Federal Court as an observer which hearing was handled by attorney Groom and Mr. Bellon and Mr. Swisher were also present. I was told that Mr. Swisher was to be paid $5,000 to be an expert witness for David Hinkson at that hearing. The testimony related to the validity of the WaterOz product labeling. During his testimony Mr. Swisher again stated under oath he was disabled from injuries he received as a Marine while serving in the Korean war and that was why he had to have questions repeated several times as he was also hearing impaired from a grenade blast. After the hearing, Mr. Swisher was paid $5,000.

21. By December 2003, Messers Bellon and Swisher, aided by Mr. Groom, and accompanied by Idaho County Sheriffs officers took over WaterOz. By December 3, 2003 I was served with a Temporary Restraining Order by Mr. Swisher and immediately forced to leave the factory along with Jeri Gray and several other employees loyal to David. With David's permission, attorney, Mr. Wesley W. Hoyt was hired who went to court, got the TRO vacated and arranged for the return of control of WaterOz to me and the other representatives who had been designated by David to run his business.

22. At one point I learned that Swisher billed WaterOz for over $5,000.00 in charges that were not owed, some of which had been billed previously and paid. I also learned that Mr.

Swisher billed WaterOz $12,000 for the purchase of an outdated Atomic Absorption or AA Machine that David did not agree to purchase because WaterOz had already purchased an ICP machine. Subsequently, I learned that a third party claimed he owned the AA Machine which Mr. Swisher was trying to sell to David. This bill was disputed and never paid.

23. Until his visit in mid-September, I became aware that Swisher would not come inside WaterOz since he had been banned by Mr. Hinkson in January 2003. However, Mr. Swisher periodically stopped by to pick up minerals which were taken out to his vehicle and delivered to him. This was based on an arrangement he had made with Jeri Gray.

24. After Mr. Swisher was defeated in his takeover attempt with Mr. Bellon, he developed a new scheme to extort property from David involving the filing of a counterclaim in the TRO lawsuit, demanding the payment of $500,000 and delivery of title to property including a three story office building, 20 acres behind the factory and a Road Patrol road grader. These items were demanded by Mr. Swisher in the TRO lawsuit, which claims were resolved without any of these items being transferred to Mr. Swisher.

25. In his testimony on January 14, 2005 in the Solicitation trial against David, Swisher claimed that Hinkson considered him to be his "best friend" and alleged that as a demonstration of such friendship Hinkson had given him the following items of valuable property: (1) $500,000.00 in cash; (2) a three-story office building that was under construction and nearly finished, which Swisher claimed Hinkson said he "didn't need" (a building Hinkson was constructing as a call center for telephone sales and marketing personnel); (3) a "Road Patrol" road grader (Hinkson did not own a Road Patrol grader); and (4) Twenty 20 acres of real property behind the WaterOz factory (there was only a steep canyon behind the factory.) From my investigation of these matters I determined that these items of property had not been given to Mr. Swisher but were still in Mr. Hinkson's name, so that these statements were untrue, but served Mr. Swisher's plan to cause the jury to falsely think there was a close relationship between David and Swisher.

26. During my association with David, I saw no evidence that there had ever been a "friendship" between them. What I saw was a business relationship that failed because Mr. Swisher had not delivered accurate reports on WaterOz products. Evidence of hostility by Mr. Swisher toward David is found in the hostile takeover of WaterOz (by TRO) that lasted seven days in early December 2003. Messers Swisher and Bellon were working together to convince the Idaho District Court Judge that Hinkson's absence from WaterOz had created a void in management detrimental to the business.

27. In order to obtain the TRO, Swisher and a small group of co-conspirators fraudulently described business-related calamities so severe that the trial court was willing to give them an ex-parte TRO seizing possession of WaterOz in order to "save" the company from what Swisher portrayed as certain disaster affecting over 30 Idaho County jobs at the factory. When Swisher had achieved his goal of obtaining the TRO, he dismissed all employees loyal to David and declared himself the CEO of WaterOz.

Affidavit of Gregory W. Towerton – Page 4

28. Under Swisher's TRO and seven day management of WaterOz, valuable assets of the company were stolen including customer lists and trade secrets belonging to Mr. Hinkson's business, which valuable property rights were passed on to competitors. I learned that as soon as the TRO was entered, Mr. Bellon immediately called Dan Vaughn, a business broker and demanded that WaterOz be listed for sale.

Further Affiant sayeth naught.

I declare under penalty of perjury that the foregoing is correct this 15 day of April 2012.

Gregory W. Towerton

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California  95301
In Propria Persona


## UNITED STATES DISTRICT COURT DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case #: 1:04-cr-00127-RCT-1 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT HINKSON'S MEMORANDUM |
| vs | ) | IN SUPPORT OF <u>GROUND FIVE: LACK OF</u> |
| | ) | <u>JURISDICTION</u>, AS IS HEREBY APPENDED |
| David R. Hinkson, | ) | TO HINKSON'S MOTION TO VACATE THE |
| | ) | CONVICTION AND SENTENCE UNDER |
| Defendant. | ) | SECTION 2255, TITLE 28 USC |
| | ) | |
| | ) | |

COMES NOW David R. Hinkson, by and through his own hand and hereby submits this

MEMORANDUM REGARDING GROUND FIVE: LACK OF JURISDICTION, IN SUPPORT OF

MOTION TO VACATE CONVICTION AND SENTENCE UNDER 28 U.S.C. §2255.

For the reasons set forth below in this Memorandum In Support of Defendant Hinson's

Motion to Vacate the Conviction and Sentence under 28 U.S.C. §2255 the conviction and judgment

must be vacated and the indictment dismissed.

