UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

CIV No. 1:12-cv-196-RCT

(formerly Nos. 1:04-cr-127-RCT & 3:02-cr-142-RCT)
—————————————————

DAVID ROLAND HINKSON,
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.
—————————————————


ANSWER OF THE UNITED STATES TO HINKSON'S
MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255


—————————————————


Michael J. Mullaney
Acting United States Attorney

Michael Patrick Sullivan
Special Assistant U.S. Attorney

John F. De Pue
Michael Taxay
Attorneys
National Security Division
U.S. Department of Justice
Washington, D.C. 20530

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Hinkson's Prosecution for Soliciting the Murders of
           Federal Officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The District Court Denies Hinkson's Motion for a New Trial . . . . . 11

      C.    A Panel of the Court of Appeals Reversed the Conviction  . . . . . . . 13

      D.    The En Banc Court Affirms the Conviction . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    Introduction and Governing Principles . . . . . . . . . . . . . . . . . . . . . . 15

      B.    Hinkson Is Not Entitled to a New Trial Based Upon "Newly-
           Discovered Evidence" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           1.    Swisher's False Testimony Concerning His Military
                  Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           2.    Swisher's "Alibi" Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . 23

           3.    Evidence Relating to Swisher's Medical Condition . . . . . . . . 25

           4.    Evidence Demonstrating That Swisher Had a Motive
                  to Lie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

           5.    Swisher's Alleged "Fraud on the Court" . . . . . . . . . . . . . . . . 32

C.   Hinkson's Claims That This Court Engaged in Judicial Misconduct and That It Should Recuse Itself from Adjudicating the Instant Petition Are Meritless ...................................... 33

D.   Hinkson's Claim That the Government Denied Him Discovery Is Without Foundation ...................................... 40

E.   Hinkson's Claim of Ineffective Assistance Does Not Warrant Relief on Collateral Review ...................................... 43

F.   Hinkson's Claim That the Solicitation Counts on Which He Was Convicted Are Legally Insufficient for Failing to Allege Jurisdiction Is Plainly Without Merit ...................................... 52

G.   Hinkson Is Entitled to No Relief Based Upon His Claims of Juror Misconduct ...................................... 55

   1.   Hinkson's allegation of premature deliberations .......... 55

   2.   The allegation that Haynes failed to disclose, during voir dire examination, a friendship with the wife of Judge Lodge ... 58

   3.   The allegation that a juror was biased as the result of a similar incident involving an acquaintance .................... 60

      a.   The Juror Misconduct Claim Is Untimely .......... 62

      b.   Casey's Affidavit Cannot Be Considered for the Purpose of Impeaching the Jury's Verdict .......... 64

      c.   Casey's Allegations Fail to Demonstrate Juror Misconduct ...................................... 67

H.   The Government Did Not Engage in Misconduct Resulting in the Disqualification of Defense Counsel Hoyt .................... 68

   1.   Pertinent Facts ...................................... 68

2.    Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## TABLE OF AUTHORITIES

Cases:

BankATLANTIC v. Blythe Eastmen Paine Webber, Inc.,
  955 F.2d 1467 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Bond v. United States,
  131 S. Ct. 2355 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

Brady v. Maryland,
  373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Clemens v. United States Dist. Ct.,
  428 F.3d 1175 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ellis v. United States,
  313 F.3d 636 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fields v. Brown,
  503 F.3d 755 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 59

Hard v. Burlington N. R.R. Co.,
  870 F.2d 1454 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 66, 68

Hebner v. McGrath,
  543 F.3d 1133 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64

Hill v. United States,
  368 U.S. 424 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hinkson v. United States,
  131 S. Ct. 2096 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Jones v. United States,
  527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Knowles v. Mirzayance,
  129 S. Ct. 1411 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Liteky v. United States,
  510 U.S. 540 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Lynn v. United States,
  365 F.3d 1225 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mandacina v. United States,
  328 F.3d 995 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

In re Mason,
  916 F.2d 384 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Massaro v. Unites States,
    538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 41, 43

Mayle v. Felix,
    545 U.S. 644 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 62

McDonough Power Equip., Inc. v. Greenwood,
    464 U.S. 548 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60

Miller v. Terhune,
    49 Fed. Appx. 148 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Moore v. Illinois,
    408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Murchu v. United States,
    926 F.2d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 40

Odom v. United States,
    455 F.2d 159 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Padilla v. Kentucky,
    130 S. Ct. 1473 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Premo v. Moore,
    131 S. Ct. 733 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 48

Rhoades v. Henry,
    598 F.3d 511 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Richardson v. Marsh,
    481 U.S. 200 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Ronwin v. State Bar of Ariz.,
    686 F.2d 692 (9th Cir. 1982), rev'd on unrelated grounds sub nom
    Hoover v. Ronwin,
    466 U.S. 558 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Shannon v. United States,
    512 U.S. 573 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Standing Comm. on Discipline v. Yagman,
    55 F.3d 1430 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Strickland v. Washington,
    466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Tanner v. United States,
    483 U.S. 107 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 64, 65

Tracey v. Palmateer,
    341 F.3d 1037 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 67
United States v. Addonizio,
    442 U.S. 178 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
United States v. Alcantara-Rueda,
    81 Fed. Appx. 204 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
United States v. Berry,
    624 F.3d 1031 (9th Cir. 2010),
    cert. denied, 132 S. Ct. 431 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17
United States v. Bond,
    681 F.3d 149 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
United States v. Dupuy,
    760 F.2d 1492 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
United States v. Feola,
    420 U.S. 671 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
United States v. Frady,
    456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 58, 72
United States v. Gianelli,
    543 F.3d 1178 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
United States v. Griggs,
    713 F.2d 672 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
United States v. Herrera,
    481 F.3d 1266 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
United States v. Hinkson:
    526 F.3d 1262 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . 2, 6, 13, 14, 20, 47, 51
    585 F.3d 1247 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
    611 F.3d 1098 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15
United States v. Kerr,
    778 F.2d 690 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
United States v. Navarro-Garcia,
    926 F.2d 818 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
United States v. Nelson,
    718 F.2d 315 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
United States v. Peltier,
    446 F.3d 911 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55

United States v. Pimentel,
 654 F.2d 538 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66, 67

United States v. Scrivner,
 189 F.3d 825 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

United States v. Studley,
 783 F.2d 934 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

United States v. Swisher,
 790 F. Supp. 2d 1215 (D. Idaho 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Swisher,
 365 Fed. Appx. 784 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Tham,
 884 F.2d 1262 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Willenbring v. United States,
 306 F.2d 944 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39


Constitution:

U.S. Const. amend. X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54


Statutes:

18 U.S.C. § 115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

18 U.S.C. § 373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 52, 53

18 U.S.C. § 373(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

18 U.S.C. § 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 1001(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 1001(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

18 U.S.C. § 1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

18 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

18 U.S.C. § 1114(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

18 U.S.C. § 3147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

28 U.S.C. § 455(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2255(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 2255(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rules:

Fed. R. Civ. P. 15(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Crim. P. 33(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

Fed. R. Evid.:

     Rule 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13, 14

     Rule 403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     Rule 606 (1972 advisory committee notes) . . . . . . . . . . . . . . . . . . . . . 65

     Rule 606 (2011 advisory committee notes) . . . . . . . . . . . . . . . . . . . . . 65

     Rule 606(b) (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

     Rule 606(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 64, 65, 66, 67

     Rule 606(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

     Rule 606(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

     Rule 606(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

     Rule 608(b) (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     Rule 608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 14, 20

     Rule 609(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rules Governing Section 2255 Proceedings For The United States District Courts,
     R. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

CIV No. 1:12-cv-196-RCT

(formerly Nos. 1:04-cr-127-RCT & 3:02-cr-142-RCT)

———————————————

DAVID ROLAND HINKSON,
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.

———————————————

ANSWER OF THE UNITED STATES TO HINKSON'S
MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255

———————————————

PROCEDURAL HISTORY

Following a jury trial in the United States District Court for the District of

Idaho, Hinkson was convicted on three counts of soliciting crimes of violence, in

violation of 18 U.S.C. § 373.  The Court sentenced him to consecutive 120-month

prison terms on each of the counts of conviction, and to a consecutive 36-month

prison term under 18 U.S.C. § 3147 (penalty for offense committed while on release),

all to be followed by 3 years of supervised release.  The Court ordered the sentence to run consecutively to a 120-month prison term for tax evasion that Hinkson received in a previous case.  (No. 3:02-cr-142-RCT, Amended Judgment (D. Idaho June 13, 2005) (ECF No. 374)).

A divided three-judge panel of the court of appeals reversed Hinkson's convictions.  United States v. Hinkson, 526 F.3d 1262 (9th Cir. 2008).  On rehearing en banc, the court vacated the panel decision, and a limited en banc court affirmed Hinkson's convictions.  United States v. Hinkson, 585 F.3d 1247 (9th Cir. 2009).  The court of appeals then denied a petition for reconsideration by the limited en banc panel or rehearing by the full court.  United States v. Hinkson, 611 F.3d 1098 (9th Cir. 2010) (en banc).  On April 18, 2011, the Supreme Court denied Hinkson's petition for a writ of certiorari.  Hinkson v. United States, 131 S. Ct. 2096.  Hinkson filed the instant motion to set aside his sentence under 28 U.S.C. § 2255 on April 17, 2012 (No. 1:12-cv-00196-RCT (D. Idaho) (ECF No. 1)).[1]  He filed an "Amended Memorandum" in Support of his Motion to Vacate on May 21, 2012 (ECF No. 3) ("Amended Memo").

---

[1] Hinkson's April 17, 2012 "Motion" consists of eight separately paginated memoranda, each addressing a different claim identified in his Motion to Vacate. Many of the separate Memoranda include attachments or exhibits which relate to several different claims.  To facilitate reference to the memoranda and attachments comprising this motion, we employ the pagination assigned to them under the ECF system.

## STATEMENT OF JURISDICTION

This Court's jurisdiction to entertain a motion to set aside a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" rests upon 28 U.S.C. § 2255 and Rule 4 of the Rules Governing Section 2255 Proceedings For the United States District Courts.  Hinkson's April 17, 2012 motion is timely as it was filed within one year of the date on which the judgement of conviction became final.  See 28 U.S.C. § 2255(f)(1).  However, insofar as Hinkson's Amended Memo was filed beyond the one-year limitations period set out in Section 2255(f)(1), it is timely only insofar as it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out  – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B); see Mayle v. Felix, 545 U.S. 644, 656-61 (2005).  As we explain, see infra p. 63-65, one of the claims raised in Hinkson's Amended Memo fails to satisfy that requirement.

## STATEMENT OF THE FACTS

### A.    Hinkson's Prosecution For Soliciting the Murders of Federal Officials

Hinkson is a tax objector who refused to pay income tax on the profits of his Grangeville, Idaho business, called "WaterOz," which sold bottled water for its purported medicinal benefits.  Hinkson, 585 F.3d at 1251.  The government investigated Hinkson for tax evasion and related offenses, for which he was eventually

3

arrested and convicted.  Id. at 1252 & n.1.

In 2004, a grand jury indicted Hinkson on nine counts of soliciting a crime of violence, in violation of 18 U.S.C. § 373, and two counts of threatening to murder the family of a federal official, in violation of 18 U.S.C. § 115.  The indictment alleged that Hinkson had solicited or threatened the murders of IRS Agent Steven Hines, who investigated the tax fraud case; Assistant U. S. Attorney ("AUSA") Nancy Cook, who prosecuted the case; and U.S. District Court Judge Edward J. Lodge, who sentenced him.  Hinkson, 585 F.3d at 1251, 1254.  Pertinent to Hinkson's instant motion, three of the Section 373 counts alleged that sometime during December 2002 and January 2003, Hinkson had solicited Elven Joe Swisher to torture and kill those officials.  Id. at 1253 & n.5.  See No.1:04-cr-127-RCT, Superseding Indictment, Doc. No. 37 (Counts 7-9).

The government's theory at trial was that Hinkson, who had hired Swisher to conduct quality control tests of WaterOz products (Tr. 983-85), solicited Swisher to kill the three officials because he believed that Swisher was a Korean War combat veteran.  Swisher testified on direct examination that he told Hinkson that he had served in the Marines and that, when Hinkson asked whether he had been in combat and killed anyone, he responded "[y]es" and added that he had killed "[t]oo many." Tr. 988-89; Hinkson, 585 F.3d at 1253.

4

Swisher further testified that, during April 2002, Hinkson had initially told Swisher that he (Hinkson) would pay "$10,000 per 'head' " for Swisher to torture and kill Dennis Albers, a local attorney, and his family because the attorney had opposed Hinkson in a legal dispute. Hinkson, 585 F.3d at 1252; Tr. 995-96. During July or August 2002, Hinkson told Swisher that he wanted Hines, AUSA Cook, and their families treated in the same manner as he had suggested for Albers. Tr. 1003-05. When Swisher told Hinkson "that he was out of his mind," Hinkson responded, "Well, you know, I know you're used to it. I mean, you have killed people." Tr. 1005. Swisher was less convinced this time that Hinkson was joking, and Swisher threatened to contact law enforcement. Tr. 1005-06. Hinkson then came to Swisher a third time sometime in January 2003 and again asked him to torture and kill the prosecutor and agent, their families, and the federal judge assigned to the case for "[a]t least $10,000 a head." Tr. 1007-08. Hinkson "plead[ed]" with Swisher, whom he called his "best friend," to do this for him, but Swisher declined. Tr. 1009.