# SUBJECT MATTER JURISDICTION

## 1. <u>INSUFFICIENCY OF INDICTMENT TO ALLEGE A CRIME</u>.

The subject indictment fails to contain the mandatory allegation that the acts constituting the charged law-violations occurred within the "special and maritime territorial jurisdiction of the United States" as an element of the crime. Lacking this mandatory element, the government did not have jurisdiction to prosecute and the court did not have jurisdiction to adjudicate this matter.

It is well established that defects in subject matter jurisdiction may be raised at *anytime Mitchell v. Maurer*, 293 U.S. 237, 244 (1934); *13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure* § 3522 (2nd ed. 1984). <u>Fed.R.Crim.P. 12(b)(2)</u> provides in relevant part that "lack of jurisdiction, or the failure of the indictment or information to charge an offense, shall be noticed by the court at any time." [1]

In order for an indictment to be sufficient it must include all elements of the charge. The mandate of "*inclusion of all elements* ... derives from the Fifth Amendment, which requires that the grand jury have considered and found all elements to be present." – *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir.1988) (en banc). [Italics added].

Further,

"...and of paramount importance, a sufficient indictment is required to implement the Fifth

---

[1]  From the NOTES OF ADVISORY COMMITTEE ON RULES:
Note to Subdivision (b)(1) and (2). These two paragraphs classify into two groups all objections and defenses to be interposed by motion prescribed by Rule 12(a). In one group are defenses and objections which must be raised by motion, failure to do so constituting a waiver. In the other group are defenses and objections which at the defendant's option may be raised by motion, failure to do so, however, not constituting a waiver. (Cf. Rule 12 of Federal Rules of Civil Procedure [28 U.S.C., Appendix].)

In the first of these groups are included all defenses and objections that are based on defects in the institution of the prosecution or in the indictment and information, other than lack of jurisdiction or failure to charge an offense.

Amendment guaranty and make clear the charges so as to limit a defendant's jeopardy to offenses charged by a group of his fellow citizens, and to avoid his conviction on facts not found, or perhaps not even presented to, the grand jury that indicted him." – *United States v. Radetsky*, 535 F.2d 556, 562 (10th Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976), overruled in part on other grounds by *United States v. Daily*, 921 F.2d 994, 1004 & n. 11 (10th Cir.1990); see *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962).

And,

It is true that where there is a post-verdict challenge to an indictment asserting the absence of an element of the offense, it has been held the indictment will be sufficient if it contains "words of similar import" to the element in question. *United States v. Vogt*, 910 F.2d 1184, 1201 (4th Cir.1990), cert. denied, 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). See generally *United States v. Mason*, 440 F.2d 1293, 1296-97 (10th Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971). "Upon a proceeding after verdict at least, no prejudice being shown, it is enough that the necessary facts appear in any form, or by fair construction can be found within the terms of the indictment." *Hagner v. United States*, 285 U.S. 427, 433, 52 S.Ct. 417, 420, 76 L.Ed. 861 (1932). However, we have considered the language of the indictment here and there is no wording of similar import to the requirement that the proscribed acts be committed " ... **within the special maritime and territorial jurisdiction of the United States.** – *U.S. v. Brown*, 995 F.2d 1493, 1505 (C.A.10 (Okla.), 1993).

Although some other defenses and objections based on defects in an indictment are waived

by failure to raise them before trial, lack of subject matter jurisdiction is never waived and thus, may

be raised at any time. See *Pon v. U.S.*, 168 F.2d 373, 374 (1st Cir. 1948); *Sewell v. U.S.*, 406 F.2d

1289, 1292 (8th Cir. 1969).

"In sum, we are convinced that we must notice the critical omission of this essential element from the indictment handed down by the grand jury. Therefore, the conviction and sentence on Count 4 must be vacated." – *Brown* at 1505.

2.  **INSUFFICIENCY OF PROOF OF CRIME AT TRIAL – TERRITORIAL JURISDICTION MUST BE PROVEN AT TRIAL.**

"The final and more troublesome challenge to the convictions is Burjan's contention that the government **failed to establish that the trial court had jurisdiction** because it did not show that the charged offenses were committed in the Canal Zone. It is unimportant, of course, that this point is raised for the first time on appeal, as an attack on the subject matter jurisdiction of the trial court may be raised at any stage. F.R.Cr.P. 12." – *Government of the Canal Zone v. Burjan*, 596 F.2d 690, 693 (5th Cir 1979). [Bolding added]

3.      **THE GOVERNMENT HAS THE BURDEN TO PROVE TERRITORIAL JURISDICTION.**

" * * * "(i)t is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor," *United States v. Benson*, supra, at 481, "the standard of proof (on this element) is more relaxed than for other elements of a criminal prosecution. It is necessary only that the location of criminal activity be established by a preponderance of the evidence . . . ." *United States v. Luton*, 486 F.2d 1021, 1023 (5th Cir. 1974)." – *Burjan* at 694.

While the standard of proof may be somewhat relaxed, nonetheless the government must allege the element of territorial jurisdiction in the indictment and prove it as a part of its case or the case must be dismissed for lack of jurisdiction.

F.R.Crim.P. 52 provides: "**(b) Plain Error.** A plain error that affects substantial rights may be considered even though it was not brought to the court's attention. In this instant matter it was plain error when the trial court failed to "notice" the lack of territorial jurisdiction.