On cross-examination, Hinkson's co-counsel, Thomas Nolan, vigorously impeached Swisher's credibility. See Hinkson, 585 F.3d at 1253-54. He elicited testimony calculated to demonstrate that Swisher had reported Hinkson to the authorities only after the two had experienced a falling out; that the two had been adversaries in civil litigation (e.g., id. at 1252; Tr. 1060-61, 1064, 1079); that Swisher

5

was allegedly involved in a failed effort to take over Hinkson's business (Tr. 1057-59, 1105-06); and that Swisher believed that Hinkson had attempted to have him killed. Tr. 1067-71; see Hinkson, 526 F.3d at 1301 (McKeown, J., dissenting).  Nolan also sought to develop inconsistencies between Swisher's trial testimony and his previous testimony before a grand jury (e.g., Tr. 1023-30, 1032-33, 1039-40), and Nolan led Swisher to acknowledge that, during that testimony, he admitted to having a flawed memory (Tr. 1047-49).

After completing "an extensive and withering cross-examination," Hinkson, 526 F.3d at 1303 (McKeown, J., dissenting), Nolan requested a sidebar conference. Nolan stated that "[f]or quite sometime [sic], we have been trying to dig into [Swisher's] military history because we don't believe it's accurate." Tr. 1114.  Nolan told this Court that "[b]ecause of [Swisher's] age and because of the time of the [Korean] war, we don't believe he was in the war." Tr. 1114.  Nolan also noted that Swisher appeared to be wearing a Purple Heart—a medal given to members of the armed forces wounded in combat—on his lapel, and Nolan said that he had a letter from Bruce Tolbert, an archives technician at the National Personnel Records Center ("NPRC"), indicating that Swisher had not received any medals.  Hinkson, 585 F.3d at 1254; Tr. 1114-15, 1122-25.  The government observed that it had not inquired on direct examination "about winning medals or combat," but had instead focused on

what Swisher had represented to Hinkson about his military service.  Tr. 1115.  This Court permitted Nolan to reopen cross-examination and to inquire about Swisher's military service and the object on Swisher's lapel.  Tr. 1116-17; <u>Hinkson</u>, 585 F.3d at 1254.  In response to Nolan's questions, Swisher testified that he was wearing a Purple Heart Medal awarded as a consequence of wounds he received while on a classified mission to free prisoners of war in North Korea following the armistice that terminated the Korean conflict.  <u>Id.</u>; Tr. 1117-18. Nolan then confronted Swisher with the NPRC letter.  Tr. 1118-19; <u>Hinkson</u>, 585 F.3d at 1254.  Swisher maintained that he had, indeed, received a Purple Heart and produced from his pocket what appeared to be a "replacement" military discharge form, known as a "DD-214." <u>Id.</u> at 1254 & n.10; Tr. 1119-20.

At a subsequent sidebar, Nolan moved for a mistrial claiming that the prosecutor had known about the "Replacement DD-214" previously and should have spoken up about it.  Tr. 1124-25.  This Court "agreed with the government that [Nolan] had tried for a 'grandstand play' that had backfired." <u>Hinkson</u>, 585 F.3d at 1255; Tr. 1127.  The Court denied the mistrial motion.  Tr. 1128.  However, with the consent of the parties, the Court then instructed the jury that it had "made a mistake in allowing the questioning with regard to the Purple Heart Medal" and that the jury should "disregard completely all of Mr. Swisher's testimony with regard to that

7

military commendation."  Tr. 1132-33.

During presentation of the defense case, the government brought to Hinkson's and the district court's attention a letter, of which the prosecutor had recently received a copy, from Lieutenant Colonel ("Lt. Col.") K.G. Dowling, Assistant Head of the Awards Branch of the Marine Corps, to the Idaho branch of the Department of Veterans Affairs.  Tr. 2069; Hinkson, 585 F.3d at 1255 & n.13.  The letter discussed the replacement discharge form Swisher had produced at trial, which Swisher had also used for purposes of obtaining veteran benefits.  Id. at 1255.  The letter stated that the form did not appear in Swisher's official file; that Swisher's official file did not show him receiving any medals; that Swisher had not been injured in combat but was injured in an automobile accident; and that some of the medals listed on the form Swisher had produced had not existed on the date listed on the form.  Id. at 1255-56.

The same day, Swisher's official military personnel file arrived at the court in response to a subpoena.  Hinkson, 585 F.3d at 1255-56.  The file contained an original copy of Swisher's discharge form, which listed no medals or combat wounds, and a copy of the letter from Lt. Col. Dowling that the government had brought to the court's attention.  Id. at 1256.  The file also contained photocopies of documents Swisher had presented to the Department of Veterans Affairs, including: (1) the replacement discharge form that he had produced at trial, and (2) what appeared to be

8

a contemporaneous letter attesting to Swisher's entitlement to wear the Purple Heart and other medals.  Id.  Upon initially examining the file, this Court observed that the file appeared to state that Swisher had participated in "top secret activities" and was "awarded the medals he says he was awarded."  Id.  But on review of the file during an intervening weekend, this Court ultimately found the file to be "very difficult to decipher," id.; Tr. 2305, with documents that were "neither self-authenticating nor self-explanatory."  Hinkson, 585 F.3d at 1256; Tr. 2317.  This Court was " 'not convinced' one way or the other whether the Swisher-produced [replacement discharge] form was credible," and the Court suggested that conclusive evidence on this point might come from a custodian of military records or from the person whose signature appeared on the documents Swisher had produced.  Hinkson, 585 F.3d at 1256.  Nolan, however, did not move for a continuance to obtain such evidence.  Id. Instead, Nolan moved to introduce into evidence Swisher's military personnel file, which by then he had also examined, id.; Tr. 2307-08, as well as the letter from Lt. Col. Dowling to the Idaho Department of Veterans Affairs.  Hinkson, 585 F.3d at 1256.

This Court denied that motion on two grounds.  First, the Court determined that the documents should be excluded under Federal Rule of Evidence 403, which provides that evidence, even if relevant, "may [be] exclude[d] if its probative value

is substantially outweighed by," *inter alia*, "a danger of . . . confusing the issues, . . . [or] undue delay [or] wasting time."  Fed. R. Evid. 403; <u>see</u> <u>Hinkson</u>, 585 F.3d at 1256.  The Court found that the documents were unauthenticated and inconclusive; that "[w]ithout an adequate foundation, the jury would have no way to determine which documents to credit"; that establishing a foundation would "require considerable time"; and that "[t]he court is unwilling to allow this issue to become a distracting side show to the trial and so finds that it could be confusing to the jury to introduce these confusing documents and could distract the jury from their primary purpose."  Tr. 2609-10; <u>see</u> <u>Hinkson</u>, 585 F.3d at 1256.  Second, this Court concluded that the documents were inadmissible under Federal Rule of Evidence 608(b), which then provided that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime . . . may not be proved by extrinsic evidence."  Fed. R. Evid. 608(b) (2010); <u>see</u> Tr. 2608-11.  The Court rejected Hinkson's argument that the documents were probative of whether Swisher had committed "fraud on the court," observing that the relevant testimony had been stricken from the record.  Tr. 2608.

This Court did, however, offer the defense the opportunity to reopen cross-examination concerning Swisher's military record and, in particular, to "thrust the [impeaching documents] under his nose and ask[] the impeaching question."  Tr.

2320; see Tr. 2607, 2610-11.   Nolan, however, elected not to reopen the cross-examination.   Tr. 2627.

During its summation, the government argued that Hinkson solicited Swisher to kill the federal officials because "[h]e understood Mr. Swisher had a military record and that he had served in combat and killed people.   It's the kind of person that he thinks will do such a thing."   Tr. 2813.   The jury found Hinkson guilty on the charges concerning his solicitation of Swisher.   Hinkson, 585 F.3d at 1253 & n.5.   The jury deadlocked on three charges concerning Hinkson's solicitation of another acquaintance, James Harding, to torture and kill the same federal officials.   Id. at 1253 & n.4.   The jury also acquitted Hinkson on three additional solicitation charges and the charges of threatening to kill the children of two of the federal officials.   Id. at 1253 & nn.3, 7; see Tr. 2883 (jury verdict).

B.   The District Court Denies Hinkson's Motion for a New Trial

Following his conviction, Hinkson moved for a new trial.   Hinkson, 585 F.3d at 1257.   Among other things, he argued that he had "newly discovered evidence": two affidavits from military officials, including one from the officer who had allegedly signed the replacement discharge form produced by Swisher at trial, stating that the replacement discharge form was forged.   Id.[2]

---

[2]   There is no longer any dispute that, although Swisher served in the Marine Corps, he did not serve in Korea and did not receive the Purple Heart or any other decorations.   Over two years after the district court proceedings concluded, Swisher

This Court denied the motion. See No. 1:04-cr-127-RCT, Memorandum Decision and Order, ECF No. 244 (hereafter "New Trial Order"). The Court concluded that the substance of these affidavits was not "new" and was largely cumulative of the information petitioner possessed at trial; that Hinkson's counsel had not been diligent in discovering it; that it would not be admissible in a new trial; and that it was not material in any event. Id. at 3-12. The Court found "meritless" Hinkson's "attempts to recharacterize the evidence as central to the Government's case by arguing that Swisher's silent wearing of a miniature Purple Heart lapel pin on his breast-pocket while testifying made his military record 'intrinsic to both his credibility and the [G]overnment's theory of prosecution.'" Id. at 6 (brackets in original). The Court found that "the Government elicited on direct examination only that Hinkson *believed* that Swisher had substantial combat experience; whether or not Swisher had *actually* served in combat or was wounded and decorated was never relevant to the key question as to whether Hinkson thought Swisher to be a potential contract killer who would willingly agree to murder the three federal officials Hinkson wanted dead." Id.

---

was convicted of knowingly wearing a military decoration to which he knew he was not entitled, in violation of 18 U.S.C. § 704(a); willfully and knowingly making false representations to obtain benefits to which he was not entitled, in violation of 18 U.S.C. § 1001(a)(2) and (3); and presenting false testimony and a forged document to obtain benefits to which he was not entitled, in violation of 18 U.S.C. §§ 641 and 642. See United States v. Swisher, 365 Fed. Appx. 784 (9th Cir. 2009) (affirming conviction); see also United States v. Swisher, 790 F. Supp. 2d 1215 (D. Idaho 2011) (denying habeas relief).

C.    A Panel of the Court of Appeals Reversed the Conviction

A divided panel of the court of appeals reversed, remanding for a new trial on the basis of the newly produced affidavits. Hinkson, 526 F.3d at 1297-98. The panel majority concluded, among other things, that documents relating to Swisher's military record would allow the defense to undermine Swisher's testimony in a new trial. Id. The panel did not, however, reach the issue of whether this Court had abused its discretion in excluding the documentary evidence about Swisher that Hinkson had sought to introduce at trial. Id. at 1265. The panel did state, in passing, that exclusion had been improper under Rule 608(b), reasoning that the evidence was not addressed to an out-of-court incident of untruthfulness, but instead was relevant to impeach an in-court "statement" that Swisher had made by wearing a Purple Heart pin. Id. at 1283. But the panel also stated that "the district court's evidentiary ruling under Rule 403 was almost certainly not an abuse of discretion." Id.

Judge McKeown dissented. 526 F.3d at 1298-1308. She stated, among other things, that "I cannot think of a clearer example of a collateral issue than Swisher's military service." Id. at 1305. "[T]he real issue," she explained, was Hinkson's "perception of Swisher's purported prowess and daring, not the truth of his military service." Id. at 1306. She found the "majority's discussion of the wearing of the Purple Heart by Swisher" to be "misplaced," observing that testimony regarding

13

receipt of the decoration had been stricken (id. at 1306 n.6) and that the veracity, *vel non*, of Swisher's military record was "a classic sideshow." Id. at 1305.  And she observed that "[i]ronically, Swisher's puffing of his military achievements makes it even more likely that Hinkson would have found him to be a suitable candidate." Id.

    D.    The En Banc Court Affirms the Conviction

On rehearing en banc, the court vacated the panel decision, and a limited en banc court affirmed Hinkson's convictions.  Hinkson, 585 F.3d 1247.  Applying an abuse-of-discretion standard, the en banc court affirmed this Court's conclusion that no new trial was warranted based on newly discovered evidence.  Id. at 1263-67.  The en banc court noted, among other things, that "the material point was whether Swisher *told* Hinkson he had killed men in battle, not whether he had actually done so."  Id. at 1265; see id. at 1266-67.

The en banc court also addressed and rejected Hinkson's argument that this Court had abused its discretion in excluding the documents about Swisher's military record.  Hinkson, 585 F.3d at 1267.  The en banc court concluded that exclusion had been permissible under Rule 403 (and therefore did not reach the alternative Rule 608(b) ground).  Id.  Judge William Fletcher (who had written the panel majority opinion), joined by three other judges, dissented.  Id. at 1268-1303.  Judge Fletcher reiterated the panel majority's reasoning for believing that a new trial was warranted.

Id. at 1283-1303.  The court of appeals denied a petition for reconsideration by the limited en banc panel or rehearing by the full court.  Hinkson, 611 F.3d 1098.  Chief Judge Kozinski, who had previously been a member of the en banc majority, dissented.  Id. at 1099.

## ARGUMENT

A.      Introduction and Governing Principles

Before addressing Hinkson's specific claims concerning his entitlement to relief under Section 2255, a summary of the principles governing such relief is warranted. Most significantly, a petitioner is not entitled to relief under Section 2255 unless "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).  Thus, as the Supreme Court explained in United States v. Addonizio, 442 U.S. 178, 184 (1979), the range of claims cognizable under this standard is narrow.  "[A]n error of law does not provide a basis for collateral attack unless the claimed error constitute[s] 'a fundamental defect which inherently results in a complete miscarriage of justice.'" Id. at 185 (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  Consequently, "Errors of law which might require reversal of a conviction or sentence on appeal do not necessarily provide a basis for [habeas relief]."  United States v. Gianelli, 543 F.3d 1178, 1185 (9th Cir. 2008) (citation omitted).  Several of Hinkson's claims allege errors of law.  However, even if there

were a basis for such claims, none come close to satisfying Addonizio's demanding standard.