4.      **JURISDICTION OF FEDERAL COURTS, IN GENERAL**

There are no common-law offenses against the United States; see *United States v. Hudson*, 7 Cranch (11 U.S.) 32 (1813); *United States v. Coolidge*, 1 Wheat. (14 U.S.) 415 (1816); *United States v. Britton*, 108 U.S. 199, 206, 2 S.Ct. 531, 535 (1883); *Manchester v. Massachusetts*, 139 U.S. 240, 262-63, 11 S.Ct. 559, 564 (1891); *United States v. Eaton*, 144 U.S. 677, 687, 12 S.Ct. 764, 767 (1892); *United States v. Flores*, 289 U.S. 137, 151, 53 S.Ct. 580, 582 (1933).

"Courts of the [common law] kind were not created by the Constitution, nor does the Constitution invest them with any criminal jurisdiction. Even the powers of an express character given to Congress upon the subject embrace only a limited class of well-known offences. Congress may provide for the punishment of counterfeiting the securities and current coin of the United States, and may pass laws to define and punish piracies and felonies committed on the high seas, and offences against the law of nations. Treason is defined by the Constitution, but it has never been decided that the offender could be tried and punished for the offence until some court is vested with the power by an act of Congress."

"Implied power in Congress to pass laws to define and punish offences is also derived from the constitutional grant to Congress to declare war, to raise and support armies, to provide and maintain a navy, and to make rules for the land and naval forces, and to provide for organizing, arming, and disciplining the militia and for governing such parts of them as may be employed in the public service. Like implied authority is also vested in Congress from the power conferred to exercise exclusive jurisdiction over places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings, and from the clause empowering Congress to pass all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the government of the United States, or any department or officer thereof." – *United States v. Hall*, 98 U.S. 343, 345-46 (1879).

In addition the US Supreme Court has found that:

"Although the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, except piracies and felonies on the high seas, offenses against the laws of nations, treason and counterfeiting the securities and current coin of the United States, no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States, whether committed within one of the states of the Union or **within territory over which congress has plenary and exclusive jurisdiction.**" – *Logan v. United States*, 144 U.S. 263, 12 S.Ct. 617 (1892). [Bolding added.]

5.    **AGREEMENT AMONG THE CIRCUITS**

**"It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor."** – *United States v. Benson*, 495 F.2d 475 (5th Cir., 1974) [Bolding added]

Only when jurisdiction is proven are convictions sustained. In two Sixth Circuit cases, *United States v. Tucker*, 122 F. 518 (W.D.Ky. 1903), a case involving an assault committed at a federal dam, and *United States v. Blunt*, 558 F.2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, **jurisdiction was sustained only by finding that the U.S. owned the property in question** and that the state involved had ceded jurisdiction.[2] In *United States v.*

---

[2]    Other cases cited herein are relevant to this same proposition: that jurisdiction, once challenged, required the

(continued...)

*Johnson,* 426 F.2d 1112 (7th Cir. 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and cession. In contrast, when jurisdiction is not established the case fails. *In re Kelly,* 71 F. 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the United States. Cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see *United States v. Heard,* 270 F.Supp. 198 (W.D.Mo. 1967); *United States v. Redstone,* 488 F.2d 300 (8th Cir. 1973); *United States v. Goings,* 504 F.2d 809 (8th Cir. 1974) (demonstrating loss of jurisdiction); *Hayes v. United States,* 367 F.2d 216 (10th Cir. 1966); *United States v. Carter,* 430 F.2d 1278 (10th Cir. 1970); *Hall v. United States,* 404 F.2d 1367 (10th Cir. 1969); and *United States v. Cassidy,* 571 F.2d 534 (10th Cir. 1978).

Of all the circuits, courts in the Ninth Circuit have addressed jurisdictional issues more than any of the others. In *United States v. Bateman,* 34 F. 86 (N.D.Cal. 1888), it was determined that the United States did not have jurisdiction to prosecute for a murder committed at the Presidio because California had never ceded jurisdiction; see also *United States v. Tully,* 140 F. 899 (D.Mon. 1905). But later, California ceded jurisdiction for the Presidio to the United States, and it was held in *United States v. Watkins,* 22 F.2d 437 (N.D.Cal. 1927), that ceding jurisdiction enabled the U.S. to maintain a murder prosecution; see also *United States v. Holt,* 168 F. 141 (W.D.Wash. 1909), *United States v. Lewis,* 253 F. 469 (S.D.Cal. 1918), and *United States v. Wurtzbarger,* 276 F. 753 (D.Or. 1921). Because the U.S. owned and the state had ceded jurisdiction over Fort Douglas in Utah, it was held

---

[2]    (...continued)
government to prove the territorial jurisdiction to sustain the conviction.

that the U.S. had jurisdiction for a rape prosecution in *Rogers v. Squier*, 157 F.2d 948 (9th Cir. 1946). But, without a cession, the U.S. has no jurisdiction; see *Arizona v. Manypenny*, 445 F.Supp. 1123 (D.Ariz. 1977). By direct implication, therefore, we see that proof of jurisdiction is a mandatory element in federal prosecutions of this nature, else there would never be a need to allege and show it to sustain a conviction.

6. **TERRITORIAL JURISDICTION NOT SUBJECT TO DISPUTE**

Mr. Hinkson requests the Court take Judicial Notice, without limitation, of the <u>Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part 1 and Part 2 , April 1956 and 1957</u> (40 U.S.C. § 255 and 50 U.S.C. § 175 amended to 40 U.S.C. § 3111 and § 3112) often referred to as the "Eisenhower Report" which shows the historical basis of, and myriad decisions regarding federal jurisdiction, all of which agree on this point.