Second, "'[t]he law in this circuit is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion.'" United States v. Scrivner, 189 F.3d 825, 828 (9th Cir. 1999) (quoting Odom v. United States, 455 F.2d 159, 160 (9th Cir. 1972)); see Murchu v. United States, 926 F.2d 50, 55 (1st Cir. 1991) ("Issues resolved by a prior appeal will not be reviewed again by way of a 28 U.S.C. § 2255 motion.") (citation omitted); cf. United States v. Berry, 624 F.3d 1031, 1038 (9th Cir. 2010) ("[Section] 2255 may not be used as a chance at a second appeal"), cert. denied, 132 S. Ct. 431 (2011).  As this Court has previously observed (New Trial Order 28), "[Hinkson's] conduct in the trial proceedings to date demonstrates his belief that sheer repetition of arguments and motions may accomplish his objectives.  He has engaged in repeated attempts to argue and reargue the same issues the Court has previously rejected."  Particularly in respect to Hinkson's claims relating to Swisher's alleged perjury concerning his military record and the exclusion of evidence tending to demonstrate the falsity of his stricken testimony concerning that record, the instant motion is nothing more than a continuation of that practice.  Those issues have twice been the subject of appellate review and, during that process, have been passed on by thirteen different members

16

of the court of appeals.  His arguments relating to such issues are therefore foreclosed by the rulings of this Court and those of the en banc court of appeals affirming them.

Third, claims of newly-discovered evidence, raised in a Section 2255 motion, are subject to treatment as a motion for a new trial on the grounds of newly-discovered evidence under Fed. R. Crim. P. 33(b)(1).  See Berry, 624 F.3d at 1038-39; see also Lynn v. United States, 365 F.3d 1225, 1237 (11th Cir. 2004) ("[Section] 2255 motions based on new evidence are subject to the standards generally applicable to motions for a new trial based on new evidence").  Thus, in order to warrant a new trial under Section 2255, the newly-discovered evidence must satisfy the stringent criteria that govern the application of the rule, including the requirements that the evidence: (1) truly be newly-discovered; (2) be material to the issues at trial; (3) not be cumulative or merely impeaching; and (4) would probably result in acquittal at a new trial.  Berry, 624 F.3d at 1042 (citing Hinkson, 585 F.3d at 1264).  Hinkson has not even attempted to demonstrate fulfillment of those requirements in the context of his "newly-discovered evidence" claim.  Indeed, as we show in Section B below, the evidence that Hinkson maintains is "newly-discovered" (1) was known to him or available at the time of trial; (2) replicated evidence submitted to the jury; or (3) would (for the most part) merely have further impeached Swisher's veracity.  Such reasons prompted

17

this Court to deny Hinkson's new trial motion based on "newly-discovered evidence" of a similar nature.

Finally, "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68 (1982). That principle governs claims not raised on direct appeal and advanced for the first time on collateral review. See Massaro v. Unites States, 538 U.S. 500, 504 (2003) (citing Frady and stressing "the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice"). In addressing claims not raised at trial or on appeal, Hinkson has made no effort whatsoever to demonstrate cause and prejudice and, for that reason alone, they afford no basis for relief under Section 2255.[3]

B.    Hinkson Is Not Entitled to a New Trial Based Upon "Newly-Discovered Evidence"

1.    Swisher's False Testimony Concerning His Military Record

Hinkson's contention that Swisher's misrepresentation concerning Swisher's military record and the rulings that ensued from it entitles Hinkson to dismissal of the

---

[3]    Hinkson's instant claims of ineffective assistance of trial counsel cannot constitute a justification for his failure to raise claims embraced by the instant motion on direct appeal as he was represented by a different team of attorneys on appeal.

charges or to a new trial permeates his motion for relief under Section 2255.  More specifically, in relation to his "newly-discovered evidence" claim, Hinkson maintains that he did not know at the time of trial that Swisher would subsequently be convicted of offenses relating to his falsified military record; that the record of conviction would enable him not only to demonstrate Swisher's fraud but also that the government suborned Swisher's perjury; and that this Court was, by virtue of its rulings, a party to the fraud.  Mot., Ground One: Newly-Discovered Evidence ¶¶ 2, 20 (ECF No. 1-1, at 7) (claiming that the government knew that Swisher was a liar and should have moved to strike his testimony); see also Mot., Ground Two: Judicial Bias and Judicial Misconduct ¶ 2b (ECF No. 1-3, at 28) (accusing the Court of improperly excluding material demonstrating Swisher's perjury); Mot., Ground Eight: Prosecutorial Misconduct (ECF No. 1-6, at 7) (accusing government of suborning perjury by eliciting Swisher's testimony).  These assertions should be summarily rejected.

In the first place, Swisher's subsequent fraud conviction cannot constitute "newly-discovered" evidence because the underlying facts, which actually constitute the basis of Hinkson's claims, were not only known to Hinkson but fully litigated at trial and on direct appeal.  See United States v. Herrera, 481 F.3d 1266, 1270-72 (10th Cir. 2007) (rejecting argument that defendant's post-trial diagnosis of diabetes was "newly-discovered" evidence because defendant was fully aware of underlying

symptoms before trial).[4]  Well before trial was concluded, Hinkson's attorneys had procured the Tolbert letter, which contradicted Swisher's assertion on cross-examination that he had earned the Purple Heart for a wound received while on a secret mission in North Korea following the Korean War.  Hinkson, 585 F.3d at 1254. Also during the trial, the government furnished both this Court and Hinkson's counsel with the Dowling letter, which stated that Swisher's "Replacement DD-214" did not appear in Swisher's official file and was inconsistent with his official military record. Finally, Swisher's official military personnel file, which arrived at the court the same day, contained both an original copy of Swisher's discharge, which listed no decorations or combat wounds, as well as what appeared to be a copy of the "Replacement DD-214" that he had produced at trial and correspondence attesting to his entitlement to the Purple Heart and other decorations.  Id. at 1256.  This Court excluded evidence casting doubt on Swisher's military record because: (1) it was inadmissible under Fed. R. Evid. 608(b) as extrinsic evidence to impeach a witness; and (2) it should be excluded under Fed. R. Evid. 403(b) in any event.  Id. at 1258.

In addition to the foregoing documents casting doubt on Swisher's military

---

[4]  Of course, Swisher's conviction did not even exist at the time of Hinkson's solicitation prosecution.  See Hinkson, 526 F.3d at 1303 n.3 (McKeown, J., dissenting from panel decision) (noting that Swisher's conviction constitutes "after-the-fact information").  Moreover, at a hypothetical retrial, the fact of the subsequent conviction would simply be admissible for the purpose of impeaching Swisher.  See Fed. R. Evid. 609(a)(2).  Impeachment evidence, however, does not constitute a basis for a new trial based upon newly-discovered evidence.  See, e.g., Hinkson, 585 F.3d at 1264.

record and the legitimacy of the "Replacement DD-214," Hinkson submitted as an exhibit supporting his Motion for a New Trial an affidavit from the official who purportedly signed the document asserting that his signature was a forgery.  Another proffered affidavit, executed by the Marine Corps liaison to NPRC, confirmed that the document was a forgery; that Swisher was never awarded any decorations; and that Swisher's only injury while in military service was in an automobile accident. Hinkson, 585 F.3d at 1257.  As explained above, this Court denied the motion for a new trial because, *inter alia,* the "newly discovered evidence" was cumulative of evidence Hinkson possessed and had attempted to admit at trial; would not be admissible at trial; and, in any event, was merely impeaching.  New Trial Order 3-6. And this Court rejected the argument that Swisher's alleged combat record – as evidenced by his taking the witness stand wearing a miniature Purple Heart Medal – was central to the government's case.  Id. at 6.

On direct review, the en banc court affirmed.  It held that this Court had not abused its discretion in excluding the Dowling letter and Swisher's military personnel file and that, likewise, it had not abused its discretion in denying Hinkson's new trial motion based upon virtually identical "newly-discovered evidence" proffered in connection with his new trial motion.  Hinkson, 585 F.3d at 1266-67.  The fact that the same evidence – once again claimed to have been "newly-discovered" – was not

21

only available at trial but was addressed on direct appeal in connection with Hinkson's claim that this Court had improperly excluded it (and subsequently denied a motion for a new trial) forecloses entertainment of this claim on collateral review. See Scrivener, 189 F.3d at 828. These rulings also foreclose Hinkson's repeated claims (see, e.g., Mot., Ground One ¶ 2 (ECF No. 1-1, at 7); 1:04-cr-00127-RCT Mot. to Recuse Judge Tallman ¶¶ 12, 15 (ECF No. 322) ("Mot. to Recuse")) that this Court's exclusion of evidence concerning Swisher's military record constituted judicial misconduct, evidence of bias, concealment of fraud, and subornation of perjury.[5]

The same facts also put the lie to Hinkson's related argument that the government "suborn[ed] perjury with reference to . . . the testimony of Swisher" by concealing the true nature of his military record. Mot., Ground Eight ¶¶ 3-6 (ECF No. 1-6, at 8). As this Court observed, until defense counsel confronted Swisher with the Tolbert letter during cross-examination, the government had no reason whatsoever to question the bona-fides of Swisher's military record, including his entitlement to the Purple Heart Medal or the authenticity of the "Replacement DD-214" Swisher produced to support his entitlement to wear it. New Trial Order 17. Indeed, following

---

[5]   In connection with his claim involving "newly-discovered" evidence that Swisher testified falsely, Hinkson proffered the affidavit of former juror Ben Casey, which asserts that, had he known of Swisher's false testimony, he would not have voted to convict Hinkson on the Swisher counts. But, as this Court has observed (New Trial Order 11), under Fed. R. Evid. 606(b), such statements are inadmissible to impeach a jury verdict. Moreover, this Court entered an order prohibiting such interviews. See No. 1:04-cr-127-RCT ECF No. 220 (Feb. 23, 2005).

Swisher's cross-examination, it was the government that obtained and furnished the Court and the defense with the Dowling letter, which made clear that the content of Swisher's "Replacement DD-214" was unsupported by records on file at the Marine Corps Personnel Management Support Branch. Hinkson, 585 F.3d at 1255. As this Court observed (New Trial Order 19-20), that information was made available to Hinkson as soon as it came into the Court's and the government's possession, and the defense was afforded ample opportunity to exploit it, via further cross-examination of Hinkson, if it chose to do so. Therefore, not only did the government not engage in misconduct, Hinkson could not possibly claim that he was prejudiced by the allegedly belated disclosure. Moreover, Hinkson failed to assert as a claim on direct appeal that the government engaged in misconduct by failing to disclose the true state of Swisher's military record.[6] Absent a showing of cause and prejudice, he is barred from asserting that claim now.[7]

       2.   Swisher's "Alibi" Evidence

---

[6] On appeal, Hinkson merely claimed that the government stated, during its summation, that Swisher told Hinkson that he (Swisher) was a combat veteran, knowing that, in fact, he was likely not a combat veteran. The court of appeals rejected that argument (Hinkson, 585 F.3d at 1268), observing that the government's only references to Swisher's alleged military record were what Swisher had told Hinkson about his military service and not that Swisher was, in fact, a combat veteran.

[7] In connection with the "prosecutorial misconduct" claim, Hinkson maintains that, when Swisher's deceit concerning his military record became apparent, the prosecution should have moved to strike his testimony. That, of course, is precisely the remedy that this Court afforded the defense – ordering stricken Swisher's testimony concerning his "military commendation" – once it was called into question. See Tr. 1132-33; Hinkson, 585 F.3d at 1255.

As explained previously, Swisher testified that sometime during April 2002, Hinkson solicited him to kill Albers and his family (Tr. 994-995); that "probably[] around July or August of 2002" Hinkson initially solicited him to kill AUSA Cook and Investigator Hines (Tr. 1004, 1010); and that Hinkson repeated the solicitation, adding Judge Lodge to the list, in January 2003. Tr. 1007-08. The superseding indictment, however, only charged Hinkson with solicitations to Swisher that occurred during the December 2002 to January 2003 timeframe. See No. 1:04-cr-127-RCT, Superseding Indictment 6-9 (ECF No. 37). Defense witness Greg Towerton testified that, throughout the month of July 2002 (when Hinkson first raised the subject of killing the three federal officials), Hinkson was, in fact, traveling on vacation with his family. Tr. 2479. And Hinkson testified that, from April 16, 2002, until November 21, 2002, he "was pretty much gone a lot," traveling "in Russia, the Ukraine, Egypt, Venezuela, Mexico [and] Africa." Tr. 1902. And, shortly before his November 21, 2002 arrest, he was in the Ukraine. Id.

Hinkson now proffers "newly-discovered evidence," including his own affidavit and that of Greg Towerton, to establish that during two of the three periods during which he allegedly solicited Swisher to commit murder – April 2002, and July to August 2002 – he was out of the area on business or pleasure trips. See Mot., Ground One ¶¶ 14-15 (ECF No. 1-1, at 18); Hinkson Aff. ¶¶ 5-13, 18-20, 24 (ECF

24

No. 1-2, at 13); Towerton Aff. ¶¶ 2-7 (ECF No. 1-3, at 6).  This information cannot possibly qualify as "newly-discovered" under Fed. R. Crim. P. 33(b)(1).  In the first place, the information proffered by Towerton simply replicates his trial testimony concerning Hinkson's vacation.  And, likewise, Hinkson's proffer largely tracks his trial testimony that he was out of the country for much of the time between April and November 21, 2002.  And, in any event, Hinkson can hardly maintain that the evidence proffered in his affidavit concerning his own whereabouts during those periods were not known to him at the time of his trial and therefore could not have been addressed with greater particularity had he elected to do so.[8]

### 3.    Evidence Relating to Swisher's Medical Condition

In a similar vein, Hinkson proffers "newly-discovered" evidence that he maintains demonstrates that, during the periods of time he allegedly solicited Swisher to kill the federal officials, Swisher's medical condition was such that he could not possibly have been capable of doing so.  See Mot., Ground One ¶¶ 12-13 (ECF No.