See *United States v. Gabrion*, 517 F.3d 839 (6th Cir., 2008) for an example (just one of literally hundreds of cases) of a properly drawn indictment which correctly alleges the jurisdiction under Section 1111 of Title 18 U.S.C:

> "Between on or about June 3, 1997, and on or about July 5, 1997, in the County of Newaygo, in the Southern Division of the Western District of Michigan, Marvin Charles Gabrion II did, after deliberation, premeditation and malice aforethought, willfully kill Rachel Timmerman within the special maritime and territorial jurisdiction of the United States by drowning her in Oxford Lake, which lies within the Manistee National Forest." – *Gabrion*, supra. at 842.

The foregoing, once again, illustrates the need for the government to allege jurisdiction when charging under Section 1114. In Mr. Hinkson's case, no such territorial jurisdiction was ever alleged much less proven.

7. **STATEMENT OF THE CASE REGARDING JURISDICTION**

MAXIM 1: <u>The indictments were consistent with prevailing DOJ procedure, but did not allege</u>

territorial jurisdiction.

On June 22, 2004 a Federal Grand Jury indicted Mr. Hinkson for Solicitation of Murder related to three Federal Officials (Dkt #1). There was a superseding indictment (Dkt #37) dated September 21, 2004 which charged the same crimes in exactly the same language as the original. Both the original and the superseding indictments were constructed in a manner consistent with the U.S. Attorney's Manual.[3]

Surely if the grand jury recognized the territorial nature of the alleged crime(s)[4] the indictment would have said so. When 18 U.S.C. § 1114 is tied to its dependent sections, 1111, 1112 and 1113 there is jurisdiction **only if the crime occurred within the special maritime and territorial jurisdiction** of the United States, and only then can the Federal government prosecute.

MAXIM 2:     Territorial jurisdiction was not mentioned in either indictment.

A failure of the grand jury to have the special maritime and territorial jurisdiction of the United States presented as an element of the offense which is invoked under Section 1114 would,

---

[3]      **Indictment Form  –  Solicitation to Commit a Crime of Violence (18 U.S.C. § 373)**
On or about the ____ day of ____ 19____ , in the   District of _____ the defendant with intent to engage in conduct constituting a felony that has as an element the use [attempted use] [threatened use] of physical force against the person [property] of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did solicit, command, induce and endeavor to persuade, to engage in such conduct, that is, [describe crime, e.g., to murder an officer of the United States in violation of Title 18, United States Code, Section 1114], in violation of Title 18, United States Code, Section 373. – From the US Attorneys Manual, Title 9.  Criminal Resource Manual, Section 1085.

[4]      A failure of the government to have presented evidence that the alleged crimes were perpetrated within federal jurisdiction is a fatal defect to the validity of the grand jury's indictment. "In this appeal, Mr. Prentiss raises the following six arguments: (1) the district court lacked subject matter jurisdiction because the government failed to allege or establish, as a prerequisite to federal jurisdiction, ... " – *U.S. v. Prentiss,* 206 F.3d 960 (10ᵗʰ Cir., 2000) conviction overturned on that ground.

"The Hilderbrand indictment cited only 18 U.S.C. § 1111, which merely defines the types of murder. The indictment alleged that the crime took place on an Indian reservation, but did not allege that the crime took place by an Indian against an Indian. In addition, the indictment failed to cite to any statute other than the general murder statute. Thus, we ordered the dismissal of the indictment as insufficient." – *U.S. v. James,* 980 F.2d 1314 (C.A.9 (Wash.), 1992).

by itself, invalidate the entire indictment. In both *Russell*, supra and *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), the Supreme Court held that in order to be sufficient an indictment must contain the elements of the offense and apprise the defendant of the nature of the charge.

> The inclusion of all elements also derives from the Fifth Amendment, which requires that the grand jury have considered and found all elements to be present.... But even if we were to assume that this notice emanated from the indictment, (an assumption not justified under the authorities in our opinion) we would still be left with a document that did not contain any part of one element of the offense, and thus did not satisfy the Fifth Amendment requirement that all elements of the offense have been considered and found by the grand jury. – *U.S. v. Hooker*, 841 F.2d 1225, 1230 (C.A.4 (Va.), 1988); See *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) regarding the crucial question of whether he was convicted of an offense not charged in the indictment.

The missing element in this instant matter against Mr. Hinkson was an allegation that the crime was committed "within the special territorial and maritime jurisdiction of the United States" but which was never alleged much less established; IN FACT, THE CONTRARY WAS ESTABLISHED.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides, inter alia, "[t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Under this Rule "it is still essential that every element of an offense be stated and that the defendant be given fair notice of the charge against him...." *1 Charles A. Wright, Federal Practice and Procedure*: Criminal § 123, at 348 (2d ed. 1982) (footnote omitted); see *United States v. Seeger,* 303 F.2d 478, 482 (2d Cir.1962). The purpose of this requirement is to give a defendant adequate notice of the charges under the facts and to permit him to plead former jeopardy upon prosecution and to enable him to prepare a defense. *United States v. Carrier,* 672 F.2d 300, 303 (2d Cir.), cert. denied, 457 U.S. 1139 (1982).

MAXIM 3:    The indictments charged a violation of TWO code sections in each count.

The original and superseding indictments charged Mr. Hinkson with eleven (11) counts of

federal law violations under two different sections of the U.S. Code (18 U.S.C. §1114 and 18 U.S.C.

§373).

MAXIM 4:    One code section required proof of acts that were not established at trial.

Section 1114 requires that either murder, or manslaughter, or attempted murder or

manslaughter, must have occurred in order to invoke the jurisdiction of the Court. It was not proven

at trial that Mr. Hinkson murdered, manslaughtered or attempted to murder anyone, much less a

federal official.