_____

[8]  Hinkson maintains (Hinkson Aff. ¶ 25 (ECF No. 1-2, at 17) that he could not have anticipated the time periods during which Swisher claimed Hinkson solicited Swisher to murder Attorney Albers and the three federal officials and was therefore unable to rebut them with particularity.  This Court rejected a similar claim in denying Hinkson's motion at trial seeking to require the government to allege with greater particularity the dates of the alleged solicitations in order to enable him to mount an alibi defense.  See No. 1:04-cr-127-RCT, Order, ECF No. 35.  Moreover, the superseding indictment specified the time frame of the Swisher solicitations charged as offenses and on which he was ultimately convicted.  See No. 1:04-cr-127-RCT, Superseding Indictment, ECF No. 37 (Counts 6-8).  And, by the time Hinkson took the stand on January 20, 2005, Swisher had completed his testimony a week earlier.  Hinkson therefore had ample notice concerning the time frames of the solicitations involving Swisher and sufficient time to marshal rebuttal testimony and evidence.

1-1, at 16) (noting that Swisher had heart surgery on September 15, 2002, to insert a pacemaker); ¶ 15c (at 19) (Swisher in a wheelchair with a catheter and bladder bag); ¶¶ 15f, 15g (at 20) (Swisher had a heart attack in early June 2002, was bedridden and may have been in a coma); ¶ 15h (at 21) (Swisher was recovering from a heart attack during the June to August 2002 time frame); ¶ 15k (at 22) (noting that in November 2002, Swisher still very sick, catheterized, confined to a wheelchair, and "casting the image of a pathetic figure rather than one capable of extreme violence"); ¶ 15l (at 23) (Swisher's medical condition did not change much during December 2002, or January 2003); Sandberg Aff. ¶ 12 (ECF No. 1-2, at 36) (noting Swisher's collapse in June 2002); Doty Aff. ¶ 8 (ECF No. 1-2, at 38) (Swisher confined to a wheelchair in December 2002); Lewis Aff. ¶¶ 3-4 (ECF No. 1-2, at 40) (noting Swisher in poor health in 2003); Swisher Aff. ¶ 11 (ECF No. 1-3, at 22) (noting installation of a pacemaker in September 2002).

None of this proffered evidence can possibly be considered "newly-discovered." In the first place, Hinkson himself testified that, as of November 2002, "Joe Swisher's health was so bad that he wasn't able to walk." Tr. 1927. "He [walked], with a crutch, [would] go four feet; and then he'd collapse." Tr. 1928. Hinkson further testified that in September 2002, Swisher had open heart surgery (Tr. 1970) and that, during a subsequent skeet shooting expedition with Roman Polankio,

26

a potential WaterOz client from the Ukraine, Swisher "shot from his chair because he had a hard time standing.  He was pretty sick."  Tr. 1974.  And, Swisher's own January 3, 2003 affidavit, which Hinkson possessed at the time of trial (see Tr. 1977), stated that "[o]n September 15, 2002, I experienced a complete heart block which resulted in the insertion of a dual pacemaker."  Swisher Aff. ¶ 11 (ECF No. 1-3, at 22).  Hinkson's proffered "newly-discovered evidence" is merely a cumulative elaboration of such testimony.

Moreover, in addition to Hinkson's trial testimony, the affidavit he submitted in connection with the instant motion itself demonstrates that, well before trial, Hinkson knew the nature and extent of Swisher's alleged health issues and could have further elaborated on them following Swisher's testimony had he chosen to do so.  See Hinkson Aff. ¶ 9 (ECF No. 1-2, at 14) ("[b]y the end of July 2002, my understanding was that Mr. Swisher was . . . gravely ill from his heart condition"); ¶ 23 (at 17) (noting that it was impossible to have solicited Swisher as a "hit man" in July or August 2002 as he was in a coma for at least part of the time); ¶ 28 (at 18) ("[w]hile I was in Russia and Ukraine, I learned that Mr. Swisher had undergone open heart surgery on or about September 15, 2002, to implant a pace maker").

### 4.   Evidence Demonstrating That Swisher Had a Motive to Lie

Hinkson had hired Swisher, who operated a mineral testing service known as

"Northwest Analytical," to verify the mineral content of medicinal water produced by WaterOz. Tr. 983-85.  Apparently to demonstrate that Swisher was biased and had a motive to testify falsely concerning Hinkson's solicitations, Hinkson claims that in December 2002, Swisher and Richard Bellon, who worked for Hinkson as a legal assistant (Tr. 1981), participated in a scheme to seize WaterOz by means of obtaining legal process from a local court.  In connection with the takeover scheme, Swisher allegedly informed Hinkson that, if Hinkson did not grant him ownership interest, he would testify against Hinkson in federal court.  See Mot., Ground One ¶¶ 4a, 16b, 17, 18 (ECF No. 1-1, at 8); Hoyt Aff. ¶¶ 21, 22 (ECF No. 1-2, at 6); Hinkson Aff. ¶¶ 38-39; 72-73 (ECF No. 1-2, at 21); Amended Memo ¶ 6a-e.  But, as the law of this Circuit plainly establishes, "newly-discovered" evidence whose only plausible purpose is to impeach a witness does not constitute grounds for a new trial.  Hinkson, 585 F.3d at 1264.  Moreover, this "newly-discovered" evidence pertaining to the "takeover/extortion" scheme  virtually replicates Hinkson's trial testimony that, by means of orchestrating the issuance of a temporary restraining order (TRO) from a local court, Bellon engaged in a scheme to take over WaterOz and threatened Hinkson that he would leave Hinkson "rotting in jail" if Hinkson did not give him a half interest in the company. Tr. 1981. According to Hinkson, Swisher was a participant in the scheme.  As Hinkson testified:

28

Q: Mr. Hinkson, did Mr. Swisher sue you?

A: Yes.

Q: As a part of that suit with Mr. Bellon?

A: For half of everything I have, yes.

Tr. 1985; see also Tr. 2152, 2179; Tr. 2491-94 (testimony of Greg Towerton). As this Court observed at trial, the jury heard the details of the takeover scheme "ad nauseam," which, even then, was introduced solely to demonstrate Swisher's bias. Tr. 1987. Indeed, from the time of the defense's opening statement (Tr. 323), to its summation (Tr. 2780-81, 2797-98), the scheme was employed to cast doubt on Swisher's veracity.

Hinkson also proffers "newly-discovered" evidence that, while conducting quality control testing for WaterOz, Swisher intentionally contaminated a sample of a potassium product with cyanide, sent the poisoned sample to an independent laboratory for testing, and then threatened to use the damaging test results to extort an ownership interest in WaterOz from him. See Mot., Ground One ¶ 4a (ECF No. 1-1, at 9); Hinkson Aff.  ¶¶ 26, 38-39, 54, 67, 72 (ECF No. 1-2, at 17). Again, the proffered evidence replicates Hinkson's trial testimony (Tr. 1924-32), which this Court admitted for the sole purpose of "trying to impeach Mr. Swisher's testimony" (Tr. 1923):

Q: Mr. Hinkson, at some point, did Mr. Swisher contact you regarding that sample of potassium?

A: Yes.

Q: What did he tell you about the potassium?

A: He told me that the potassium tested at 30,000 parts per million sodium cyanide.

Tr. 1930.  When asked "[w]hat did [Swisher] tell you about those samples, in terms of your business" (Tr. 1931), Hinkson responded:

A: He said . . . [o]n the 4th of January, he said that he wanted to be fifty-percent owner of WaterOz or he was going to testify against me to the Food and Drug Adminstration that I was sending out sodium cyanide to my customers.

Tr. 1931-32; see Tr. 1977 (Swisher "tried to blackma[il] me").  And, similarly, when testifying on Hinkson's behalf, Greg Towerton, the general manager of Water Oz (Tr. 2466), stated that, during June or July 2003, he overheard Swisher state that, if he did not get his money, $10,000, "he would go down to Boise and make sure the Feds put Mr. Hinkson away for life."  Tr. 2474.  Thus, the proffered evidence is, once again, both cumulative and  not "newly-discovered."

Hinkson further claims that Swisher engaged in other fraudulent practices in his business relationship with WaterOz, including fraudulent and "double" billing; replacing WaterOz product with tap water and then falsely reporting the test results; and charging Hinkson for a mineral testing machine that Hinkson had purchased from

30

another source.  See Mot., Ground One ¶¶ 4c-4e, 5, 6 (ECF No. 1-1, at 10); Hinkson

Aff. ¶ 72 (ECF No. 1-2, at 27).  Aside from the fact that such evidence likewise fails

to qualify as "newly-discovered evidence" because its sole purpose is to impeach

Swisher, it was both duplicative of trial testimony and available at the time of trial.

Thus, defense witness Towerton testified that Swisher demanded $6,000 for past due

invoices.  But when Towerton examined WaterOz's books and records, he could not

find any unpaid invoices.  Tr. 2476.

Similarly, during his own testimony, Hinkson adverted to such accusations for

the express purpose of "impeach[ing] Mr. Swisher's testimony and, also, show[ing]

his bias."  Tr. 1987.  See id. (adverting to Swisher's billing statement); Tr. 1976

(addressing Swisher's insistence that Hinkson purchase a testing machine from him).

Moreover, some of Hinkson's fraud claims are based on an affidavit that Swisher

executed on January 3, 2003 (ECF No. 1-3, at 21), and whose contents Hinkson

expressly referenced during his trial testimony.  See Tr. 1977.  And, likewise, other

exhibits Hinkson now proffers to demonstrate Swisher's alleged fraudulent conduct

in dealing with him predate Hinkson's trial and were obviously in his possession long

before it commenced.  See "Northwest Analytical Invoice" addressed to "Water Oz"

for the purchase of an "Atomic Absorption Spectrograph," dated 04/01/03 (ECF No.

1-3, at 11); "Northwest Analytical Invoice" addressed to "Water Oz," dated 05/27/03,

demanding immediate payment of an overdue amount totaling $5,495.00 (ECF No. 1-3, at 17).  Hinkson has not offered a plausible reason why such evidence could not have been presented at trial.

### 5.    Swisher's Alleged "Fraud on the Court"

Finally, Hinkson identifies a number of alleged false statements, contradicted by "newly-discovered" evidence set out in his own affidavit, that Swisher allegedly made during trial in order to afford additional plausibility to his testimony.  He maintains that Swisher testified falsely that he (Hinkson) considered Swisher to be his "best friend."  Mot., Ground One ¶ 7a (ECF No. 1-1, at 14); Hinkson Aff. ¶¶ 30-32 (ECF No. 1-2, at 19).  Such testimony, Hinkson maintains, was material because it made it more likely that he would have solicited Swisher to kill federal officials.  But, during Hinkson's own trial testimony, Hinkson made it clear that Swisher was merely his "tester, an acquaintance.  I wouldn't call him my friend."  Tr. 2078.  Thus, that very evidence was placed before the jury.

Hinkson also identifies as fraudulent Swisher's testimony that in September 2002, Bellon hosted a barbecue that Swisher, Hinkson, and a Russian business partner of Hinkson's all attended.  Mot., Ground One ¶ 12 (ECF No. 1-1, at 16).  Hinkson now maintains that, in fact, the gathering occurred during November 2002.  Hinkson Aff. ¶¶ 55-58 (ECF No. 1-2, at 24).  Hinkson argues that the date of the event was

32

significant because in November 2002 (when he now claims the event occurred), Swisher's weakened medical condition, resulting from heart surgery, was such that Swisher would not likely have been the recipient of a subsequent solicitation to commit murder.  <u>See</u> Mot., Ground One ¶ 12 (ECF No. 1-1, at 16).  But Hinkson, whose testimony followed Swisher's, could have controverted the date of the barbecue at Bellon's; he did not do so.  Instead, Hinkson verified Swisher's testimony, confirming that the barbecue occurred in September 2002, "just before [Swisher's] open heart surgery."  Tr. 1970.

    C.    <u>Hinkson's Claims That This Court Engaged in Judicial Misconduct and That It Should Recuse Itself from Adjudicating the Instant Petition Are Meritless</u>

Hinkson further maintains (Mot., Ground Two: Judicial Bias and Judicial Misconduct (ECF No. 1-3, at 27); Amended Memo 26-41) that he is entitled to a new trial as the result of judicial misconduct.  In a separate submission captioned "Motion to Recuse Judge Tallman," Hinkson advances many of the same arguments that constitute the basis for the "misconduct" claim.  These contentions neither support his claim of judicial misconduct nor constitute a basis for this Court's recusal in ruling on his Section 2255 Motion.  Because the facts and legal principles relating to both the misconduct and recusal claims are virtually identical, we address them together.

First, many of Hinkson's arguments in support of his "misconduct" claim and

related recusal motion merely recapitulate complaints made elsewhere in his blizzard of meritless contentions.   See, e.g., Amended Memo 26, ¶ 3 (Swisher's false statements; alleged juror misconduct); id. at 27, ¶ 4 (newly-discovered evidence); id. at 30-33 (claim that the government failed to disclose Swisher's military record and improperly portrayed him as a combat hero); id. at 38-39 (claim of government misconduct); Mot. to Recuse ¶ 12 (alleged juror misconduct); id. ¶¶ 14-15 ("newly-discovered evidence" relating to Swisher's health and Hinkson's travels).   The government has addressed these issues elsewhere in its response, and Hinkson has not even attempted to explain how they bear upon his allegations of supposed judicial misconduct.