Section 1114 of Title 18 reads as follows:

> Whoever kills or attempts to kill any officer or employee of the United States or of
> any agency in any branch of the United States Government (including any member
> of the uniformed services) while such officer or employee is engaged in or on
> account of the performance of official duties, or any person assisting such an officer
> or employee in the performance of such duties or on account of that assistance, shall
> be punished - (1) in the case of murder, as provided under Section 1111; (2) in the
> case of manslaughter, as provided under Section 1112; or (3) in the case of attempted
> murder or manslaughter, as provided in Section 1113.

Note: Section 1114 makes reference to at least one of three statutes: §§ 1111, 1112 or 1113,

and to this extent Section 1114 is dependent for enforcement upon at least one of those sections.

Thus, the government in charging, and the trial court in attempting to apply the law, are required to

find that one of these dependent statutes were violated.

Under the US Code, "murder" is defined as:

18 U.S.C. § 1111. Murder

(a)    Murder is the unlawful killing of a human being with malice aforethought. Every
       murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate,

malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.  Any other murder is murder in the second degree.

**(b)**     **Within the special maritime and territorial jurisdiction of the United States.** [bolding added]

and "manslaughter" is defined as:

18 U.S.C. § 1112. Manslaughter

(a)     Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary – Upon a sudden quarrel or heat of passion. Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

**(b)**     **Within the special maritime and territorial jurisdiction of the United States.** [bolding added]

The evidence in this case proves that neither murder nor manslaughter occurred.  In such event Section 1114 has a third alternative, "attempt"; attempt requires that 18 U.S.C. §1113 be applied.  When Section 1113 is applied, it provides that there is a fixed territorial scope of its purview which is:

**"... whoever, within the special maritime and territorial jurisdiction of the United States..."**

MAXIM 5:     All three dependent code sections (§§ 1111, 1112 & 1113) require proof that the crime occurred within the territorial jurisdiction of the United States.

In order for Section 1113, the attempt statute, (or 1111, the murder statute, or 1112, the manslaughter statute) to apply, the actor must have been within the *"special maritime and territorial jurisdiction of the United States"* which was not the case with Mr. Hinkson.  Eight of the original

eleven (11) counts were dismissed after the 2005 trial and Mr. Hinkson stood convicted of only three counts, (counts 7, 8 & 9) known herein as the "Swisher Counts." [5]

MAXIM 6:    <u>Territorial jurisdiction was an essential element of the crime as alleged in counts 7,</u>

<u>8 & 9.</u>

The federal constitutional right to due process of law requires that the State prove beyond a reasonable doubt every fact necessary for a criminal conviction. *In re Winship*, 397 U.S. 358 (1970).

* * * Trial judges are kept busy responding to motions, objections and requests by the litigants. It is quite wrong, however, to assume that a judge is nothing more than a referee whose authority is limited to granting or denying motions advanced by the parties. As Learned Hand tersely noted, a 'judge, at least in a federal court, is more than a moderator; he is affirmatively charged with securing a fair trial, and he must intervene sua sponte to that end, when necessary.' *Brown v. Walter*, 62 F. 2d 798, 799 (CA2 1933). That duty encompasses not only the avoidance of error before it occurs, but the correction of error that may have occurred earlier in a proceeding."[6] – *Carlisle v. U.S.,* 517 U.S. 416, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) at pg 437.

Counts 7-9 inclusive as set forth in the exact language of the Swisher Counts, all charged Mr.

Hinkson with a crime *"in violation of 18 U.S.C. §1114; in violation of 18 U.S.C. § 373."* There is

no escaping the fact that the government charged Mr. Hinkson with a violation of Section 1114 of

Title 18, which necessarily brings up the dependent statutory Sections 1111, 1112 and 1113. In order

to prove a violation of Section 1114, one of the elements of the government's case was that Mr.

---

[5]     Counts 7, 8 and 9 of the Superseding Indictment are exactly the same except as to the name of the alleged victim and each reads the same, in relevant part, as follows: "Between about December 2002 and January 2003, the precise date being unknown to the grand jury, in the District of Idaho, the defendant, DAVID ROLAND HINKSON, with the intent that EJS [Elven Joe Swisher] engage in conduct constituting a felony that has as an element the use of physical force against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did solicit, command, induce and endeavor to persuade EJS to engage in such conduct, ... in violation of Title 18, United States Code, Section 1114; in violation of Title 18, United States Code, Section 373.

[6]     * * * The basic principle has been stated many times. There is a "power 'inherent in every court of justice so long as it retains control of the subject matter and of the parties, to correct that which has been wrongfully done by virtue of its process.' *Arkadelphia Co. v. St. Louis Southwestern Ry. Co.,* 249 U. S. 134, 146. See Northwestern Fuel Co. v. Brock, 139 U. S. 216, 219.' *United States v. Morgan,* 307 U. S. 183, 197 (1939). Although that statement was made in a civil case, we have made it clear that a federal court has even broader discretion to notice error independently in the trial of a criminal case than in civil cases. Crawford v. United States, 212 U. S. 183, 194 (1909)." – *Carlisle v. U.S.* at 437

Hinkson was *"within the special and maritime territorial jurisdiction of the United States"* when the law violation occurred. This nexus of subject matter jurisdiction was required both at the grand jury and at trial.

MAXIM 7:    Territorial jurisdiction was not alleged or proven by the government.