Other claims in Hinkson's Motion to Set Aside Sentence and his Motion to Recuse simply reflect dissatisfaction with this Court's prior rulings.  Mot. to Recuse ¶ 10 (noting "miscreant rulings"); Amended Memo 28-29 (ruling excluding Swisher's military record); id. at 34 (claim that this Court misconstrued evidence so as to permit perjured testimony to stand uncorrected); id. at 35-36 (claim that this Court's rulings reflect bias in favor of the government); id. at 38 (failure to, *sua sponte*, declare a mistrial following juror's question concerning sanity); id. (claim that this Court improperly ruled that co-counsel Wesley Hoyt had a conflict and could not continue to represent Hinkson); Mot. to Recuse ¶¶ 6, 10a, 10d, 11-13, 17-20, 22-24 (judicial

34

rulings regarding Swisher's testimony and the extrinsic evidence relating to his military record); id. ¶¶ 12, 21 (failure to, *sua sponte*, declare a mistrial as a consequence of the juror note concerning Hinkson's mental state); id. ¶ 10c (denial of defense motion to present evidence concerning a "Payroll Exception" defense in preceding tax prosecution); id. ¶ 26 & Hoyt Aff. ¶¶ 11-14 (attach.) (taking issue with this Court's ruling requiring Hoyt's withdrawal as defense counsel).

Hinkson relies on 28 U.S.C. § 455 to support both his claim of judicial misconduct and his Motion to Recuse. That statute provides in pertinent part:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

As the Supreme Court explained in Liteky v. United States, 510 U.S. 540 (1994), "judicial rulings alone almost never constitute a valid basis for a bias or partiality recusal motion." Id. at 555. Such rulings "[a]lmost invariably . . . are proper grounds for appeal, not for recusal. [Moreover], opinions formed by the judge on the basis of facts introduced or events occurring in the course of . . . current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id.; see, e.g., Miller v. Terhune, 49 Fed. Appx. 148, 150 (9th Cir. 2002) (quoting Liteky); United States v. Nelson, 718 F.2d 315, 321 (9th Cir. 1983)

("[a]dverse rulings do not constitute the requisite bias . . . even if they were erroneous") (citation omitted). Here, none of this Court's rulings demonstrates such "deep-seated favoritism or antagonism." Liteky, 510 U.S. at 555. Indeed, several of the rulings relating to Swisher's testimony and his military record, on which Hinkson primarily relies to support his claim of judicial bias and impropriety, were addressed on appeal and were sustained by the en banc court of appeals. Accordingly, this Court's judicial rulings provide no basis whatsoever for either a motion to recuse or a claim of judicial misconduct.

Relying on an affidavit executed by his former co-counsel Hoyt and appended to his "Motion to Recuse Judge Tallman," Hinkson also alleges that Swisher was observed leaving Judge Tallman's chambers on the day that he testified. See Mot. to Recuse ¶ 27 & Hoyt Aff. ¶¶ 5-10 (attach.); Mot., Ground Two ¶ 12 (ECF No. 1-3, at 38); Amended Memo ¶ 15. Such an assertion, however, must first be considered in the context of the sordid history of this case and Hinkson's preceding conduct. As this Court has observed (New Trial Order 23-30), Hinkson's "*modus operandi*" (id. at 29) throughout both the instant solicitation prosecution and the preceding tax prosecution has been to engage in "repeated and persistent misconduct and abuse of the legal system" (id. at 23) to "attempt to obtain a different judge, delay the proceedings, [and] harass" the participants. Id. at 24. More specifically, Hinkson has filed frivolous civil

36

litigation calculated to harass and intimidate federal officials from performing their duties; has filed administrative complaints against them; has forced the recusal of the judge, prosecutor, and investigator in the tax case by soliciting their murders; has continued to solicit acts of violence against federal officers while awaiting trial in the instant solicitation case; and has even made threats against this Court. Id. at 24-25. In previously denying a motion to recuse, this Court predicted, on the basis of Hinkson's record, that "it is highly probable that he will continue to engage in similar and additional misconduct in the future." Id. at 30. True to form, upon the imposition of sentence in this case, Hinkson hurled obscenities at this Court and had to be physically subdued by U.S. Marshals as a consequence of his conduct. Sentencing Tr. 352-53. In the context of such circumstances, Hinkson's instant allegation of "judicial impropriety" does not suggest that this Court's "impartiality might reasonably be questioned" (28 U.S.C. § 455(a)). Instead, it merely constitutes a continuation of his predicted pattern of conduct calculated to force this Court's recusal and further frustrate judicial proceedings. But, as this Court has earlier observed (New Trial Order 23), "[r]ecusal is generally not required where a party attempts to force a judge to recuse himself." See Standing Comm. on Discipline v. Yagman, 55 F.3d 1430, 1443-44 (9th Cir. 1995); United States v. Studley, 783 F.2d 934, 940 (9th Cir. 1986)

37

("A judge is not disqualified by a litigant's . . . intemperate and scurrilous attacks . . . .")

But even if Hinkson's allegations were credited, but see Ellis v. United States, 313 F.3d 636, 641 (1st Cir. 2002) (for the purpose of Section 2255 review, sworn allegations of fact should be taken as true *unless "inherently incredible"*) (emphasis added), they fail to demonstrate bias or the appearance of bias such as would call into question the court's impartiality. See 28 U.S.C. § 455(a). In the first place, Hoyt's alleged observation of Swisher meeting with this Court was apparently of so little moment at the time of trial that neither Hoyt nor co-counsel Nolan raised the matter or inquired of the Court concerning its purpose. Nor did Hoyt bother to mention the visit when, following the alleged incident, he filed a motion for this Court to recuse itself under Section 455(a). See No. 1:04-cr-127-RCT, ECF No. 117. And Hinkson, likewise, failed to allege such "judicial misconduct" on direct appeal – a procedural default that precludes its entertainment as a ground for setting aside his sentence on collateral review in any event. Such apparent lack of concern on the part of counsel, itself, demonstrates that the alleged encounter was not of such a nature as would cast doubt upon this Court's impartiality in the mind of a reasonable person.[9]

---

[9]   Indeed, failure by Hoyt to inquire concerning the purpose of the alleged meeting with Swisher or to make the observation a matter of record, at the very least, casts substantial doubt upon the accuracy of his recollection, and whether the visit ever occurred.

38

But, even in the context of a claim, advanced on appeal, that counsel for a party had an *ex parte* conference or communication with a judge, "the mere fact that a communication took place does not necessarily demonstrate that the judge's impartiality might reasonably be questioned." United States v. Alcantara-Rueda, 81 Fed. Appx. 204, 205 (9th Cir. 2003) (citing Willenbring v. United States, 306 F.2d 944, 946 (9th Cir. 1962)).  In such cases, there must be a suggestion or implication that "improper conduct took place in [the] conference or that the merits of the case were discussed." Willenbring, 306 F.2d at 946.  Even where the trial court conducts an *ex parte* conference with a prosecutor, the fact that such a conference occurred is, itself, "not a fact showing bias and prejudice." Id.  Here, Hoyt acknowledges that at no time did he "see any member of the prosecution team involved in [the] transaction between Mr. Swisher and Judge Tallman."  Mot. to Recuse, Hoyt Aff. ¶ 10 (attach.). And, what is more, nothing in Hoyt's affidavit reflects what may have been the purpose of the alleged encounter or what was supposedly said by the participants.  In short, no "'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person'" would have concluded from the alleged observation that there was a significant risk the Court would resolve the case on any basis other than on the merits. Clemens v. United States Dist. Ct., 428 F.3d 1175, 1178 (9th Cir. 2005) (quoting In re Mason, 916 F.2d 384, 386 (7th Cir. 1990)).  See also Rhoades v. Henry,

39

598 F.3d 511, 519 (9th Cir. 2010) (noting the absence of any factual showing that would indicate actual or inferred bias or otherwise rebut the "strong presumption that a judge is not biased or prejudiced").

Finally, in our view, this Court is perfectly capable of passing on the merits of Hinkson's companion "judicial misconduct" and recusal claims. The court of appeals has "held repeatedly that the challenged judge himself should rule on the legal sufficiency of a recusal motion in the first instance." <u>Studley</u>, 783 F.2d at 940. Indeed, even in a case in which the judge's alleged participation in *ex parte* communications with counsel for a party constitutes the basis for a claim of judicial impropriety, because the allegation "relates to facts that were peculiarly within the judge's knowledge," it is not an abuse of discretion for him to pass on the motion. <u>Ronwin v. State Bar of Ariz.</u>, 686 F.2d 692, 701 (9th Cir. 1982), <u>rev'd on unrelated grounds *sub nom.*</u> Hoover v. Ronwin, 466 U.S. 558 (1984).[10]

D.   <u>Hinkson's Claim That the Government Denied Him Discovery Is Without Foundation</u>

While not developed in a supporting memorandum, Hinkson identifies as another basis for relief the government's alleged failure to furnish him with: (1)

---

[10]   This Court, however, could reasonably deem it prudent to refer Hoyt's allegation that it met with Swisher in chambers to another judge for inquiry. <u>See</u> <u>Murchu</u>, 926 F.2d at 57. This Court followed that practice in addressing a previous recusal motion filed by Hinkson. <u>See</u> New Trial Order 31.

Swisher's medical records, which he now maintains could have established that Swisher was not fit for duty as a "hitman" at the time he was allegedly solicited; and (2) a copy of Hinkson's passport, which would allegedly demonstrate that Hinkson was out of the country at the time the alleged solicitations occurred.  See Mot., Ground Three, at 4 (ECF No. 1, at 4).  These claims are specious.  First, Hinkson could have but did not raise on appeal the claim that the government's failure to produce these items violated its obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963).  His failure to do so or to demonstrate cause and prejudice for his default, itself, forecloses further review.  See Massaro, 538 U.S. at 504 (absent demonstration of cause and prejudice, claims that could have been but were not raised on direct appeal cannot be raised on collateral review).

Second, "*suppression by the Government* is a necessary element of a Brady claim."  United States v. Dupuy, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) (emphasis added) (citing Moore v. Illinois, 408 U.S. 786, 794-95 (1972)).  Thus, as the court of appeals explained in Dupuy, "'[w]here defendants . . . had within their knowledge the information by which they could have ascertained the supposed Brady material, there is no suppression by the government.'"  Id. at 1502 n.5 (quoting United States v. Griggs, 713 F.2d 672, 674 (11th Cir. 1983)).  Here, Swisher's medical records, which Hinkson now speculates could have corroborated trial testimony that Swisher had

41

suffered a heart attack and was therefore not likely to have been solicited to be a "hitman," was at no time in the possession of the prosecution and could – if deemed material by the defense – have been subpoenaed by the defense for trial. Hinkson, however, did not do so. Likewise, Hinkson surely knew full well the contents of his own passport and the dates on which it reflected foreign travel. Although by the time of trial on the solicitation charges, his former attorney had surrendered it to the Court's office of pretrial services in compliance with its demand (Tr. 2348-50, 2370-71), the attorney had also reviewed its contents. Tr. 2350. Hinkson has supplied no reason why he could not have applied to the Court for a copy of the passport for evidentiary purposes. In any event, the evidence that Hinkson speculates his passport and Swisher's medical records would supply was not suppressed. As explained in detail previously, both Hinkson's travels and Swisher's medical condition were the subject of extensive trial testimony. At the very best, these items would have merely corroborated that testimony. See United States v. Tham, 884 F.2d 1262, 1266 (9th Cir. 1989) (rejecting Brady claim, submitted in a petition for relief under Section 2255, because allegedly suppressed material was developed on both direct and cross-examination).[11]

---

[11]   Without citation to the record, Hinkson suggests (Mot., Ground Three, at 4 (ECF No. 1, at 4)) that he "demanded" both Swisher's medical records and his passport from the government. Both items were as accessible to him as they were to the prosecutors. Indeed, at the time of trial, his passport was in the custody of an arm of the Court. Tr. 2350.

E.   Hinkson's Claim of Ineffective Assistance Does Not Warrant Relief on Collateral Review

Despite the fact that the trial strategy of his two attorneys, Thomas Nolan and Wesley Hoyt, succeeded in obtaining Hinkson's acquittal on three of the nine counts on which he was indicted and a jury deadlock on three others, he now contends (Mot., Ground Four: Ineffective Assistance of Counsel (ECF No. 1-4, at 4)) that they provided him ineffective assistance at trial. While a petition for collateral relief under Section 2255 constitutes the proper vehicle for advancing claims of ineffective assistance (see Massaro, 538 U.S. at 508-09), the requirements for obtaining such relief are stringent. As the Supreme Court recently reiterated in Premo v. Moore, 131 S. Ct. 733 (2011), "'[t]o establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" Id. at 739 (quoting Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009)). As to the first requirement, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." Id. at 739 (citing Strickland v. Washington, 466 U.S. 668, 687-89 (1984) (internal quotation marks

43

omitted)).   As to the requirement of prejudice, "a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 739 (internal quotation marks omitted); see, e.g., Strickland, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

Hinkson has not even attempted to demonstrate how his claims of ineffective assistance satisfy what the Supreme Court has characterized as Strickland's "'high bar.'" Premo, 131 S. Ct. at 739-40 (quoting Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010)).   Indeed, the only trial errors Hinkson specifically identifies consist of Nolan's efforts to deal with Swisher's false testimony concerning Swisher's military record.   None can possibly be viewed as errors, much less "errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." Id. at 739 (internal quotation marks omitted).   More specifically, Hinkson faults Nolan for failing to obtain with greater alacrity information casting doubt on Swisher's military service and failing to review his military personnel file when this Court afforded him the opportunity to do so.   Mot., Ground Four ¶¶ 4a-4b, 6a, 7 (ECF No. 1-4, at 6).   Yet, as a consequence of suspicion that Swisher was a military fraud, defense counsel had conducted just such an inquiry and, by the time Nolan cross-examined Swisher, Nolan had obtained from the NPRC information reflecting that

44

Swisher was not, as he had claimed, a decorated combat veteran. Tr. 1114-16, 1122-24. Nolan then relied on that information when he reopened cross-examination of Swisher. Tr. 1117-19. Defense counsel can therefore hardly be judged derelict in his efforts to investigate Swisher's military record and to exploit adverse material.