The trial record shows that the government failed to prove or even allege that Mr. Hinkson was within the special maritime and territorial jurisdiction of the United States; and the indictment shows that no such element was alleged. In order for Section 1114 to apply, an actual murder, manslaughter, or attempted murder or manslaughter must have occurred. Each of these crimes requires that the perpetrator have been *"within the special maritime and territorial jurisdiction of the United States"*. In addition, each of the Swisher Counts failed to allege such territorial jurisdictional element which was the necessary predicate for invoking 18 U.S.C. § 1114. Therefore, as alleged in the indictment, it is impossible for Section 1114 to stand alone; impossible for § 1114 to support § 373 without further delineation from one of its dependent sections. Thus, 18 U.S.C. § 373 has no effect without the support of § 1113 in this instant case.

8.    **ANALYSIS**

The "evidence" presented to the grand jury, the allegations in the charging instrument, and the "proof" [7] presented at trial, was that there was a solicitation for murder of three Federal officials. There was no evidence presented to the grand jury, nor to the petit jury at trial of any territorial jurisdictional nexus with Section 1114 of title 18 United States Code. See the transcript and complete record of the proceeding which are incorporated in their entirety herein by this reference

---

[7]    Said so-called proof being highly suspect as one Hinkson juror has affirmed: "If I had known that Swisher was a fraudulent military combat hero I would *never* have voted to convict Mr. Hinkson." See affidavit of juror Ben Casey.

as if they were fully set forth herein.

The relevant language of 18 U.S.C. Section 1113 reads as follows:

§ 1113.  **Attempt to commit murder or manslaughter** "Except as provided in Section 113 of this title, <u>whoever, within the special maritime and territorial jurisdiction of the United States</u>, attempts to commit murder or manslaughter, shall, for an attempt to commit murder be imprisoned not more than twenty years or fined under this title, or both, and for an attempt to commit manslaughter be imprisoned not more than seven years or fined under this title, or both. – *18 U.S.C. § 1113.* [Underlining added]

Note the statutory jurisdictional language: *"within the special maritime and territorial jurisdiction of the United States"* is present in three of the five statutes in question (see sections 1111, 1112, & 1113) and that language is incorporated into the fourth and fifth statutes, being Sections 373 and 1114 of Title 18 U.S.C. Such language establishes a mandatory factual element of Mr. Hinkson's case and makes it clear that the criminal act must have been committed *"within the special and maritime territorial jurisdiction of the United States"* or there was no jurisdiction to prosecute, try, convict and sentence Mr. Hinkson.

The government having charged Mr. Hinkson with multiple violations of Section 1114 **and** multiple violations of Section 373 of Title 18 United States Code in the various counts in the Superseding Indictment, must have believed that under Section 1114 the "attempt", from Section 1113, was the solicitation as described in Section 373.

MAXIM 8a:  <u>Solicitation is dependent upon other statutes to create a sufficient allegation of a complete crime AND the case fails when it is not alleged.</u>[8]

If solicitation *IS* considered the act which constitutes an "attempt" to commit murder

_____

[8]  Hence the US Attorney's Manual suggested language for the indictment wherein both Sections 373 and 1114 are included to insure that a crime has actually been charged.

(pursuant to Section 1113), then the government's case against Mr. Hinkson under Section 373 fails because it did not allege or prove territorial jurisdiction pursuant to Section 1114 which depends upon Section 1113 in order to define the crime of "attempt".

Or alternatively:

MAXIM 8b:   Where an indictment and trial proof do not match, the case fails.

If solicitation of murder **_IS NOT_** considered conduct which constitutes an "attempt" to murder under Section 373, then the government's case fails for two reasons: 1) it failed to actually prosecute Section 1114 as charged in the indictment; and 2) it failed to allege or prove territorial jurisdiction pursuant to Section 1114.

MAXIM 9:   Territorial jurisdiction is specified in a US Code definition.

At this point, an examination of the mandatory language: *"within the special maritime and territorial jurisdiction of the United States"* is necessary as these words define and limit the relevant jurisdictional authority of the US Government to prosecute and the court to adjudicate under Section 1114 (with its dependent code Sections, 1111, 1112 and 1113).

The United States Attorneys Manual, published by the US Department of Justice and used **_mandatorily_** by all US Attorneys recognizes *territorial jurisdiction* as a requisite element of the crime and it states that:

> "The term 'special maritime and territorial jurisdiction of the United States is defined in eight subsections of 18 U.S.C. § 7."

This court is hereby requested to take judicial notice of the US Attorney's manual (Fed.R.Evid 201) which can be viewed and reviewed many places including several on the Internet, one of which is at: http://www.justice.gov/usao/eousa/foia_reading_room/usam/.

The manual continues:

> "These subsections relate to maritime jurisdiction, 18 U.S.C. § 7(1), 7(2); lands and buildings, 18 U.S.C. § 7(3); Guano Islands, 18 U.S.C. § 7(4); aircraft, 18 U.S.C. § 7(5); spacecraft, 18 U.S.C. § 7(6); places outside the jurisdiction of any nation, 18 U.S.C. § 7(7); and foreign vessels en route to and from the United States, 18 U.S.C. § 7(8). – *US Attorneys Manual Title 9, Criminal Resource Manual Section 663.*

**Title 18 U.S.C. § 7 contains the ONLY definition** of the "special maritime and territorial jurisdiction of the United States" for Title 18 purposes. Section 7 of Title 18 clearly defines the scope of the special maritime and territorial jurisdiction of federal courts, which is not where the crimes in this case occurred. The record of the case proves conclusively that Mr. Hinkson was in Idaho County, Idaho at or near his home and factory close to Grangeville, when the alleged acts occurred giving rise to the indictment. Because Grangeville, Idaho (and its surrounding areas) are not *"within the special maritime and territorial jurisdiction of the United States"*, there was, and is, no jurisdictional nexus for the government to have charged Mr. Hinkson or for the court to have heard the case, entered a conviction and imposed a sentence.[9]