Moreover, contrary to Hinkson's current claim that the defense team failed to review Swisher's military personnel record when afforded the opportunity to do so, Nolan represented to this Court that he had, in fact, "reviewed [Swisher's] file that's been given to us" (Tr. 2307-08) and observed that, among other things, it contained an official letter stating that Swisher's "Replacement DD-214" was a forgery and information that Swisher's injuries, suffered during his military service, were the result of an automobile accident. Tr. 2308; see Tr. 2601. As a former company clerk in the National Guard, Nolan acknowledged "some familiarity with [military] records." Id. He was therefore able to determine from his review of Swisher's personnel file that it appeared that Swisher had been reduced in rank, had seen no combat, and had come close to qualifying as an "Expert" with his weapon. Tr. 2598, 2601. Nolan added that, if Swisher "was injured by a grenade, top secret or not, it would be in there." Tr. 2308, see Tr. 2601-02. Nolan's own representations to this

Court refute Hinkson's claim that Nolan was derelict for failing to review Swisher's military personnel file and to familiarize himself with its contents.[12]

Hinkson further faults Nolan for "withdrawing" the mistrial motion following Swisher's production of the "Replacement DD-214." Mot., Ground Four ¶¶ 2c-2d (ECF No. 1-4, at 5). The record shows that, in fact, Nolan moved for a mistrial (Tr. 1124) but that the Court denied it following argument by government counsel. Tr. 1128. Only then did the defense agree to the Court's proposed instruction that the jury disregard Swisher's testimony concerning his military commendation. Tr. 1130-31.[13]

Finally, relying on Nolan's *post hoc* alleged expression of dissatisfaction with his handling of Swisher as a witness, Hinkson faults Nolan for "not going after Swisher on cross-examination." Mot., Ground Four ¶ 6b (ECF No. 1-4, at 8); id. Nolan Memo (attach.) (ECF No. 1-5, at 3) (Nolan's statement that he could "kick

---

[12]    Nolan's statement at trial that he had reviewed Swisher's military record when afforded the opportunity to do so is inconsistent with a memorandum he allegedly wrote in 2005 (attached to Hinkson's motion) in which he claims that "I didn't look at them" and made his decision concerning the disposition of Swisher "without looking at them." Mot., Ground Four, Nolan Memo (attach.) (ECF No. 1-5, at 3). Nonetheless, the memorandum tracks Nolan's statement to this Court that he had, in fact, reviewed Swisher's personnel file and recalled its contents. Nolan noted, for example, that it contained a record of Swisher's reduction from Corporal to PFC as a consequence of non-judicial punishment and his rifle qualification. All in all, Nolan characterized Swisher's service record as "very bland and very ordinary." Id.

[13]    Hinkson also faults Nolan for "refus[ing] to make any other motions for mistrial, even though the trial record reflects other opportunities to do so." Mot., Ground Four ¶ 2d (ECF No. 1-4, at 5). Aside from the fact that Hinkson fails to particularize such opportunities, his assertion is factually incorrect. See Tr. 1330-31 (defense motion for a mistrial on the ground of "juror prejudice").

[him]self for not going after [Swisher] and cross examining him"). But, as this Court observed, Nolan's election not to reopen cross-examination of Swisher when afforded the opportunity to do so was a "strategic decision" (New Trial Order 7) and a reasonable one at that. In the first place, as this Court warned defense counsel, in the wake of its ruling excluding extrinsic evidence concerning Swisher's military record, "they would be stuck with Swisher's answers" (id. at 6; see Tr. 2319-20), and the defense had no way of knowing what his answers to further inquiry concerning his military record would be. Moreover, as Judge McKeown observed, the defense had conducted "an extensive and withering cross-examination" (Hinkson, 526 F.3d at 1303 (McKeown, J., dissenting)) that "repeatedly attacked [Swisher's] credibility" (id. at 1301) on many other grounds. Should it appear that, without an apparent reason for doing so, defense counsel was also badgering an elderly veteran concerning the accuracy of his military record with respect to events that allegedly occurred 50 years earlier, the defense counsel could well incur the jury's displeasure. A tactical decision to forego such risks, when weighed against the speculative benefit that might otherwise result, demonstrates prudence, not incompetence.[14]

---

[14]   In addition, Hinkson now faults Nolan for being "confused as to the Dowling report." Mot., Ground Four ¶ 2 (ECF No. 1-4, at 5). If this otherwise unexplained statement constitutes a reference to the apparent inconsistency between the Dowling report, which stated that Swisher was never in combat, much less decorated for heroism, and his apparently authentic "Replacement DD-214," which reflected that he had served in combat and had been wounded in action, the same measure of uncertainty as to which was authentic was shared by this Court. See Tr. 2308-11, 2317. When confronted with equally plausible but inconsistent service

Hinkson further faults Nolan for failing to conduct further research or to develop further evidence concerning the alleged efforts of Bellon and Swisher to wrest control of WaterOz from him or to exploit "highly damaging information showing the use of force" in the takeover bid. Mot., Ground Four ¶¶ 3d, 6d (ECF No. 1-4, at 6); see also Hoyt Aff. ¶ 30 (ECF No. 1-2, at 8) (accusing Nolan of failing adequately to investigate the takeover effort by Swisher and Bellon). But, as this Court has previously observed, in addressing Nolan's effort to impeach Swisher, the jury heard the details of the takeover scheme "ad nauseam." Tr. 1987. It is therefore impossible to perceive how Nolan's alleged failure to attempt to exploit additional, cumulative evidence concerning that matter could constitute "incompetence under prevailing professional norms" (Premo, 131 S. Ct. at 740) (internal quotation marks and citation omitted), or how the use of such additional materials would have likely altered the outcome of the trial. Id. at 739.

Hinkson similarly claims that Nolan failed to review other items that Hinkson speculates would have contained material casting doubt on Swisher's credibility (Mot., Ground Four ¶¶ 3a-3c (ECF No. 1-4, at 6)), including information that Swisher had once been sued by several doctors for fraud and had been charged with child molestation. See also Hoyt Aff. ¶ 4 (ECF No. 1-2, at 2) (claiming that Nolan failed

records, such "confusion" hardly constitutes incompetence. In any event, Nolan fully understood that the Dowling letter constituted evidence that Swisher had presented "a false document . . . to the court." Tr. 2321.

to review deposition testimony relating to other investigations involving Swisher); id. ¶ 31 (at 39) (claiming that Nolan failed to examine records of prior lawsuits against Swisher).  Hinkson fails to explain, however, the theory under which such materials would be admissible at trial or otherwise be used, what they would establish, or what their likely impact on the outcome of the proceeding might be, particularly in view of the sheer volume of impeachment material deployed against Swisher.  Indeed, immediately prior to Swisher's testimony, this Court expressly prohibited cross-examination bearing upon the child abuse allegation.  Tr. 968-69.

Relying on a memo that Nolan executed on February 11, 2005, in which Nolan stated that "maybe I'm wrong because I got confused on the three counts, but it basically means that the credibility of Swisher is the key to the entire case," Mot., Ground Four, Nolan Memo (attach.) (ECF No. 1-5, at 6), Hinkson maintains that "Nolan was always confused by this case and he admits it."  Mot., Ground Four ¶ 1 (ECF No. 1-4, at 5).  Once again, however, Hinkson has not even hinted how Nolan's alleged "confusion" relating to the separate counts might have constituted substandard performance or have adversely affected the outcome of the case.  And it is unclear from Nolan's own statement whether his "confusion" relating to the counts occurred at the time of trial or in his attempts to conduct a post-mortem of the proceedings and the impact of Swisher's testimony on them.

Finally, without further elaboration, both Hinkson and his former co-counsel**,** Hoyt, fault Nolan for presenting a "structurally deficient [defense], lacking adequate preparation, and without proper performance in . . . execution." Mot., Ground Four, at 7 (ECF No. 1-4, at 10); <u>see</u> <u>also</u> <u>id.</u> ¶ 6 (ECF No. 1-4, at 7) (claiming that Nolan failed to provide leadership to the defense team or to formulate a defense); Hoyt Aff. ¶ 44 (ECF No. 1-2, at 11) (claiming that Nolan "was completely incompetent on this case [and] nothing he did was tactical"). This *post hoc* assessment of Nolan's trial strategy simply does not withstand scrutiny.

In addition to his extensive impeachment of Swisher, Nolan's pervasive – and largely successful – trial tactic was to exploit the statutory requirement that, in order to obtain a conviction for solicitation under 18 U.S.C. § 373(a), it is necessary to establish beyond reasonable doubt that a defendant who solicits a crime of violence must actually intend its commission, and that "circumstances strongly corroborative of that intent" be established. In his opening statement, Nolan stressed that the evidence would show that Hinkson would joke about killing federal agents but that his rants were not taken seriously. Tr. 325-29. And, during his summation, Nolan argued that Hinkson's requests that others commit acts of homicide on his behalf were nothing more than expressions of bravado and manifestations of his "socially inept" and "offensive" personality. Tr. 2759-60; <u>see</u> <u>id.</u> 2762, 2767-72. <u>See</u> <u>also</u> Tr. 1031

50

("The theory of the defense is . . . that none of this is serious . . . ."). Thus, throughout the trial, Nolan, aided by Hoyt, elicited testimony from both government and defense witnesses that Hinkson was a blowhard, whose speech was laced with hyperbole, and who did not mean what he was saying. Tr. 702-04 (cross-examination of James C. Harding); see Tr. 785 (re-cross-examination of Harding); see also Tr. 825-27 (cross-examination of Anne Bates); Tr. 887-88, 891-92 (cross-examination of Lonnie Birminghan); Tr. 932 (cross-examination of Richard Bellon); Tr. 1029-30, 1090-91 (cross-examination of Elvin Swisher); Tr. 1505-07 (direct examination of Jerry D. Smith); Tr. 1562 (direct examination of Debbie Eileen Morley); Tr. 2040-41 (Hinkson's testimony that he was speaking "metaphorically" when he proposed "hunt[ing]" the "feds"); Tr. 2347-48, 2352 (direct examination of Brit Groom). The now-vacated court of appeals panel decision in this case attests to the efficacy of Nolan's trial strategy. As the panel observed, "[t]he jury acquitted Hinkson outright on three of the nine counts charging solicitation in violation of § 373(a). On these three counts, the jury concluded that the government had not shown that Hinkson had been serious in soliciting murder on that occasion." Hinkson, 526 F.3d at 1287. The fact that the strategy was not universally successful hardly reflects ineptitude.[15]

---

[15]   In connection with his ineffective assistance claim, Hinkson also observes that co-counsel Hoyt has admitted that "he was operating below . . . standard" at trial. Mot., Ground Four ¶ 6 (ECF No. 1-4, at 7). See Hoyt Aff. ¶ 25 (ECF No. 1-2, at 7) (noting that "[a]s Mr. Nolan's co-counsel I was totally ineffective in my attempts to represent Mr. Hinkson in the Solicitation Case . . ."). Neither Hinkson nor Hoyt attempts to particularize how Hoyt was "totally ineffective," id., or how any such

F.    <u>Hinkson's Claim That the Solicitation Counts on Which He Was Convicted Are Legally Insufficient for Failing to Allege Jurisdiction Is Plainly Without Merit</u>

Hinkson's convictions for solicitation, in violation of 18 U.S.C. § 373, alleged that the offense solicited was "to murder an officer and employee of the United States, in violation of Title 18, United States Code, Section 1114." <u>See</u> No. 1:04-cr-127-RCT, ECF No. 37, Superseding Indictment 6-8 (Counts 7-9). The statute incorporated by these Counts, 18 U.S.C. § 1114, provides:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished –
> (1) in the case of murder, as provided under section 1111;
> (2) in the case of manslaughter, as provided under section 1112; or
> (3) in the case of attempted murder or manslaugher, as provided in section 1113.

Both Sections 1111 (murder) and 1113 (attempted murder) prohibit such offenses when committed "[w]ithin the special maritime and territorial jurisdiction of the United States."

Hinkson maintains (Mot., Ground Five: Lack of Jurisdiction (ECF No. 1-5, at 19); Amended Memo 42-61) that the solicitation counts on which he was convicted

---

professional dereliction may have adversely affected the outcome of the trial.

are legally insufficient because they lacked an allegation that, when he solicited the

offenses, he was within the "special and maritime territorial jurisdiction of the United

States" (Amended Memo 42) and that the government similarly failed to prove such

offenses because it did not establish that the solicitations occurred within the special

maritime and territorial jurisdiction.  The apparent basis for the argument is that the

offense solicited – 18 U.S.C. § 1114 – refers to both Sections 1111 and 1113 for the

purpose of establishing penalties.  Such references, however, have no bearing

whatsoever on the jurisdictional component of either Section 373 or Section 1114.

As the court explained in <u>United States v. Peltier</u>, 446 F.3d 911 (8th Cir. 2006):

> The statute states that a person who commits such an offense 'shall be punished as provided under sections 1111 and 1112 of this title.' 18 U.S.C. § 1114. . . . *[T]hat language is intended to incorporate the punishment prescribed in § 1111(b), not its jurisdictional provision;* the language in § 1114 cannot reasonably be taken to incorporate that portion of § 1111(b) that does not deal with punishment.  The district court correctly characterized § 1114 as 'a statute of general applicability' in which the situs of the crime was not an element.

<u>Id.</u> at 914 (emphasis added).  Such reasoning is, of course, equally applicable to

similar references in Section 1114(3) to 18 U.S.C. § 1113, which was not charged in

<u>Peltier</u>.  The reference's manifest purpose in citing Section 1113 is likewise merely

to "incorporate the punishment prescribed in [it]."  446 F.3d at 914.