As the United States Supreme Court held in the *Bond v United States* [10] case: State law trumps federal law when crimes could have been charged under state law according to the Ninth and Tenth Amendments to the United States Constitution, as the jurisdiction involves matters within the purview of state powers. In *Bond* the Defendant was held to have standing to challenge the federal

---

[9]     And neither were **any** of Mr. Hinkson's accusers within such special jurisdiction when the alleged solicitation(s) occurred; like Elven Joe Swisher, who was subsequently convicted of perjury, fraud and theft of V.A. benefits, and the unauthorized wearing of a Purple Heart and other medals, all a part of a scheme to portray himself as a decorated combat veteran in aid of his application for V.A. benefits that defrauded the U.S. Government of a substantial amount of money. Ironically, the same lies as told to the V.A. for which Swisher was criminally prosecuted, were used by him in the Hinkson case in order to gain the unassailable underlined credibility of a wounded combat hero when he was presented as a witness to the Hinkson's jury.

[10]     *Bond v United States*, No. 09-1227, SUPREME COURT OF THE UNITED STATES, October Term, 2010, Decided June 16, 2011

statute regarding caustic substances on the grounds that the measure interfered with the powers reserved to States to regulate crimes related to bodily injury to others. In this matter, Mr. Hinkson has the right to challenge the lack of jurisdiction where a state would preempt the prosecution of that crime under state law, pursuant to *Bond*.

Here, Mr. Hinkson is directly challenging the authority of the federal government to have prosecuted him when the state of Idaho has the primary responsibility for such matters as murder, manslaughter, and the attempt thereof [11] for all the reasons cited in *Bond*. In addition, the prosecution stated no federal territory jurisdictional basis that would justify an indictment by a federal grand jury, or adjudication by the trial court, or support a verdict and sentence, because of the lack of proof of federal territorial jurisdiction, *i.e.*, jurisdiction specifically delineated by Congress. As with *Bond*, the state of Idaho had full prosecutorial authority, and still does for that matter, and the federal government has none.

Since there is no jurisdictional nexus between the federal government and Mr. Hinkson vis-a-vis Section 1114 of Title 18, and its dependent Sections, 1111, 1112 and 1113, which would bring him within the prosecutorial purview of the federal government; no amount of rationalizing, concocting, fabricating, misconstruing of law or facts, or petty intellectual dishonesty can deem it otherwise.

For these reasons, the court lacked original jurisdiction to hear the charges brought by the government and the court lacked subject matter jurisdiction *ab initio*, to enter the judgment of conviction and sentence. See *United States v. Allied Towing Corp.,* 602 F. 2d 612, (4th Cir. 1979);

---

[11] Idaho State Code Sections I.C. §18-4001, *et seq.*

and *United States v. Cordova,* 89 F. Supp. 298 (ED New York 1950). See also *United States v. Lopez,* 514 U.S. 549 (1995) 115 S.Ct. 1624; and *Schechter Corp. v. United States,* 295 U.S. 495 (1935) 55 S.Ct. 837) for discussions of the necessity of a finding that the crime occurred within the jurisdiction (*i.e.* in this instant matter, *"within the special maritime and territorial jurisdiction of the United States"* pursuant to 18 U.S.C. § 7) in order for the federal government to have prosecutorial authority. See *U.S. v. Corey,* 232 F.3d 1166 (9th Cir., 2000) for an in-depth examination of the restrictions on jurisdiction outside the *"special maritime and territorial jurisdiction of the United States"*; see also *U.S. v. Neil,* 312 F.3d 419 (9th Cir., 2002); *United States v. Ross,* 439 F.2d 1355 (9th Cir., 1971); *U.S. v. Hayden,* 260 F.3d 1062 (9th Cir., 2001); *U.S. v. Gavin,* 959 F.2d 788 (C.A.9 (Hawai'i), 1992); *U.S. v. Begay,* 42 F.3d 486 (C.A.9 (Ariz.), 1994); *U.S. v. Lewellyn,* 481 F.3d 695 (9th Cir., 2007); *U.S. v. Gourde,* 440 F.3d 1065 (9th Cir., 2006); *U.S. v. Lilly,* 512 F.2d 1259 (C.A.9 (Mont.), 1975).

It is noteworthy that certain crimes were made punishable by the United States if committed *"within the special maritime and territorial jurisdiction of the United States"*: *United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) at fn 5. Also see *U.S. v. Warren,* 984 F.2d 325 (C.A.9 (Hawai'i), 1993) – the the locus of a crime is an element to be proven at trial.

Here, at best, we are dealing with a government prosecution of a violation of § 1114 (Dkt #37) under a solicitation statute ,18 U.S.C. § 373, for acts clearly outside the territorial boundaries of the U.S. Section 1113. That the government has chosen to construe § 373 as meeting the requirements of an "attempt" under § 1114 and its dependent section § 1113, does not confer authority to prosecute or sentence when the alleged crime took place outside of the *"special maritime and territorial jurisdiction of the U.S"*. Only Section 1113 confers authority to prosecute

for an "attempt to murder" and, thus, to enter judgment and sentence, however, the jurisdictional element in Section 1113 must be both pled and proven. 18 U.S.C. § 1113 limits the government's and the court's authority to proceed to one who was *"within the special maritime and territorial jurisdiction of the United States."* Defendant Hinkson was not, at the time of the alleged acts, *"within such territorial jurisdiction"*, therefore the conviction must be reversed, the sentence vacated and the Superseding Indictment must be dismissed.