Nor does <u>Bond v. United States</u>, 131 S. Ct. 2355 (2011), support Hinkson's

claim (Amended Memo 57-58) that the absence of such a jurisdictional nexus prevents

the federal government from asserting jurisdiction over such offenses.  At issue in
Bond was whether Congress possessed the constitutional authority to enact 18 U.S.C.
§ 229, which implemented the Chemical Weapons Convention to which the United
States was a party.  As Hinkson acknowledges, Bond simply held that a criminal
defendant possesses standing to assert that such legislation exceeds Congress's
constitutional authority and intrudes upon powers reserved to the states under the
Tenth Amendment.  See Bond, 131 S. Ct. at 2364-67.  Nothing in that case suggests
that, in order to pass muster under the Constitution, such legislation must be confined
in its application to the special maritime and territorial jurisdiction.  On remand, the
court of appeals sustained the enactment of Section 229 as a valid exercise of
congressional power under the "Necessary and Proper Clause" as it bore a rational
relationship to the treaty power.  United States v. Bond, 681 F.3d 149, 157-58 (3d Cir.
2012).  Congress's constitutional authority to protect its officials and employees in the
fulfillment of their official duties – here a United States District Judge, a federal
prosecutor, and a criminal investigator – likewise falls comfortably within the scope
of that Clause.  As the Peltier court explained, "[k]illing a federal officer engaged in
his or her official duties affects the federal government's ability to execute its laws
and is thus an offense that the United States can punish. . . .  A statute like § 1114 is

'necessary in order to insure uniformly vigorous protection of federal personnel.'" 446 F.3d at 914 (quoting United States v. Feola, 420 U.S. 671, 684 (1975)).

### G.   Hinkson Is Entitled to No Relief Based Upon His Claims of Juror Misconduct

Hinkson advances three separate grounds for maintaining that he is entitled to vacatur of his conviction or, at the least, an evidentiary hearing, due to alleged juror misconduct.  First, he maintains that a note submitted to this Court during the trial demonstrates that the jurors had discussed the case among themselves prior to the commencement of deliberations.  See Mot., Ground Six: Jury and Juror Misconduct (ECF No. 1-5, at 39); Amended Memo 62-70.  Second, he claims that, during *voir dire* examination, juror Claudia Haynes improperly concealed the fact that she "knew and was in communication" with the wife of Judge Lodge.  Mot., Ground Six ¶ 10 (ECF No. 1-5, at 10); Hoyt Aff. (attach.) (ECF No. 1-6, at 2).  Finally, in a claim raised for the first time in his Amended Memo, Hinkson maintains that a member of the jury (whom he speculates was Haynes) concealed the fact during *voir dire* that an acquaintance was the victim of a solicited attack.  Each of these claims lacks any foundation whatsoever in fact.  In any event, none provides a basis for relief.

### 1.   Hinkson's allegation of premature deliberations

At the outset of the trial, the jury was instructed that it was not to discuss this case "with anyone, including your fellow jurors . . . until all of the evidence has been

received." Tr. 265.  During Swisher's cross examination, Juror Haynes submitted a note to the court which stated:

> Your Honor, I do not know if this is allowed for me to ask; but can Mr. Swisher be asked about the mental capacity of Mr. Hinkson? Did he do a clinical evaluation of Mr. Hinkson? Is David Hinkson on medication? Is Mr. Hinkson mentally ill? Are we or are we not supposed to consider his mental capacity?

Tr. 1036.  With the concurrence of counsel for both parties, this Court advised the jurors that, in response to the question, it was "going to allow the parties to proceed with the presentation of the evidence.  So we won't respond immediately to your question." Tr. 1039.

Hinkson now maintains that, because the note from Haynes inquired whether "we" were supposed to consider mental capacity, it establishes that the jurors had been discussing the evidence among themselves.  See Amended Memo 63.  The contents of Haynes' note, however, are manifestly insufficient to impugn the "'almost invariable assumption of the law that jurors follow their instructions.'" Shannon v. United States, 512 U.S. 573, 585 (1994) (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)); see also Jones v. United States, 527 U.S. 373, 394 (1999); Fields v. Brown, 503 F.3d 755, 782 (9th Cir. 2007) ("[w]e presume that jurors follow the instructions").  Here, the instructions prohibited discussion of the evidence prior to the close of the case.  Submitted by a single juror, the note contained no indication

56

whatsoever that any members of the jury had discussed Hinkson's mental state among themselves or that Haynes was making her inquiry on behalf of anyone other than herself.  Haynes' use of the term "we" simply referred to whether the jury would be able to consider Hinkson's mental capacity.  And Haynes prefatory statement, "I do not know if this is allowed for me to ask" (Tr. 1036), demonstrates her desire to comply with the Court's rules governing jury conduct.  Cf. Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003) ("ambiguous" allegation concerning premature discussion concerning defendant's guilt did not require an evidentiary hearing).

Moreover, none of the participants in the trial – the Court, counsel for the government, or Hinkson's two attorneys – appear to have construed the note to reflect disobedience of the Court's instruction concerning premature discussion of the evidence.  Neither the government nor the defense lodged an objection to the inquiry or sought clarification concerning the reason for the inquiry.  See Tr. 1331 (noting, in denying a motion for a mistrial at the close of the government's case, that "the defendant did not raise any objection to either the juror's question or the court's response at th[e] time" the juror's inquiry was made).[16]  Indeed, in the absence of any effort to demonstrate cause and prejudice for defense counsel's failure to take such

_____

[16]     The mistrial motion was based on the assertion that Haynes' inquiry demonstrated that <u>she</u> had formed an opinion concerning Hinkson's guilt. Tr. 1330.

action or to raise the issue on appeal, Hinkson is entitled to no relief on collateral review in any event.  See Frady, 456 U.S. at 167-68.

Following Hinkson's trial, defense attorney Hoyt interviewed Haynes.[17] According to Hoyt, Haynes informed him that "she had an interest in the law and in psychology and had read from books on the subject."  See Mot., Ground Six, Hoyt Aff. (attach.) (ECF No. 1-6, at 2).  Apparently on the basis of that statement, Hinkson also maintains that, during jury deliberations, Haynes "consulted information on these subjects to help her formulate her opinions" (Mot., Ground Six ¶ 9 (ECF No. 1-5, at 49)), and he speculates that she may have "brought out-of-court information into the jury's presence."  See Amended Memo 63; id. at 67.  However, nothing in Hoyt's rendition of his interview with Haynes or any other evidence submitted in connection with Hinkson's Motion to Vacate supports such rank speculation.  It therefore must be disregarded as unfounded.

>    2.    The allegation that Haynes failed to disclose, during *voir dire* examination, a friendship with the wife of Judge Lodge

Hoyt further avers that, during his interview with former juror Haynes, she told him that, prior to trial, she had become acquainted with Judge Lodge's wife, an Idaho

---

[17] In doing so, it appears that Hoyt violated this Court's antecedent order (No. 1:04-cr-127-RCT, ECF No. 220) prohibiting any "lawyer, investigator, or agent operating on behalf of a party to [the] proceedings [to] have any further contact with any members of the jury" absent "prior authorization from the Court."  Violation of such an order is, itself, sufficient to permit the district court to disregard an affidavit based upon such an interview.  See Tanner v. United States, 483 U.S. 107, 126 (1987).

State Senator, "over a dairy issue near her home" and that she (Haynes) had talked to Judge Lodge's wife "a number of times and supported her in her political career as an Idaho State Senator."  Mot., Ground Six, Hoyt Aff.  ¶¶ 4, 5 (attach.) (ECF No. 1-6, at 2).  On the basis of that assertion, Hinkson claims that Haynes concealed during *voir dire* examination the fact that she "was close to one of the alleged victims . . . Judge Lodge and his wife" and that she had "an ongoing relationship with Judge Lodge's wife . . . an Idaho State Senator with whom [Haynes] was seeking political favors."  Amended Memo 68-69.  But none of the facts in Hoyt's affidavit support any of these assertions.  Indeed, nothing in that document suggests that Ms. Haynes had any relationship whatsoever with Judge Lodge; that she had an "ongoing relationship" with Mrs. Lodge; or that she had requested any official favors from Mrs. Lodge.

Aside from this, in cases where post-conviction relief is sought on account of an alleged failure to truthfully respond to a question asked during *voir dire* examination, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); see, e.g., Fields, 503 F.3d at 766-67; BankATLANTIC v. Blythe Eastmen Paine Webber, Inc., 955 F.2d 1467, 1473 (11th Cir. 1992).  As the court of appeals has explained with respect to the first step of the

inquiry, "'we cannot put upon the jury the duty to respond to questions not posed.'" Hard v. Burlington N. R.R. Co., 870 F.2d 1454, 1460 (9th Cir. 1989) (quoting United States v. Kerr, 778 F.2d 690, 694 (11th Cir. 1985)). In this case, Haynes had no opportunity to "answer honestly" (McDonough, 464 U.S. at 556) an inquiry concerning her acquaintance or relationship with Judge Lodge's wife because, as in Hard, supra, the question was not posed. The sole inquiry on *voir dire* that was arguably pertinent was whether "any of you know United States District Judge Edward Lodge" or whether "you or anyone close to you previously had dealings with any of [the] named federal officials?" Tr. 34. None of the evidence presented in connection with Hinkson's instant petition suggests that Haynes knew Judge Lodge or that she or anyone close to her had dealings with him. No similar inquiry was made whether any member of the venire was acquainted with family members of any of the solicitation targets. And, under such circumstances, Haynes could not reasonably be expected to understand the inquiry concerning Judge Lodge to extend to them as well. See Hard, 870 F.2d at 1459 (no facts indicating an intention to "hide the truth" where juror answered truthfully by giving a negative response to an inquiry whether he had ever worked for the Burlington Northern Railway even though he had worked for a predecessor, the Northern Pacific Railroad).

3.  The allegation that a juror was biased as the result of a similar incident involving an acquaintance

On May 17, 2012, former juror Ben S. Casey executed an affidavit that stated in part:

> [d]uring the time that I served on the jury, a female juror broke down crying and said that a family member or someone very close to her had a similar thing happen to them.  Someone had paid someone to hurt someone close to her and because of this she said Hinkson should be convicted.  I thought she was emotionally compromised and I told her she shouldn't be on the jury.  She stopped crying but led the faction of the jury which were convicting him.

Amended Memo, Casey Aff. ¶ 4 (attach.) (ECF No. 3-2, at 2).  According to Tim Richardson, a paralegal who showed a draft of the affidavit to Casey for the purpose of obtaining his signature, Casey "agreed that, in general, the language accurately portrayed what had occurred, but that the way it was worded did not totally express his recollection because the female juror was somewhat hysterical and crying when she had made the statements referenced therein."  Amended Memo, Richardson Aff. ¶ 7 (attach.) (ECF No. 3-2, at 4).  Accordingly, Casey added in his own handwriting the following caveat to the information set out above: "[i]f this statement is not exactly correct -- my best recollection is that her emotional connection compromised her impartiality & she should not have served."  Amended Memo, Casey Aff. ¶ 4 (attach.) (ECF No. 3-2, at 2); see id. Richardson Aff. ¶¶ 8-10 (attach.) (ECF No. 3-2, at 5).

On the basis of Casey's averments, Hinkson maintains for the first time in his Amended Memo that the juror concealed "her connection to a similar crime involving someone close to her" and therefore "was predisposed to convict [him] without waiting for all the evidence . . . ."  Amended Memo 67-68 (footnote omitted).  This new claim provides no basis for relief for several reasons.

### a.    The Juror Misconduct Claim Is Untimely

As explained above, Hinkson's conviction became final on April 18, 2011.  As Hinkson's Amended Memo was not filed until May 21, 2012, this claim is untimely and should be rejected for that reason alone.  As the court of appeals explained in Hebner v. McGrath, 543 F.3d 1133 (9th Cir. 2008), in enacting AEDPA, Congress imposed "'a tight time line' in the form of a one-year time limit on . . . prisoners seeking to challenge their convictions in federal court."  Id. at 1137 (quoting Mayle v. Felix, 545 U.S. 644, 662 (2005)).  A habeas petition may be amended following the expiration of that one-year period provided that the claims set out in the amended pleading "relate back" to those set out in the initial, timely petition.  Id. at 1137-38.  In order to so qualify, however, the new claims must be "'tied to a common core of operative facts'" (id. at 1138 (quoting Mayle, 545 U.S. at 664)) – i.e., the claim must involve the "same conduct, transaction, or occurrence."  Mayle, 545 U.S. at 664.  Such an assessment is not governed merely by reference to whether any of the claims in the

original (and timely) petition and those in the amended (and untimely) petition share a common label.  See Mandacina v. United States, 328 F.3d 995, 1002 (8th Cir. 2003) (new claim of ineffective assistance did not relate back to that asserted in initial petition where the first alleged failure to discover potentially exculpatory footprint evidence, and the other alleged failure to investigate contents of an interview report furnished by the police).

Here, likewise, Hinkson's claim of juror misconduct, alleged for the first time in his Amended Memo, cannot be said to "have arisen out of the same set of facts" (Mandacina, 328 F.3d at 1000) as his original claims of juror impropriety.  The first of those claims was based on Haynes' submission of a note during trial suggesting (Hinkson argues) that members of the jury had discussed the case prior to the commencement of deliberations.  The second resulted from Haynes' alleged failure to disclose during *voir dire* that she was acquainted with Judge Lodge's wife, a matter that attorney Hoyt allegedly discovered during a post-trial interview with her.  In contrast with these timely contentions, the gravamen of Hinkson's claim in his Amended Memo is that, during deliberations, an unidentified female juror became so emotionally distraught, as the result of a solicited attack on a friend, which she did not disclose during *voir dire*, that she was unable to deliberate objectively.  Thus, Hinkson's claims are based on "discrete occurrences . . . [which] depend upon

63

separate transactions and do not share a common core of operative fact." Hebner, 548 F.3d at 1139.  Consequently, the "bias" claim, based on Casey's recent affidavit, cannot relate back to the date of Hinkson's timely Motion and must be rejected for that reason alone.