Defendant anticipates that the government's argument will be to the effect that the charge was levied under 18 U.S.C. § 373 and not under 18 U.S.C. § 1113. But this argument will fail because the charged statute (§373) is paired with § 1114 that is dependent on another statute (§1113) and requires the addition of another provision to implement a sentence. Thus, the dependent statute, § 1113, does, in fact, require compliance with the jurisdictional element of the included or imbedded statute.

At the very least the sentence and the judgment entered[12] in this case were actually predicated solely on 18 U.S.C. § 373, and the territorial element in Section 1114 was disregarded. This fact alone negates jurisdiction because the charging statute and charging instrument must be completely harmonized from indictment to entry of judgment and sentence, or they are void and without effect. Section 373 does not, by itself, given the wording of the Hinkson indictment, contain the authority to enter a sentence absent consideration of 18 U.S.C. §1114 with its dependent § 1113, as stated in § 1114 and in the Superseding Indictment.

MAXIM 10: <u>The territorial locus must be alleged to prove jurisdiction.</u>

---

[12]     See Dkt #s 266 & 267

The charging instrument failed to convey jurisdiction upon the government to prosecute and upon the court to adjudicate this case because jurisdiction was not alleged and cannot be inferred from within the four-corners of the indictment. *Ergo,* the indictment fails, the prosecution fails and the subsequent entry of judgment fails for lack of jurisdiction.

For these reasons, the entry of judgment and sentence against Mr. David Hinkson must be vacated and the indictment dismissed.

David R. Hinkson, #08795-023
USP Atwater
U.S. Penitentiary
P.O. Box 019001
Atwater, California  95301
In Propria Persona

# UNITED STATES DISTRICT COURT DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case #: 1:04-cr-00127-RCT-1 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT HINKSON'S |
| vs | ) | MEMORANDUM IN SUPPORT OF |
| | ) | GROUND SIX: JURY AND JUROR |
| David R. Hinkson, | ) | MISCONDUCT, AS IS HEREBY |
| | ) | APPENDED TO HINKSON'S MOTION TO |
| Defendant. | ) | VACATE THE CONVICTION AND |
| | ) | SENTENCE UNDER SECTION 2255, TITLE |
| | ) | 28 USC |

COMES NOW David R. Hinkson, by and through his own hand and hereby submits this MEMORANDUM REGARDING GROUND SIX: JURY AND JUROR MISCONDUCT, IN SUPPORT OF MOTION TO VACATE CONVICTION AND SENTENCE UNDER 28 U.S.C. §2255.

For the reasons set forth below in this Memorandum In Support of Defendant Hinson's Motion to Vacate the Conviction and Sentence under 28 U.S.C. §2255 the conviction and judgment must be vacated and the indictment dismissed.

-1-

## JURORS DISCUSSED THE CASE BEFORE CHARGING

1.    On page 1036, lines 13-20, of the trial transcript it is seen that the Jury had given a note to the Judge.   That note reads as follows:

> "Your Honor, I don't know if this is allowed for me to ask; but can
> Mr. Swisher be asked about the mental capacity of Mr. Hinkson?
> Did he do a clinical evaluation of Mr. Hinkson?   Is David Hinkson
> on medication?   Is Mr. Hinkson mentally ill?   Are we or are we
> not supposed to consider his mental capacity?"

2.    This note was written using the word "we" which reasonably means that more than one juror contributed to its authorship although the note was handed to the court personnel by Ms. Claudia Hanes.

3.    This note implicates that two or more jurors had not only discussed the case but had determined that I was guilty and were ready to move onto the insanity portion of the case.

4.    An evidentiary hearing is needed where jurors can be subpoenaed and the necessary evidence gathered to determine the source of this early determination contrary to the Court's specific admonition not to discuss the case or consider any outside information.

5.    This is proof of juror misconduct which needs to be developed in discovery with an expanded record.

6.    It is absolutely impermissible for a juror to consider either matters outside of what has been presented in court, it is equally impermissible for a juror to be considering such facts prior to the close of evidence.

7.    The jury had thus indicated by that note that they considered Swisher an authority on the psychiatric condition of the defendant and wanted his additional input when he was not offered as an expert in psychological matters.

8.    The point here is that Judge Tallman, if he had been acting as a neutral trial court judge,

rather than as an extension of the prosecution, should have, *sua sponte*, declared a mistrial at that moment as a result of manifest juror misconduct: i.e., the jury had not followed Judge Tallman's instructions and were discussing the case among themselves and had deliberated and made a decision. These facts by themselves are grounds to vacate the conviction and sentence.

9. After the trial, attorney Hoyt met with juror Hanes and learned that she was interested in the law and psychology and consulted information on these subjects to help her formulate her opinions. (See EXHIBIT F-1, Affidavit of Wesley W. Hoyt attached.)

10. In that conference with juror Hanes, Mr. Hoyt learned that she knew and was in communication with Judge Edward Lodge's wife, an Idaho State Senator whom she supported, but that she did not disclose that information in Voir Dire Examination. (Id.)

11. The question is, to what extent was she influenced in her decision as a juror by her prior acquaintanceship with Mrs. Lodge.

12. Also, a question arises whether she consulted any texts regarding the law or mental health during this trial contrary to the admonition of the Court.

13. Because this juror note sent to the court questioning whether they should be considering the mental state of Hinkson which was not in issue, it is evident that the jury was both illegally discussing the trial before the close of evidence and argument, AND it was considered allegations not even presented. At the time the jury sent the aforementioned note to the court, there had been no discussion of Hinkson's mental state or possible diagnose of same.

14. There are other issues involving juror misconduct that arise from the record and will be shown in discovery if permitted.

THEREFORE, for the foregoing, the conviction and sentence of the defendant should be vacated forthwith.

-3-