> b.    Casey's Affidavit Cannot Be Considered for the Purpose of Impeaching the Jury's Verdict

Even if Hinkson's bias claim were not time-barred, the evidence supporting it is not properly cognizable by this Court for the purpose of impeaching the jury's verdict.  Fed. R. Evid. 606(b) provides:

> **(1) Prohibited Testimony or Other Evidence.**
> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> **(2) Exceptions.**  A juror may testify about whether:
> **(A)** extraneous prejudicial information was improperly brought to the jury's attention;
> **(B)** an outside influence was improperly brought to bear on any juror; or
> **(C)** a mistake was made in entering the verdict on the verdict form.

As the Supreme Court explained in Tanner v. United States, 483 U.S. 107, 119 (1987) "[s]ubstantial policy considerations support the [Rule's codification of the] common-law rule against the admission of jury testimony to impeach a verdict."  Absent that

rule, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.  If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference."  Id. at 120 (citation omitted); see id. at 126; Fed. R. Evid. 606 (1972 advisory committee notes) ("[t]he mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment").

Here, Casey's statement that a member of the jury appeared distraught during deliberations, allegedly as a consequence of the experience of an acquaintance, falls squarely within the prohibitions against providing testimony concerning "any statement made or incident that occurred during the jury's deliberation; the effect of anything on . . . another juror's vote; or any jurors mental processes concerning the verdict . . . ."[18]  Fed. R. Evid. 606(b)(1).  See, e.g., United States v. Pimentel, 654 F.2d 538, 542 (9th Cir. 1981) ("[t]estimony of a juror concerning the motives of individual

_____

[18]    The predecessor version of Fed. R. Evid. 606(b) more explicitly provided that a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations concerning "anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . ."  Fed. R. Evid. 606(b) (2010).  When the rule was revised to its present form in 2011, the Advisory Committee Note made clear that "[t]he[] changes are intended to be stylistic only.  There is no intent to change any result in any ruling on evidence admissibility."  See Fed. R. Evid. 606 (Advisory Committee Notes to 2011 Amendments).

jurors and conduct during deliberation is not admissible"); New Trial Order 11 (collecting cases).[19]

Nor is there merit to Hinkson's argument (Amended Memo 69-70) that the allegations of juror misconduct in Casey's affidavit fall within exceptions (2)(A) and (2)(B) to the prohibitions set out in Rule 606(b). The affidavit contains no indication that the juror brought any evidence not presented at trial to the attention of her peers. See United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991) (juror's experiment conducted during weekend recess constitutes extrinsic evidence). And, likewise, this is not a case where a juror recounted personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict. See Hard, 812 F.2d at 485 (juror, who was a former employee, possessed and shared personal knowledge of railroad's settlement practices). Indeed, absent any evidence of "extraneous influences on the deliberation, in the sense of overt acts of jury tampering," the allegations in Casey's affidavit must be disregarded. Pimentel, 654 F.2d at 542.

---

[19] Moreover, as this affidavit was obtained in violation of of the Court's order prohibiting contact with former jurors by persons acting on behalf of parties without its authorization, the Court has the discretion to disregard it. See note 17, supra.

c.     Casey's Allegations Fail to Demonstrate Juror
       Misconduct

Hinkson maintains that he proffered Casey's affidavit to demonstrate that the "female juror lied to the court in *voir dire.*" Amended Memo 69. But that purpose is simply not contemplated by the exceptions to the prohibitions against juror impeachment evidence in Fed. R. Evid 606(b). Nonetheless, even if that were not the case, Casey's affidavit fails to accomplish that objective. First, Casey's affidavit fails to identify the juror who engaged in an emotional outbursts and allegedly claimed that a friend had been the victim of a solicited crime.[20] Second, Casey has cast doubt upon his own affidavit's factual veracity by informing the paralegal who prepared it that it did not "totally express his recollection" (Amended Memo, Richardson Aff. ¶ 7 (attach.) (ECF No. 3-2, at 4)) and qualifying its typed averments by adding a handwritten caveat suggesting that such statements may not be "exactly correct" and merely reflected his "best recollection" of events. Amended Memo, Casey Aff. ¶ 4 (attach.) (ECF No. 3-2, at 2). See Tracey, 341 F.3d at 1045 (habeas court did not err in failing to conduct evidentiary hearing to explore allegation of juror misconduct or bias when the allegation involved "ambiguous and confusing testimony about who said what, where they said it, and when they said it . . . lacked specificity and noted a bias that, even if true, was not caused by outside influences"). Finally, the *voir dire*

---

[20]     Hinkson's surmise that the juror may have been Ms. Haynes (Amended Memo 67-68 & n.19) is without foundation.

examination provided the unidentified juror with no occasion to acknowledge that a friend had allegedly been the victim of a solicited crime as no inquiry was made concerning such an event.[21]  See, e.g., Hard, 870 F.2d at 1459-60 (holding that juror had no duty to respond to a question not posed on *voir dire*).

H.    The Government Did Not Engage in Misconduct Resulting in the Disqualification of Defense Counsel Hoyt

1.    Pertinent Facts

The relevant facts are summarized in this Court's "Memorandum Decision and Order" re defense counsel Wesley Hoyt's Motion to Withdraw, No. 1:04-cr-127-RCT, ECF No. 249 ("Withdrawal Order").  They show that, while awaiting trial at the Ada County Jail, Hinkson had offered a cellmate, Chad Croner, $30,000  to "eliminate" Lodge, Cook, and Hines.  Tr. 1154-57.  Croner advised his attorney of the solicitation and he, in turn, notified the FBI.  Tr. 1157-62.  To rebut Croner's testimony, Hoyt called as a witness Frank Leslie Nicolai, who shared a cell at the Ada County Jail with both Croner and Hinkson.  Nicolai stated that he had never heard Hinkson solicit Croner to kill a federal judge for a fee or perform any other illegal acts.  Tr. 1315-17. In rebuttal, the government called FBI Agent Mary Martin.  She testified that she had

---

[21]    The only inquiry made concerning victimization was made by the prosecutor who asked whether "anyone *on the jury panel* [had] been the victim of a crime."  Tr. 158 (emphasis added).  Hinkson notes that a questionnaire submitted to the venire inquired "[h]as anyone close to you ever been the victim of any kind of crime."  See Amended Memo, Ground Six, Jury Questionnaire 12 (attach.) (ECF No. 3-2, at 41).  No evidence, however, was proffered indicating how any member of the venire responded to the inquiry.

reviewed a letter that Nicolai had written to the FBI.  Contrary to Nicolai's testimony, his letter stated that Hinkson had solicited him to murder a number of individuals whose names were included on a list that was attached to the letter (but not furnished to the jury).  Tr. 2658.  During an interview, Nicolai told Agent Martin that Hinkson offered him "attorney's services, money and, when he got out of jail, to be moved to Panama and work with WaterOz . . ." if he killed "four . . . primary individuals" on the list.  Tr. 2659-60.

On January 25, 2005, the government furnished Hinkson's counsel two FBI 302 witness statements that summarized Martin's interviews with Nicolai.  One recounted that, according to Nicolai, attorney Hoyt had "started working on [his] case, as partial payment for Nicolai to kill people for Hinkson."  Withdrawal Order, Hoyt Aff. (attach.) (ECF No. 242-1, at 2).  Hoyt did not become aware of the contents of the documents until after he received them from co-counsel Nolan, who had cross-examined Martin.  Hoyt read them while preparing for closing argument scheduled for the next day.  Withdrawal Order 5.  On April 21, 2005, four days before Hinkson's scheduled sentencing, Hoyt moved to withdraw.  Withdrawal Order 2.  He argued that he should be relieved as counsel because Nicolai's assertion that he was providing him legal services as part of a murder plot creates an "irreconcilable conflict of interest" such that he could no longer provide Hinkson with effective representation.  Id.  Two days later, however, Hoyt moved to postpone action on the motion, asserting that

69

"[t]he pending conflict defense counsel had with defendant has been resolved." Id. (brackets in original).  Nonetheless, in a May 4, 2005 Status Report, Hoyt suggested to this Court that "[d]ue to [his] concern for effective representation of his client and considering [his] lack of experience in federal criminal sentencing matters it is [his] opinion that it would be in Mr. Hinkson's best interest to be represented by an experienced criminal attorney as lead counsel to argue the sentencing issues related to solicitation." Id. at 3 (brackets in original).

Following a hearing, and the submission of an opposition by the government to the motion to withdraw, this Court concluded that it never had the slightest suspicion of impropriety by Hoyt – a position shared by the government –  and that any claimed conflict that now exists between him and Hinkson "did not have any effect whatsoever on the trial proceedings," particularly because Hoyt had no notice of Nicolai's allegations until after the close of all the evidence.  Withdrawal Order 7. Nonetheless, this Court concluded that, in an abundance of caution, "Mr. Hoyt should be required to withdraw as counsel and that substitute counsel must be appointed for future proceedings." Id. at 9.  In particular, the Court noted that, in arguing against a sentencing enhancement as a consequence of Hinkson's solicitations, Hoyt would need to assert that Nicolai was a credible witness whereas, at the same time, it would be in Hoyt's personal interest to discredit him concerning his allegation linking Hoyt to the alleged murder scheme.  Id. at 10.

70

2.     Argument

Hinkson maintains (Mot., Ground Seven ¶ 1 (ECF No. 1-6, at 4); see also Mot.,

Ground Two ¶ 10 (ECF No. 1-3, at 37) that the FBI "concocted" the "murder-for-hire

plot" by planting an informant in his cell with the specific goal of delivering a false

report to the FBI.  Nothing in the record supports that bald assertion.  To the contrary,

Croner's unrebutted testimony is that he had never heard of Hinkson prior to being

incarcerated with him (Tr. 1166); that he reported Hinkson's offer to his attorney

rather than to law enforcement; that his attorney informed the FBI about the

solicitation; and that he followed the instructions of both his attorney and the FBI in

avoiding asking Hinkson questions (Tr. 1157-58, 1161-63).

Nor is there a factual basis for Hinkson's claim (Mot., Ground Seven ¶ 5 (ECF

No. 1-6, at 5)) that the FBI "concoct[ed] yet another murder for hire plot" by asserting

that Hoyt was a co-conspirator in the murder-for-hire scheme.  The evidence adduced

at trial and in connection with Hoyt's motion to withdraw shows that Nicolai

originated the claim that Hoyt was furnishing him legal services as partial payment

to him for murdering individuals on Hinkson's hit list.  The FBI 302 summaries

merely recounted Nicolai's statements to an interviewing agent concerning that

supposed arrangement.

Finally, while Hinkson maintains elsewhere that both Hoyt and Nolan failed to

furnish him effective assistance at trial (see Mot., Ground Four (ECF No. 1-4, at 4)),

he now alleges that this Court's order directing Hoyt's withdrawal "deprived [him] of . . . adequate or competent representation." Mot., Ground Seven ¶¶ 7-8 (ECF No. 1-6, at 5). But this argument was not presented on direct appeal and, in the absence of a demonstration of cause and prejudice (<u>Frady</u>, 456 U.S. at 167-68), it cannot be entertained on collateral review.

Even if that were not the case, this claim could not withstand scrutiny. In the first place, it was Hoyt who invited this Court's attention to the conflict issue and, over the government's opposition, moved to withdraw. Indeed, Hoyt sought substitute counsel not only because of Nicolai's allegation suggesting his involvement in a murder-for-hire scheme, but also because he believed that it would be in Hinkson's best interest to be represented at sentencing by an attorney who was familiar with federal sentencing practice. And, in granting that motion after the close of the trial, this Court in no way impeded Hoyt's ability to competently represent Hinkson as he now maintains. By the time the recusal motion was filed and this Court acted on it, the trial had terminated. Hoyt shared responsibilities with Nolan in presenting defense summation (Tr. 2787-2804) and participated in the initial sentencing proceedings. <u>See</u> Sentencing Tr. 1-246. And, for the remainder of the sentencing proceedings, Hinkson was represented by new counsel. Withdrawal Order 9.

Finally, despite Hoyt's recent claim that the subsequent withdrawal order precluded him from providing further representation to Hinkson (<u>see</u> 1:04-cr-127-

72

RCT, Mot. to Recuse Judge Tallman, Hoyt Aff. (attach.) (ECF No. 322, at 20)), it does not appear to have deterred him from doing so.  Elsewhere, Hoyt acknowledges that  "[s]hortly after the trial in the Solicitation Case," he and his wife (who he states works as his legal assistant) interviewed former juror Haynes "to discuss her experience as a juror."  See Mot., Ground Six, Hoyt Aff. (attach.) (ECF No. 1-6, at 2).  The affidavit Hoyt executed following that interview constitutes a basis for Hinkson's "juror misconduct" claim.  And, although ostensibly submitted *pro se*, Hinkson's instant Section 2255 Motion, as well as the motions for relief that accompanied it, were apparently filed by Hoyt on Hinkson's behalf as Hoyt's signature appears on the certificates of service.

## CONCLUSION

For the foregoing reasons, Hinkson's motion to set aside his sentence under 28 U.S.C. § 2255 should be denied.

Respectfully submitted,

Michael J. Mullaney
 Acting United States Attorney

Michael Patrick Sullivan
 Special Assistant U.S. Attorney

John F. De Pue
Michael Taxay
Attorneys
National Security Division
U.S. Department of Justice
Washington, D.C. 20530

73

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July, 2012, a copy of the foregoing "Answer of the United States to Hinkson's Motion to Vacate Sentence Under 28 U.S.C. § 2255" was filed electronically.  This filing was sent to the petitioner at Atwater U.S. Penitentiary, Inmate Mail/Parcels, P.O. Box 019001, Atwater, California, 95301, via U.S. First-Class Mail.

<u>/s/ John F. De Pue</u>
John F. De Pue
<u>Attorney</u>
National Security Division
U.S. Department of Justice
Washington, D.C. 20530
Counsel for the United States