## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| DAVID ROLAND HINKSON,<br><br>       Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>       Respondent. | Criminal No.: 3:02-cr-142-RCT<br>Criminal No.: 1:04-cr-127-RCT<br>Civil No.: CIV 1:12-cv-196-RCT<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## OVERVIEW

David Roland Hinkson ("Hinkson") moves to vacate his convictions for soliciting the murders of three federal officers, including a United States District Judge, an Assistant United States Attorney ("AUSA"), and a Special Agent of the Internal Revenue Service ("IRS") Criminal Investigation Division. *See* Case No. 1:04-cr-127-RCT. He insists he does not seek habeas corpus relief for his related criminal tax and money laundering convictions. *See* Case No. 3:02-cr-142-RCT (Hinkson's criminal tax case); Case No. 1:12-cv-196-RCT, Doc. No. 5, Defendant Hinkson's Ojbection [sic] to Court's Order at 2 (claiming that Hinkson's habeas petition does not raise issues related to his tax convictions).

**HINKSON V. UNITED STATES, 3:02-CR-142-RCT;**
**1:04-CR-127-RCT; 1:12-CV-196-RCT**
**MEMORANDUM DECISION**      **1**

## FACTS

In 2002, Hinkson was first indicted for financial crimes including money laundering, income tax evasion, failure to file income tax returns, and failure to collect and pay payroll taxes.  The charges stemmed from the operation of Hinkson's Grangeville, Idaho, water-bottling company, WaterOz.  *See* Case No. 3:02-cr-00142-BLW-RCT, Doc. No. 1, Indictment.  Over a five-year period, Hinkson sold $12 million worth of water, claiming his product had medicinal properties that would cure various ailments.  *Id.*

Thereafter, in 2004, while awaiting trial on his tax case, a federal grand jury in Idaho returned an eleven-count indictment against Hinkson for soliciting the murders of three federal officials involved in the tax case:  United States District Judge Edward J. Lodge (originally assigned to preside over the matter), AUSA Nancy Cook (the prosecutor), and IRS Special Agent Steven Hines (the case agent).  *See* Case No. 1:04-cr-00127-RCT, Doc. No. 37, Superceding Indictment. The first three counts charged Hinkson with violating 18 U.S.C. § 373 by soliciting a man named James Harding ("Harding") to kill the three officials in January 2003; counts four through six charged that Hinkson made a second such request to Harding in March of that year.  *Id.*  Counts seven through nine charged Hinkson

with soliciting these same murders in December 2002 or January 2003, this time in a request to a friend and WaterOz laboratory services contractor, Elven Joe Swisher ("Swisher").  *Id.*  The final two counts charged Hinkson with violating 18 U.S.C. § 115 for threatening to kill the children of AUSA Cook and Special Agent Hines.  *Id.*

Hinkson's criminal tax trial was held before the undersigned in April and May of 2004.[1]  A jury found him guilty of twenty-six counts on May 4, 2004.  *See* Case No. 3:02-cr-00142-BLW-RCT, Doc. No. 307, Verdict.  Sentencing on the tax counts was continued until the conclusion of Hinkson's murder-solicitation trial, which commenced before the undersigned in January of 2005.

Hinkson was represented at the murder-solicitation trial by retained attorneys Wesley Hoyt ("Hoyt") and Thomas Nolan ("Nolan").  The theory of the defense was that Hinkson was a blowhard whose words could not be taken at face value due to his "offensive" personality.  *See* Case No. 1:04-cr-00127-RCT, Tr.

---

[1]      Idaho has only two United States District Judges, one of whom was the target of the contract murder.  The other judge also recused and a visiting judge from outside the district was designated by the Chief Judge of the Ninth Circuit Court of Appeals to hear the two cases against Hinkson.  *See* Case No. CR-02-00142-BLW-RCT, Docket Entry #249, Order granting in part and denying in part defendant's motion to reassign entire case to the undersigned, United States Circuit Judge Richard C. Tallman.

302.  The prosecution, meanwhile, focused on Hinkson's flashing of a roll of cash to Harding when the contract murders were discussed, *id.* at 284, and Hinkson's belief that Swisher was an experienced combat veteran who had killed many people, *id.* at 291.  Other evidence was introduced at trial to bolster the proof that Hinkson seriously intended to solicit the murders of his victims.

When Swisher was called as a witness to testify about counts seven through nine, he arrived at court wearing a replica of a Purple Heart on his lapel.  Tr. 1116. On direct examination by the government, Swisher testified that he had befriended Hinkson while doing consulting work as a water safety tester for WaterOz.  The pair had previously discussed Swisher's stint in the Marine Corps several times. Tr. 988.  Swisher testified that he had told Hinkson of his combat experience in Korea.  *Id.*  When asked by Hinkson if he had ever killed anyone, Swisher replied that he had killed "too many."  Tr. 988–89.  Swisher also detailed Hinkson's devious plans for his victims.  Hinkson told Swisher he wanted the victims and the victims' families "tortured and killed."  Tr. 995.  Specifically, Hinkson:

> [S]aid he would like to see them stripped, bound, and gagged, and then burned with cigarettes or cigars.  And then while [the victim] was down on his knees observing this occurring to his wife and any other family members that might be present, he wanted to have a plastic bag put over her head so that she would suffocate to death in front of him, along with other family members.  Then he wanted that procedure

repeated on [the victim] himself.

Tr. 996.  Swisher testified that in July or August of 2002, Hinkson said he wanted this sadistic ordeal carried out against AUSA Cook and Special Agent Hines.  Tr. 1004, 1007.  Hinkson repeated his murderous request in January 2003, Swisher testified, but this time he included Judge Lodge, who was originally assigned to preside over the criminal tax trial.  Tr. 1007.  Hinkson offered at least "$10,000 a head."  *Id.*

At trial, the defense sought to show the implausibility of the arrangement Swisher described.  Hinkson testified that he was out of the country on business for much of April through November of 2002, such that the solicitations could not have occurred.  Tr. 1902.  Greg Towerton ("Towerton"), the general manager of WaterOz, confirmed that Hinkson was on a family vacation in July 2002.  Tr. 2479.  Hinkson also testified to Swisher's poor health during these months, pointing out that Swisher had open-heart surgery in September 2002 and was in a wheelchair for a time afterward.  Tr. 1970.  By November 2002, according to Hinkson, Swisher was barely able to walk even with the assistance of a cane.  Tr. 1927.  Swisher himself acknowledged his own September heart surgery in an affidavit completed before trial.

**HINKSON V. UNITED STATES**, 3:02-CR-142-RCT;
**1:04-CR-127-RCT; 1:12-CV-196-RCT**
**MEMORANDUM DECISION**                       **5**

Hinkson also testified that his friendship with Swisher had soured by the time of trial, thereby implying that Swisher had a motive to lie about Hinkson after their falling out.  Tr. 1977.  Hinkson accused Swisher of being party to a scheme with another former Hinkson confederate, Richard Bellon ("Bellon"), to wrest control of WaterOz, noting that Bellon and Swisher had sued him over the matter.  Tr. 1985.  According to Hinkson's testimony, Swisher tried to corner Hinkson into granting Swisher a 50 percent ownership stake in WaterOz by threatening to report to the Food and Drug Administration that the WaterOz product contained sodium cyanide.[2]  Tr. 1931–32.  Towerton verified that Swisher made an attempt to extort money from Hinkson with similar threats.  Tr. 2501.  Towerton also testified that Swisher had demanded $6,000 for past-due invoices, even though Towerton had checked WaterOz's books and had been unable to find any unpaid invoices.

The defense conducted an "extensive and withering cross-examination" of Swisher, *United States v. Hinkson*, 526 F.3d 1262, 1303 (9th Cir. 2010) (McKeown, J., dissenting).  The cross-examination occupies 122 pages of trial

---

[2]     Hinkson pleaded guilty to misdemeanor violations of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(a), before United States Magistrate Judge Michel Williams.  *See* Case No. 3:02-cr-142-RCT, Doc. No. 276, Plea Agreement. As with his tax and money-laundering convictions, Hinkson does not challenge his misdemeanor convictions here.

transcript and focuses on Swisher's bias, lack of credibility, and his falling out with

Hinkson.  Tr. 1018–1132, 1142–49.  Swisher admitted that the two were no longer

friends; in fact, Swisher testified that he believed Hinkson "hate[d]" him.  Tr.

1068.  Their relationship had gotten so acrimonious, Swisher explained, that

Swisher suspected Hinkson had "put a contract out" on his life, and that someone

had recently fired a shot at him in the woods of rural Idaho.  Tr. 1067.  Swisher

also confirmed that the two had been embroiled in contentious civil litigation

involving ownership of WaterOz.  Tr. 1060.  Defense counsel Nolan even got

Swisher to acknowledge that he had a flawed memory.  Tr. 1047–49.

After concluding his cross-examination, Nolan requested a sidebar, where he

informed the Court of his concern that Swisher was exaggerating his military

record.  Tr. 1113.  Counsel stated that, due to Swisher's age, it was unlikely he

would have served at the time of the Korean War.  *Id.*  Nolan also referred to the

Purple Heart that Swisher was wearing and said that he (Nolan) had received a

letter from Bruce Tolbert, an archives technician at the National Personnel Records

Center ("NPRC") in St. Louis, Missouri, ("the Tolbert letter").  The Tolbert letter

indicated that Swisher had never been awarded any personal military decorations.

Tr. 1114.  Upon this foundation, the Court granted defense counsel's motion to

re-open Swisher's cross-examination.  Tr. 1115.

On cross-examination for the second time, Swisher testified that he was wearing a Purple Heart awarded to him for an injury sustained during classified operations in Korea following the war.  Tr. 1117.  Counsel responded by showing Swisher the Tolbert letter—disputing Swisher's claim—and asked if it refreshed his memory.  Tr. 1118.  Swisher, in turn, dramatically produced a document from his pocket, calling it a "Replacement DD-214."  The document purported to be an official Department of Defense document advising of Swisher's entitlement to various awards, including the Purple Heart.  Tr. 1118–19.

The Court immediately conducted yet another sidebar concerning the two conflicting, unauthenticated documents.  With the concurrence of the defense, the Court instructed the jury to disregard Swisher's entire testimony regarding his Purple Heart.  It was stricken from the record.  Tr. 1131–32.

About a week later, the prosecution furnished the defense with a letter sent from Lieutenant Colonel K.G. Dowling, Assistant Head of the Military Awards Branch of the United States Marine Corps, ("the Dowling letter"), to Ben Keeley of the Idaho Division of Veterans Services.  Tr. 2069, 2316.  The Dowling letter was evidently in response to a query from Keeley about Swisher's "Replacement

DD-214." Swisher had apparently attempted to obtain, and had obtained, veterans' benefits by submitting the document to officials at the Idaho Division of Veterans Services. The Dowling letter advised Keeley that the "Replacement DD-214" Swisher had relied upon did not exist in Swisher's official file. The letter also clarified that Swisher's official DD-214 mentioned neither wounds suffered nor awards received. In its concluding paragraph, the letter reiterated doubts as to Swisher's document's authenticity.

Swisher's official military personnel file arrived the same day from the NPRC in response to this Court's subpoena. The file contained copies of the Dowling letter, the official DD-214, and the "Replacement DD-214" that Swisher had displayed on the witness stand. After reviewing the personnel file in camera, the Court provided it to counsel. Tr. 2069. Without a qualified witness to interpret the contents of the personnel file, the Court was not persuaded one way or the other as to the replacement document's authenticity. Tr. 2317.

Defense counsel offered the Dowling letter and Swisher's personnel file into evidence without foundation from a qualified records custodian or witness who could interpret them, Tr. 2307–08, but the Court found both inadmissible under Rules 403 and 608(b) of the Federal Rules of Evidence. Tr. 2607. The Court did

give Hinkson's attorney the option to re-open cross-examination once more to further probe Swisher's military record and the truthfulness of his earlier statements. *Id.* Defense counsel declined the invitation, and both sides concluded their cases.

On January 27, 2005, the jury acquitted Hinkson on counts one through three, ten, and eleven, and deadlocked on counts four through six. The jury convicted Hinkson on only the three counts involving his solicitation of Swisher to murder the three federal officials, counts seven through nine. *See* Case No. 1:04-cr-00127-RCT, Doc. No. 190, Jury Verdict.

The Court sentenced Hinkson to consecutive sentences of ten years' imprisonment for each of the three charges and three years for making the solicitations while on pretrial release from his tax case. Hinkson moved for a new trial in part based on purported "newly discovered" evidence that Swisher's "Replacement DD-214" was a forgery and that Swisher had perjured himself with regard to his activities in the military. *See* Case No. 1:04-cr-00127-RCT, Doc. No. 224, Motion for New Trial. The Court denied the motion under *United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005), finding that the offered evidence was not new, that Hinkson had not been diligent in discovering the evidence, that the

evidence would not be admissible, and that the evidence was cumulative of evidence produced at trial and in any event was "merely impeaching." *See* Case No. 1:04-cr-00127-RCT, Doc. No. 244, Order Denying Motion for New Trial.

Hinkson appealed.  A divided three-judge panel of the Ninth Circuit reversed this Court's denial of Hinkson's motion for a new trial, holding that Hinkson had met all five requirements of the *Harrington* test and was entitled to a new trial.  *United States v. Hinkson*, 526 F.3d 1262, 1298 (9th Cir. 2008).  Upon rehearing, however, an en banc panel of the Ninth Circuit vacated the three-judge panel decision and affirmed this Court, concluding that this Court had not abused its discretion in denying Hinkson's motion for a new trial nor in excluding the Dowling letter.  *United States v. Hinkson*, 585 F.3d 1247, 1263–64, 1267 (9th Cir. 2009) (en banc). The United States Supreme Court denied certiorari.  *Hinkson v. United States*, 131 S. Ct. 2096 (2011).

Hinkson now petitions for habeas relief under 28 U.S.C. § 2255.

## DISCUSSION

## I.   28 U.S.C. § 2255 STANDARD

A federal prisoner may petition for a writ of habeas corpus under 28 U.S.C. § 2255 if his "sentence was imposed in violation of the Constitution or laws of the

United States." *Id.* § 2255(a).  Importantly, this Court's review of a § 2255 habeas petition is "narrowly limit[ed]" such that "an error of law that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184 (1979).  Rather, an error of law will provide a basis for habeas relief only if "'the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* at 185 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).  Having reviewed Hinkson's habeas petition and supporting appendices, and having heard the evidence against Hinkson over the course of nearly five weeks of trial in two criminal cases, the Court concludes that Hinkson's claims fail to satisfy this strict standard.

Moreover, as the Ninth Circuit has repeatedly held, a § 2255 habeas proceeding is not a forum for relitigating matters already decided on direct appeal. *See Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972) ("The law in this circuit is clear that when a matter has been decided adversely on appeal from conviction, it cannot be litigated again on a 2255 motion."); *see also United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) (explaining that "§ 2255 may not be used as a chance at a second appeal").  Hinkson's habeas petition presents a

number of claims that were fully addressed during his underlying criminal trial and disposed of on direct appeal,[3] and those claims are not reviewable in this proceeding.  *See United States v. Currie*, 589 F.2d 993, 995 (9th Cir. 1979) ("We are bound by the previous decision and decline to again review [the previously litigated] contention."); *see also Odom*, 455 F.2d at 160 (explaining that "[t]he decision in [the direct appeal] is the law of the case.").

Finally, it is well established that "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice.'"  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  Hinkson also seeks to bring defaulted claims without showing cause or prejudice, and those claims are denied.  He also seeks to add a supplemental claim that is barred as untimely under AEDPA.  Alternatively, the claims are denied on the merits.

## A.    Claim One: Newly Discovered Evidence.

---

[3]      Hinkson's attempt to relitigate rulings decided against him on direct appeal is consistent with his strategy during the underlying criminal proceedings. *See* Case No. 1:04-cr-127-RCT, Doc. No. 244, Memorandum Decision and Order Denying Motion to Dismiss and Motion for New Trial at 28 ("Defendant's conduct in the trial proceedings to date demonstrates his belief that sheer repetition of arguments and motions may accomplish his objectives.").

Hinkson alleges that "newly discovered" evidence supports his § 2255 petition. This evidence includes (1) Swisher's false testimony about his military record; (2) Hinkson's travel schedule during the period he solicited Swisher to commit murder; (3) Swisher's debilitating medical ailments during the period Hinkson solicited him to commit murder; and (4) impeachment evidence against Swisher showing his business-related motivation for lying about Hinkson.

A habeas petition raising claims based on newly discovered evidence is treated as a motion for a new trial under Federal Rule of Criminal Procedure 33. *See United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000) ("We treat [petitioner's] motion under 28 U.S.C. § 2255 as a motion for a new trial."); *see also Berry*, 624 F.3d at 1039 (explaining that "[a] district court may treat a § 2255 motion as a Rule 33 motion for a new trial" if the government waives any objection to Rule 33 timeliness). To qualify for a new trial under Rule 33 based on new evidence, Hinkson must demonstrate that "(1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial." *Hinkson*, 585 F.3d at 1264. Hinkson's claims fail to

satisfy these criteria, and were resolved against Hinkson in his prior direct appeal. *See Hinkson*, 585 F.3d at 1267 (affirming the district court's denial of Hinkson's motion for new trial).

    1.    <u>Swisher's testimony concerning his military record.</u>

Hinkson alleges throughout his § 2255 petition that Swisher's false testimony about his military record is grounds for a new trial.[4]  This claim fails because Swisher's fabrications cannot be "newly discovered;" evidence contradicting Swisher's testimony was available to Hinkson and the issue was fully litigated at trial and on appeal.  *See Hinkson*, 585 F.3d at 1257 ("Hinkson timely moved for a new trial under Federal Rule of Criminal Procedure 33 based, in relevant part, on 'newly discovered evidence' that Swisher's 'Replacement DD-214' form was forged and that Swisher committed perjury regarding his military record.").  Hinkson possessed at trial: (1) the Tolbert letter contradicting Swisher's testimony; and (2) the Dowling letter alerting the Court that Swisher's

---

[4]    Following Swisher's trial testimony, Swisher was indicted and convicted of wearing unauthorized military medals in violation of 18 U.S.C. § 704(a), making false statements in violation of 18 U.S.C. § 1001(a), and theft of government funds in violation of 18 U.S.C. § 641.  It is now undisputed that Swisher's tenure in the Marine Corps did not include combat operations in Korea nor receipt of the Purple Heart.

"Replacement DD-214" form was not in his official military file.[5]  Additionally, as

appendices to Hinkson's original post-verdict Rule 33 motion, Hinkson provided

affidavits from military officials explaining (1) that Swisher's documents were

phony; (2) that Swisher was never awarded any military decorations; and (3) that

Swisher did not suffer combat injuries.  *See id.* ("Hinkson accompanied his motion

[for new trial] with affidavits from (1) Chief Warrant Officer W.E. Miller, the

Marine Corps liaison to the National Personnel Records Center ('Miller affidavit'),

and (2) Col. Woodring, whose signature was affixed to the Woodring letter that

validated the Swisher-produced 'Replacement DD-214' form, as well as the

apparently bogus 'Replacement DD-214' form itself ('Woodring affidavit').").

There is thus no "new" evidence for this Court to consider and the claim is again

---

[5]  Hinkson also alleges government misconduct on this point, arguing
that the government suborned perjury by knowingly eliciting Swisher's false
testimony.  There is no basis for this claim.  To the contrary, the trial record
demonstrates that the government immediately shared the Dowling letter with
Hinkson's counsel.  Tr. 2604.  Had the government truly been conspiring to suborn
Swisher's perjury, it is unlikely it would have shared the only existing documents
that called Swisher's testimony into question.  Moreover, Hinkson failed to raise
this claim on direct appeal, and has shown no cause to excuse procedural default.
Thus, for the same reasons discussed throughout this section, Hinkson's
government misconduct claim, included in his petition as Claim 8, fails.

**HINKSON V. UNITED STATES**, 3:02-CR-142-RCT;
**1:04-CR-127-RCT; 1:12-CV-196-RCT**
**MEMORANDUM DECISION**                    **16**

denied.[6]

> 2.   Hinkson's own travel schedule.

Hinkson has submitted purported "alibi" evidence with his § 2255 petition, alleging that he was out of the country during much of 2002 and 2003 and was thus unable to solicit murders during that time period.  This evidence is not new; it is almost identical to Hinkson's testimony at trial about his extensive travel schedule.  *Compare* Tr. 1902 (responding to a question as to whether he was in the United States between April 16, 2002, and November 21, 2002: "I was pretty much gone a lot. . . .  I was in Russia, the Ukraine, Egypt, Venezuela, Mexico.  I even went to Africa."); *with* Memorandum in Support of Ground One at 13 ("Hinkson was outside the USA and traveling in the Ukraine on business at that time . . . ."); *see also* Tr. 2479 (Towerton testimony as to Hinkson's whereabouts in July 2002:  "He was on a traveling vacation with his children through Colorado, Las Vegas, Los Angeles, San Diego, back to Las Vegas, and a final stop here in Boise before

---

[6]   The Court incorporates by reference its prior ruling on Hinkson's Motion for New Trial, Case No. 1:04-cr-00127-RCT, Doc. No. 244, for a more complete explanation as to why this is not new evidence.  The only "new" evidence would be Swisher's subsequent criminal conviction for falsifying his military record.  Even if the Court considered Swisher's "new" conviction, the evidence would be "merely impeaching," *Hinkson*, 585 F.3d at 1264, and is thus insufficient to warrant a new trial.

returning to Grangeville.").  Moreover, it would be impossible for Hinkson to have freshly "discovered" his own whereabouts during the time period in question; he either knew or should have known his own travel schedule.  This claim fails.

### 3.   Swisher's deteriorating physical health.

Hinkson has submitted extensive allegations that Swisher was far too sick during the time period in question for Hinkson to have solicited him for murder. This evidence is not new; Hinkson himself testified at trial as to Swisher's deteriorating physical health including Swisher's heart surgery and his inability to walk without the aid of a crutch.  *See, e.g.*, Tr. 1927 ("Well, first, Joe Swisher's health was so bad that he wasn't able to walk . . . .").  And as Hinkson's own § 2255 supporting affidavit demonstrates, Hinkson knew of Swisher's ill health in 2002, ten years before filing the present habeas petition.  *See* Exhibit A-2, Memorandum in Support of Ground One ("By the end of July 2002, my understanding was that Mr. Swisher was so gravely ill from his heart condition that he would not have been able to come to WaterOz to meet with me or anybody else.").  This cumulative and belatedly presented evidence does not justify a new trial.  The jury heard it and considered it along with all other evidence in the case before it convicted Hinkson.

### 4.   Swisher's motive to lie.

Hinkson's § 2255 petition raises allegations that Swisher attempted to extort or blackmail Hinkson into granting him an ownership stake in WaterOz, thus purporting to show Swisher's motivation for testifying against Hinkson.  Like the claims discussed above, this extortion scheme was fully addressed at trial.  *See* Tr. 1985 (Hinkson testimony that Swisher sued him "[f]or half of everything I have"); Tr. 1932 (Hinkson testimony that "[o]n the 4th of January, [Swisher] said that he wanted to be fifty-percent owner of WaterOz or he was going to testify against me to the Food and Drug Administration that I was sending out sodium cyanide to my customers.").  Moreover, this evidence is "merely impeaching" of Swisher's testimony, and cannot form the basis for relief in this proceeding.

### B.   Claim Two: Trial Judge Bias.

Hinkson alleges that the Court demonstrated "reversible bias" against him during his trial.  This argument is set forth in full in Hinkson's recusal motion, a motion that is hereby denied by contemporaneous order of this Court filed with this Memorandum Decision.  *See* Case No. 1:12-cv-196-RCT, Order Denying Recusal Motion.  The reasoning for that order is incorporated herewith, and Hinkson's

claim of bias is denied.[7]

### C.   Claim Three: Suppressed or Withheld Evidence.

In a related claim to those discussed above, Hinkson argues that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing evidence of Swisher's medical records and of Hinkson's passport showing his international travel schedule.

To state a claim under *Brady*, a criminal defendant must establish that (1) the withheld evidence was favorable to the defendant; (2) the government suppressed the evidence; and (3) the government's suppression prejudiced the defendant.  *See Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011) (applying the *Brady* test). Under *Brady*'s suppression prong, if "the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," the government's failure to bring the evidence to the direct attention of the defense does not constitute "suppression."  *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).

---

[7]      Hinkson did not raise the issue of judicial misconduct on direct appeal after his prior recusal motion was denied.  His claim of judicial misconduct in his habeas petition is therefore, and in the alternative, procedurally defaulted.  *See United States v. Braswell*, 501 F.3d 1147, 1149–50 (9th Cir. 2007).

Hinkson's *Brady* claims fail for a number of reasons. First, he failed to raise on appeal that the government suppressed these items, and he has not attempted to show cause and prejudice to overcome his default. *See Bousley*, 523 U.S. at 622.

Second, in reviewing Hinkson's claim on the merits, the government did not "suppress" Hinkson's passport or Swisher's medical records. Hinkson had been required to surrender his passport to the Court as part of his pre-trial recognizance release after his first arrest in the tax case, Tr. 2086, such that the document was held by the Court, not by counsel for the government. Likewise, Swisher's full medical records were every bit as available to Hinkson as they were to the government by Rule 17 trial subpoena. *See* Fed. R. Crim. P. 17.

Hinkson's claim is similar to the petitioner's complaint in *Raley*, 470 F.3d at 804. In that case, the petitioner argued that the prosecutor suppressed the petitioner's own medical records. The Ninth Circuit held that, because the petitioner "possessed the salient facts regarding the existence of the records he claims were withheld" such that defense counsel "could have sought the documents through discovery," there was no suppression under *Brady*. *Id.* (citing *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)).

Applying *Raley*, Hinkson possessed the "salient facts" that would have

allowed him to access Swisher's medical records: he knew Swisher was in ill

health as early as July 2002 and where Swisher had been treated.  There was thus

no suppression of this easily attainable evidence.  And Hinkson was obviously

aware of his own international travels during the time period in question.  If he

needed the "specific dates" of travel, he could have easily petitioned the Court to

receive a copy of his passport.  Hinkson thus had the "essential facts" that would

have allowed him to discover and present this evidence at trial, and his *Brady* claim

fails.

###      D.      Claim Four: Ineffective Assistance of Counsel.

Despite his defense team's largely successful trial strategy, through which

Hinkson was convicted on only three of eleven counts, Hinkson now alleges that

he was deprived of his Sixth Amendment right to effective counsel during the

solicitation trial.  To prove ineffective assistance, Hinkson must show (1) "that

counsel's representation fell below an objective standard of reasonableness" and

(2) "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  *Williams v. Taylor*,

529 U.S. 362, 390–91 (2000) (quoting *Strickland v. Washington*, 466 U.S. 668,

688, 694 (1984)) (internal quotation marks omitted).

Under *Strickland*'s first prong, counsel's performance must have fallen "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, or must have been "outside the wide range of professionally competent assistance," *id.* at 690.  In reviewing counsel's actual performance under this prong, which this Court observed firsthand in months of pre-trial motions and during the two-week murder-solicitation trial in the courtroom, the Court must "begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy.'"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 689).  The Court "'must be highly deferential' and avoid the temptation to 'conclude that a particular act or omission of counsel was unreasonable' <u>simply because in hindsight the defense has proven to be unsuccessful</u>."  *Cheney v. Washington*, 614 F.3d 987, 994 (9th Cir. 2010) (emphasis added) (quoting *Strickland*, 466 U.S. at 689).

Under *Strickland*'s second prong, Hinkson must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  Hinkson has failed to satisfy either prong of the *Strickland* test, and his ineffective

assistance claim fails.

      1.    <u>Deficient performance</u>.

Hinkson's ineffective assistance claims center almost exclusively on what he believes was deficient cross-examination and impeachment of Swisher.  Hinkson thus focuses most of his arguments against Thomas Nolan, his former attorney who handled the Swisher testimony.[8]  Hinkson argues that Nolan: (1) refused to review Swisher's prior deposition and grand jury testimony and failed to present evidence about Swisher's prior acquittal on child-molestation charges; (2) failed to impeach Swisher as to the civil litigation involving Swisher, Hinkson, and Bellon; (3)

---

[8]      Hinkson also alleges that Hoyt's performance was substandard. Memorandum in Support of Ground Four at 4.  Hoyt's affidavit, attached to Hinkson's habeas petition, states the same: "As Mr. Nolan's co-counsel I was totally ineffective in my attempts to represent Mr. Hinkson in the Solicitation Case from lack of criminal trial experience in Federal Court."  Exhibit A-1 at 6, Memorandum in Support of Ground One.  This statement, standing alone, fails to demonstrate deficient performance for two reasons.  First, the statement contradicts a prior statement from Hoyt to this Court upon which the Court made an explicit factual finding.  *See* Case No. 1:04-cr-127-RCT, Doc. No. 249 at 6–7 ("Mr. Hoyt candidly admitted to the Court that he could think of nothing that he intentionally did or failed to do that could establish prejudice under controlling Ninth Circuit case law to the detriment of his client Defendant Hinkson.").  Second, the statement is not specific enough to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Thus, Hinkson's ineffective assistance claim against Hoyt fails.

conducted an inadequate investigation into Swisher's military history; (4) failed to review Swisher's military file; and (5) chose not to re-open cross-examination of Swisher after receiving the Dowling letter. *See* Memorandum in Support of Ground Four.

Hinkson also alleges that Nolan "was always confused by this case" and that "all Nolan wanted was his check and when he got it, he abruptly left town." *Id.* at 4. To support these claims, Hinkson relies on intra-office memoranda written by Nolan in the weeks following Hinkson's solicitation trial and submitted for the first time as attachments to Hinkson's habeas petition. Hinkson maintains that these memoranda, in which Nolan questions his own tactical and strategic decisions in light of the guilty verdict, demonstrate that Nolan's performance fell below an objective standard of reasonableness.[9]

---

[9] The Court's firsthand observation of Nolan's prowess in the courtroom belies the post-trial mea culpas of Hinkson's experienced and highly effective defense attorney. Hinkson's claim of deficiency is consistent with this Court's prior finding that Hinkson interprets any adverse action against him as a necessary result of bias, personal animus, or incompetence. *See* Case No. 1:04-cr-127-RCT, Doc. No. 244, ("I further find that, because [Hinkson] has previously and repeatedly engaged in similar misconduct directed at other judges, prosecutors, investigators, attorneys, and witnesses, it is highly probable that he will continue to engage in similar and additional misconduct in the future."). *See also* Case No. 3:02-cr-142-RCT, Doc. No. 176, Affidavit of Attorney Brit Groom Supporting Motion to Withdraw as Defense Attorney at 3 (explaining that, despite the fact that

As a preliminary matter, the fact that defense counsels' Swisher strategy, in hindsight, proved unsuccessful does not mean their performance was substandard. *See Cheney*, 614 F.3d at 994; *see also Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (en banc) (explaining that counsel's decisions are not reviewed under "the fabled twenty-twenty vision of hindsight").  More importantly, however, is the fact that Nolan's performance was objectively reasonable and far exceeded the Sixth Amendment standard set out in *Strickland*.

First, contrary to Hinkson's claim that Nolan failed to review Swisher's prior grand jury testimony, the record shows that Nolan did review the testimony and used it effectively in impeaching Swisher.  At the outset of Nolan's "extensive and withering cross-examination" of Swisher, *Hinkson*, 526 F.3d at 1303 (McKeown, J., dissenting), Nolan questioned Swisher at length as to his grand jury testimony, attempting to highlight inconsistencies.  Tr. 1023–33 (asking repeated questions about Swisher's prior grand jury testimony).  And as to Nolan's failure to impeach Swisher as to prior allegations of child molestation, this Court

---

"[n]either Mr. Hinkson nor his Father are lawyers and apparently have no concept of what is required to go to trial in a case as complex as this one," Hinkson considered then-attorney Groom "ineffective at best" for failing to pursue more pre-trial motions, two of which were "simply requests for this court to reconsider its earlier decisions").

expressly prohibited inquiry into those charges,  Tr. 971, an evidentiary ruling

Hinkson did not challenge on appeal.  Nolan persisted, however, in compliance

with this Court's ruling on the matter, and asked Swisher limited questions about

the child-molestation acquittal as a means of demonstrating Swisher's personal

bias against Hinkson's former state prosecutor.  Tr. 1041.  Thus, this Court finds

that Nolan reviewed, investigated, and utilized information from Swisher's prior

grand jury testimony and prior acquittal of child-molestation charges.

Zealously inquiring into areas of potential witness bias, while carefully

maintaining conformity with a court's rulings in limine, is not substandard

performance implicating the Sixth Amendment.  *See Allen v. Woodford*, 395 F.3d

979, 999 (9th Cir. 2005) (holding that counsel's impeachment of witness was

adequate when counsel "elicited a host of impeaching information").  Further, as to

Hinkson's claims that Nolan failed to review deposition testimony from "suits in

1996–1999 for fraud by Swisher related to his mining claims," Memorandum in

Support of Ground Four at 3, Hinkson has provided no explanation of how that

likely inadmissible evidence would help further discredit an already thoroughly

impeached witness.  *See supra* p. 6 (summarizing Nolan's extensive cross-

examination of Swisher); *see also Davis v. Woodford*, 384 F.3d 628, 641 (9th Cir.

2004) (holding defendant was not prejudiced by counsel's failure to impeach

prosecution witness with witness's prior conviction because counsel "[d]id

impeach [the witness's] credibility on many other grounds").

Second, Hinkson argues that Nolan failed to impeach Swisher as to the

alleged Bellon/Swisher WaterOz takeover plot.  This claim is utterly inconsistent

with the trial record.  Nolan struck blow after blow on this topic during his cross-

examination, going so far as to ask Swisher, "in December of 2003, you were part

of a take-over with Mr. Bellon at the factory, correct?"  Tr. 1057.  He also asked

Swisher if he "provide[d] an affidavit for Mr. Bellon to help him keep control of

WaterOz," Tr. 1058, and inquired whether "[y]ou actually sued Mr. Hinkson for

over $500,000, didn't you?"  Tr. 1058.  Nolan and Hoyt also elicited direct

testimony from Hinkson about Swisher's alleged extortion scheme.  *See* Tr. 1985

(Hinkson testimony that Swisher sued him "[f]or half of everything I have"); Tr.

1932 (Hinkson testimony that "[o]n the 4th of January, [Swisher] said that he

wanted to be fifty-percent owner of WaterOz or he was going to testify against me

to the Food and Drug Administration that I was sending out sodium cyanide to my

customers.").  Between the extensive cross-examination of Swisher and Hinkson's

own lengthy testimony on the topic, this Court previously made a factual finding

that the Bellon/Swisher WaterOz takeover scheme was discussed "ad nauseam." Tr. 1987.  Hinkson cannot now fault his counsel for failing to further pursue this already exhausted trial tactic.

Third, Hinkson claims that Nolan failed to adequately investigate Swisher. Contrary to this allegation, Nolan's suspicions of Swisher's background led directly to the defense's discovery of records challenging Swisher's claim that he was not a decorated military veteran.  *See* Nolan's explanations to the Court at Tr. 1113 ("Because of [Swisher's] age and because of the time of the war, we don't believe he was in the war."); Tr. 1121 ("We had, apparently, been trying to get Mr. Swisher's military records for about ninety days."); Tr. 1114 ("[T]he records fail to show that [Swisher] ever was recommended for or awarded any person [sic] decorations.").  Later, Nolan and Hoyt's continued inquiry into Swisher's background led to the discovery of even more impeaching documents.  *See Hinkson*, 585 F.3d at 1257 ("Hinkson accompanied his motion [for new trial] with affidavits from (1) Chief Warrant Officer W.E. Miller, the Marine Corps liaison to the National Personnel Records Center ('Miller affidavit'), and (2) Col. Woodring, whose signature was affixed to the Woodring letter that validated the Swisher-produced 'Replacement DD-214' form, as well as the apparently bogus

'Replacement DD-214' form itself ('Woodring affidavit').").

After conducting their investigation into Swisher's background, Nolan used the records that he and Hoyt had obtained to reopen cross-examination of Swisher, directly confronting Swisher with the impeaching documents. Tr. 1118. Thus, notwithstanding Nolan's post-hoc observation that he "really [doesn't] feel that a very good investigation was done of Swisher," Exhibit D-1 at 2, Memorandum in Support for Ground Four, his investigation was largely successful and well above the *Strickland* standard of competent performance by an advocate. *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) ("When the record clearly shows that the lawyer was well-informed, and the defendant fails to state what additional information would be gained by the discovery she or he now claims was necessary, an ineffective assistance claim fails.").

Fourth, Hinkson argues that Nolan's performance was substandard because Nolan admitted, in his post-trial intra-office memoranda, that he "didn't look at" Swisher's military records. Exhibit D-1 at 3, Memorandum in Support of Ground Four. Hinkson fails to mention that Nolan's "admission" on this issue is plainly contradicted by surrounding provisions of Nolan's post-trial memoranda, as well as Nolan's contemporaneous representations to the Court.

Despite having supposedly never looked at Swisher's military records, Nolan's post-trial memoranda still describe, in detail, "a few things I remember about [the records]," including:

> Other than the letter and the false document, they looked fairly ordinary. There was an indication he was injured when he was in Washington. I believe his rifleman proficiencies were not all experts, even though he said he fired expert. They might have been. He was demoted from corporal to PFC. We don't know on what grounds he was demoted. It was an Article 15 criminal violation. They were actually very bland and very ordinary. There's not much I can say about them other than they certainly didn't look like they involved any kind of secrecy.

*Id.* Nolan's obvious familiarity with Swisher's records, contrary to Nolan's post-hoc claim that he "didn't look at them," was also demonstrated to this Court, which had reached the same conclusion that the records without explanation were not self-explanatory. Tr. 2307–08 ("We, now, have reviewed [Swisher's] file that's been given to us."); *id.* at 2308 ("[The records] show that [Swisher] was injured when he was in Washington; and it was an auto accident, according to the letter.").

Indeed, Nolan was not only familiar with Swisher's particular records, but with military records in general as a former member of the National Guard:

> All right. So I have some familiarity with records. I look at these and I say to myself there is nothing other than to show secrecy. He became a corporate [sic] once, was reduced to a private, didn't see any combat, didn't have any involvement in any activity, got injured once

in an auto accident—and that's from the injury report when he was in
Washington—and nothing to show "secret" or "confidential."

Tr. 2601 (emphasis added). These extensive discussions of the contents of

Swisher's military records belie Hinkson's argument that Nolan was ineffective for

failing to review them. Consistent with the trial record, this Court finds that Nolan

read the records in full. Nolan's inquiry thus satisfies the first prong of the familiar

*Strickland* standard. *Cf. Hart v. Gomez*, 174 F.3d 1067, 1070–71 (9th Cir. 1999)

(holding that defense counsel who "merely 'glanced'" at important records

provided constitutionally deficient representation).

Fifth, although Nolan could "kick [himself] for not going after [Swisher] and

cross examining him," Exhibit D-1 at 3, Memorandum in Support of Ground Four,

this decision was also not objectively unreasonable. As the Court has previously

held, Nolan's decision not to re-open cross-examination was certainly "strategic,"

Doc. No. 244, Memorandum Decision and Order Denying Motion for New Trial at

7, not a result of deficient performance. Nolan had already been stung when his

first attempt to impeach Swisher backfired in front of the jury. His choice to

further side-step the minefield created by a witness he described as "very, very

difficult" and "hard to pin down and some ways charming," Exhibit D-1 at 3,

Memorandum in Support of Ground Four, was a reasonable litigation tactic at the

time that does not constitute deficient performance under *Strickland*.  Although

Nolan later lamented his decision to let Swisher off the hook, such 20/20 hindsight

does not demonstrate ineffective assistance.  *See Cheney*, 614 F.3d at 994; *see also*

*Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation

of law and facts relevant to plausible options are virtually unchallengeable . . . .").

Finally, Hinkson argues that Nolan "was always confused by this case,"

particularly by "the Dowling Report."  Memorandum in Support of Ground Four at

2.  As to Nolan's general confusion, Hinkson relies on a statement in Nolan's post-

trial memorandum that Nolan "got confused on the three [Swisher] counts."

Exhibit D-1 at 6, Memorandum in Support of Ground Four.  Despite any

"confusion" on the counts, however, Nolan recognized that "the conviction rests on

the credibility of Swisher . . . ."  *Id.*  This recognition was plainly demonstrated by

Nolan's extensive cross-examination of Swisher, where Nolan attacked Swisher's

credibility and potential bias.  Thus, despite possible "confusion" about the

specifics of the three counts charging Hinkson with soliciting Swisher, Nolan was

not confused about his ultimate objective in defending his client against Swisher's

testimony.

As to Nolan's potential confusion about the Dowling letter, Nolan's

performance was not substandard.  The difficulty in interpreting the letter's

contents in relation to the potential falsity of Swisher's "Replacement DD-214"

was equally vexing to all parties and this Court.  *See* the Court's statement at Tr.

2308 ("I just don't know, from simply looking at a silent file, whether it would be

likely, in the midst of the height of the Cold War, in the mid 1950s, that there

would necessarily be written records of the type that lawyers would like to see that

would clearly prove the lie.").  The confusion over the Dowling letter also

extended to the State of Idaho Division of Veterans Services, who ultimately

concluded, on the basis of Swisher's "Replacement DD-214," that Swisher was

entitled to veterans' benefits.  Tr. 2604.  Given this confusion amongst officials

specifically trained in reviewing military records, it is no surprise that Hinkson's

counsel did not have complete command of the Dowling letter's relationship to the

rest of Swisher's file.  This "confusion" is not indicative of deficient performance

and there was no violation of *Strickland*'s first prong.

2.   <u>Prejudice</u>.

As outlined above, Hinkson has shown no instance of substandard

performance by counsel.  Thus, the Court need not decide whether there is a

"reasonable probability that, but for counsel's unprofessional errors, the result of

the [trial] would have been different." *Strickland*, 466 U.S. at 694.  Still, the Court

notes that Hinkson's habeas petition does not explain how he was prejudiced by

any of his counsels' alleged missteps.  He simply makes a boilerplate assertion that

he "was wrongfully convicted as a direct result of Nolan's ineffective assistance of

counsel."  Memorandum in Support of Ground Four at 7.  In general, as to the

three counts relating to Hinkson's solicitation of Swisher—the only three counts of

conviction—it is unclear what else counsel could have done to discredit Swisher.

Swisher was thoroughly cross-examined and this Court properly excluded further

documentation that could have impeached Swisher's military background.  *See* Tr.

2607; *see also Hinkson*, 585 F.3d at 1267 ("[W]e hold the district court did not

abuse its discretion when it excluded the evidence under Rule 403 . . . .").  Thus,

further investigation, further impeaching documents, or further cross-examination

of this difficult witness would not have changed the outcome of the trial.[10]

---

[10]     Hinkson's petition also completely ignores all of the remaining
evidence in the case that Hinkson truly wanted the three federal officers killed
when he solicited their murders on multiple occasions, corroborating evidence the
jury considered in convicting him: (1) the testimony of James Harding and his
friend Anne Bates; (2) the testimony of cellmate Chad Croner; (3) the testimony of
FBI Special Agent Mary Martin regarding Hinkson's solicitation of cellmate Frank
Nicolai during trial; (4) tape recordings of some of Hinkson's meetings with
various witnesses; (5) similar statements Hinkson made to others about his hatred
of federal officials; and (6) Hinkson's efforts to intimidate or injure witnesses who

### E.     Claim Five: Jurisdiction.

Hinkson argues that the indictment was invalid as to the solicitation counts

on which he was convicted because they failed to allege that the crime occurred

"within the special maritime and territorial jurisdiction of the United States."  The

Swisher counts charged Hinkson with violating 18 U.S.C. § 373, which forbids

soliciting another person to commit a felony involving violence; in this case that

felony was 18 U.S.C. § 1114.  Section 1114 provides:

> Whoever kills or attempts to kill any officer or employee of the
> United States or of any agency in any branch of the United States
> Government (including any member of the uniformed services)
> while such officer or employee is engaged in or on account of the
> performance of official duties, or any person assisting such an
> officer or employee in the performance of such duties or on account
> of that assistance, shall be punished--
>
>     (1) in the case of murder, as provided under section 1111;
>
>     (2) in the case of manslaughter, as provided under section
>     1112; or
>
>     (3) in the case of attempted murder or manslaughter, as
>     provided in section 1113.

18 U.S.C. § 1114.  The statute criminalizes killing or attempting to kill federal

---

testified against him.  Considering this other evidence of guilt, Hinkson was thus
not prejudiced under *Strickland*'s second prong by alleged attorney errors in the
handling of Swisher's impeachment.

employees while they are engaged in their official duties and—in subsections (1) through (3)—provides for the appropriate penalties depending on the particular crime.  Sections 1111 through 1113, in addition to providing for penalties, each contain a jurisdictional element requiring that the crime occur "within the special maritime and territorial jurisdiction of the United States."

Hinkson's attempt to graft the jurisdictional element from §§ 1111–13 onto § 1114 is unavailing.  Section 1114 incorporates only the penalties from these sections.  *See, e.g.*, *id.* § 1114(3) ("Whoever kills . . . any officer or employee of the United States . . . shall be punished . . . as provided under section 1113.").  As the Eighth Circuit recognized, "the language in § 1114 cannot reasonably be taken to incorporate that portion of § 1111(b) that does not deal with punishment.  The district court correctly characterized § 1114 as 'a statute of general applicability' in which the situs of the crime was not an element." *United States v. Peltier*, 446 F.3d 911, 914 (8th Cir. 2006); *see also United States v. Adams*, 581 F.2d 193, 200 (9th Cir. 1978) (calling it "frivolous" to argue that § 1111 imposes a jurisdictional requirement on § 1114).  The Court agrees and holds that this principle applies to each of §§ 1111–1113.  The indictment was legally sufficient.

Finding support in *Bond v. United States*, 131 S. Ct. 2355 (2011), Hinkson

also argues that the federal government lacked the authority to prosecute him for crimes that are within the allegedly exclusive purview of state law.  Hinkson's reliance on this authority is misplaced.  *Bond* held only that the plaintiff had standing to assert her claim that 18 U.S.C. § 229, a criminal statute unrelated to the one at issue here, interfered with powers reserved to the states; the Supreme Court "expresse[d] no view on the merits of that argument."  *Id.* at 2367.

A more general broadside on Congress' power to enact § 1114 is similarly unpersuasive.  "[N]o one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States, whether committed within one of the states of the Union or within territory over which congress has plenary and exclusive jurisdiction."  *Logan v. United States*, 144 U.S. 263, 283 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510, 523 n.22 (1968).  The murder of an officer of the United States engaged in the performance of official duties is undoubtedly a crime against the United States wherever committed.  *See Peltier*, 446 F.3d at 914 (upholding constitutionality of § 1114 under the Necessary and Proper Clause).

### F.    Claim Six: Juror Misconduct.

Hinkson alleges that three instances of juror misconduct require that his

conviction be vacated.  First, he argues that a note from a juror to the Court during the trial proves that the jury had been discussing the case amongst themselves contrary to the Court's admonishment against such activity.  Second, Hinkson claims that a juror, Claudia Haynes, withheld information during voir dire concerning her acquaintance with the wife of one of the victims of Hinkson's solicitation scheme, U.S. District Judge Edward Lodge.  Finally, Hinkson attempts to impeach the jury verdict with an untimely juror affidavit alleging improper conduct by a fellow juror.  Each of these claims fail.

Importantly, Hinkson's evidence of juror misconduct is based on interviews conducted with individual jurors after the trial.  On February 23, 2005, the Court filed an order explaining that it had:

> [R]eceived a complaint from one of the jurors in this case regarding contact by defense counsel.  The juror complains in part that defense counsel: (1) pressured her into allowing him to meet with her; (2) made serious allegations impugning one of the witnesses; and (3) has given her documents that were inadmissible at trial.

Case No. 1:04-cr-127-RCT, Doc. No. 220.  In light of this complaint, and to ensure juror privacy and safety following this contentious murder-for-hire case, the Court explicitly ordered the parties or agents acting on behalf of the parties to refrain from contacting jurors without prior authorization.  *Id.*  Hinkson did not appeal this

order.

Hoyt's interview with Claudia Haynes in "early 2005," Exhibit F-1 at 1, Memorandum in Support of Ground Six, may have been a violation of the no-contact order if he conducted the interview after the order was filed.[11]  Likewise, Tim Richardson, the Oregon paralegal who drafted juror Ben Casey's affidavit in May 2012, certainly violated the order.[12]  Richardson, by his own admission, "contacted one of the jurors, Mr. Ben Casey, who lives not too far from me."  Case No. 1:12-cv-00196-RCT, Doc. No. 3, Attachment 2, Affidavit of Tim Richardson.

Based on these violations of the Court's no-contact order, and Hoyt and Richardson's failure to provide an "adequate legal and factual demonstration of just cause or necessity for such contact," *see* Case No. 1:04-cr-127-RCT, Doc. No. 220, this Court has discretion to completely disregard the juror affidavits and dismiss Hinkson's juror misconduct claims out of hand.  *See Tanner v. United*

---

[11]    In addition, as this Court explained in the no-contact order, "The Idaho Rules of Profession [sic] Conduct prohibit counsel from communicating with a juror after the juror makes known her desire not to communicate, and prohibits communication that involves misrepresentation, coercion, duress or harassment. Idaho. R. Prof. Conduct 3.5."  If Hoyt contacted Haynes after she expressed a desire not to communicate, such contact would also be a violation of the RPC.

[12]    It is a violation of the Oregon Rules of Professional Conduct to contact a juror if "the communication is prohibited by law or court order."  Or. R. Prof. Conduct 3.5(c)(1).

*States*, 483 U.S. 107, 126 (1987) (explaining that the district court had discretion to reject juror affidavits taken in violation of a district court order).  The Court exercises its discretion to do so.  Alternatively, and in the interest of justice, the Court will look beyond this questionable conduct and will consider Hinkson's juror misconduct claims on the merits.

### 1.  Improper discussion amongst jurors.

Jurors were instructed before trial commenced that if they found it necessary to communicate with the Court during their service, they should do so only in writing by handing a note to the bailiff.  During Hinkson's solicitation trial and the defense's cross-examination of Swisher, juror Claudia Haynes submitted a note to the Court.  The note read:

> Your Honor, I do not know if this is allowed for me to ask; but can Mr. Swisher be asked about the mental capacity of Mr. Hinkson?  Did he do a clinical evaluation of Mr. Hinkson?  Is David Hinkson on medication? Is Mr. Hinkson mentally ill?  Are we or are we not supposed to consider his mental capacity?

Tr. 1036.  After gaining the consent of both parties, *see* Tr. 1037 (Nolan, approving the Court's suggested course of action by stating "I think that's the best way"), the Court advised the jurors that the case would proceed without a response to the question.  Tr. 1039.  Neither party objected to the juror's question or to proceeding

without a formal response.

Because the Court had previously instructed the jurors not to discuss the case with anyone, including fellow jurors, Tr. 265, Hinkson now alleges that Haynes's note—particularly the "we" language in the final sentence—indicates that the jury had been discussing the case against instructions.  Hinkson's new reading of this juror inquiry, which is contrary to the interpretation he provided in his prior motion for a mistrial, is yet another attack on a ruling not raised on direct appeal.  *Compare* Case No. 1:04-cr-127-RCT, Doc. No. 185, Defendant's Motion for Mistrial (alleging that the note showed Haynes "had formed an opinion as to the evidence and that she had become prejudiced thereby") *with* Memorandum in Support of Ground Six at 3 (alleging that the note showed jurors "were discussing the case among themselves and had deliberated and made a decision").  Thus, the claim is defaulted.

Alternatively, the claim is denied on the merits.  Courts presume that jurors follow instructions.  *See Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007).  There is nothing in Haynes's note that contradicts this presumption.  Haynes's inquiry about what the jury could eventually consider—the "we" language—does not show that the jury had <u>already begun</u> discussing the case.  Rather, the note, as recognized

by all parties and this Court during trial, was a harmless communication not indicative of jury misconduct.

2.    Haynes's relationship with Judge Lodge's wife.

As another allegation of misconduct against juror Claudia Haynes, Hinkson now argues that Haynes concealed during voir dire that she was acquainted with the wife of Judge Lodge, one of Hinkson's murder targets.

As the Supreme Court has explained, to obtain a new trial based on a juror's purportedly improper responses, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Failing to respond honestly to a question on voir dire "could indicate an attempt to conceal bias, which would provide the basis for a challenge for cause." *Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1459 (9th Cir. 1989). Importantly, however, a juror cannot "conceal" information into which no inquiry was ever made on voir dire. *Id.* at 1460 ("'[W]e cannot put upon the jury the duty to respond to questions not posed.'" (quoting *United States v. Kerr*, 778 F.2d 690, 694 (11th Cir. 1985))).

Here, the only relevant question to jurors was whether they knew "United

States District Judge Edward Lodge" or had dealings with the "named federal officials." Tr. 34. Neither party nor the Court asked whether the jurors were acquainted with <u>family members</u> of Hinkson's targeted victims. Thus, Haynes did not fail to "answer honestly a material question" because no such question was ever posed. As the Ninth Circuit explained in *Hard*, if Hinkson or his counsel wanted to know about juror relationships with victim family members, "he should have asked." *Id.*

Moreover, nothing in Hoyt's affidavit summarizing his interview with Haynes provides any basis for believing Haynes was not impartial. As Hoyt recounts, Haynes "had become acquainted with Judge Lodge's wife over a dairy issue near her home," and "had talked to Judge Lodges [sic] wife a number of times and supported her in her political career as an Idaho State Senator." Exhibit F-1, Affidavit of Wesley Hoyt, Memorandum in Support of Ground Six. As a State Senator, it is extremely likely that Judge Lodge's wife was acquainted with many of the residents in her district, and that any number of people supported her in her political career. This evidence, standing alone, does not demonstrate partiality or bias.

      3.    <u>Impeaching the jury verdict</u>.

Finally, Hinkson attempts to impeach the jury's verdict with an affidavit from a former juror concerning the jury's deliberations. The affidavit from juror Ben S. Casey, filed concurrently with Hinkson's amended habeas petition on May 21, 2012, alleges that a fellow juror broke down emotionally during deliberations, admitting past experience with a victim of a similar solicitation scheme.[13] This newly minted claim fails.

First, the claim is untimely. Because Hinkson was convicted of the underlying crimes and filed his habeas petition after 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies in this case. As modified by AEDPA, 28 U.S.C. § 2255(f) places "[a] 1-year period of limitation" on habeas petitions. Hinkson's conviction became final on April 18, 2011, such that his original habeas petition filed on April 17, 2012, was timely. His amended memorandum, however, including the Casey affidavit, was not filed until May 21, 2012, rendering it untimely and procedurally defaulted.

---

[13]     Hinkson submitted a prior affidavit from Casey as an attachment for his Rule 33 Motion for New Trial. *See* Case No. 1:04-cr-127-RCT, Doc. No. 224, Motion for New Trial, Attachment #3, Affidavit of Ben S. Casey. That affidavit, submitted by Hoyt following the solicitation trial, made no mention whatsoever of a fellow juror breaking down emotionally during deliberations. The failure to raise this claim on direct appeal results, once again, in default.

While it is possible for a claim raised in an amended petition to "relate back" to the original petition to escape the one-year limitation period, *see Hebner v. McGrath*, 543 F.3d 1133, 1137–38 (9th Cir. 2008) (citing Federal Rule of Civil Procedure 15(c)(1)), "[a]n amended habeas petition 'does not relate back (and thereby escape AEDPA's one-year limit), when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Id.* at 1138 (quoting *Mayle v. Felix*, 545 U.S. 644, 650 (2005)).

Here, although the claims brought in the original petition and the amended memorandum both relate to alleged juror misconduct, they vary in time. The first two claims, both of which were timely filed, center on juror Claudia Haynes's actions during voir dire and during the trial itself. The Casey claim, which is not timely, relates to private jury deliberations after the close of evidence in the case. Thus, under the strict reading required by the Supreme Court's decision in *Mayle*, this Court holds that Casey's affidavit does not relate to the same transaction or occurrence at issue in Hinkson's original juror misconduct claims, and the new claim is rejected as untimely. Hinkson has not shown cause as to why the delay should be excused, and it is unlikely that he could given that his counsel already interviewed Casey once shortly after trial, apparently failing to glean this evidence

of jury deliberations.

Assuming, arguendo, that this claim was timely filed, it fails on the merits. It is black-letter evidence law that a court may not consider "jury testimony to impeach a verdict." *Tanner v. United States*, 483 U.S. 107, 119 (1987).  As codified in Federal Rule of Evidence 606(b), this well-established prohibition prevents the Court from receiving a juror affidavit relating "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b).  The rule restricts juror testimony to only "facts bearing on extraneous influences on the deliberation, in the sense of overt acts of jury tampering."  *United States v. Pimental*, 654 F.2d 538, 542 (9th Cir. 1981); *see also Hard*, 870 F.2d at 1461 ("Rule 606(b) bars not just juror testimony but evidence of any sort as to a statement by a juror concerning jury deliberations, so long as a juror would be barred from making the same statement in the form of testimony in court.").  Under this standard, Casey's statement, indicating a fellow juror's mental and emotional process concerning the verdict, is the exact type of improper impeachment the rule is designed to protect against.

Hinkson attempts to circumvent the rule by claiming that Casey's statement

is only offered "to show that said female juror lied to the court in *voir dire*."

Amended Memorandum at 69.  Hinkson alleges that Casey's statement proves that

the female juror "failed to disclose a materially relevant fact about her involvement

with <u>one of the victims</u>."  *Id.* (emphasis added).  Even if this argument theoretically

brings Casey's statement within an exception to Rule 606(b), nothing in Casey's

belated affidavit indicates that the female juror was emotionally distraught over

one of the victims <u>in this case</u>.  *See* Case No. 1:12-cv-00196-RCT, Doc. No. 3,

Attachment 2, Affidavit of Ben S. Casey.  Casey does not allege that the juror

referenced personal knowledge of the parties in the case, nor does he allege that the

juror injected evidence not at issue in the trial.  *See* Fed. R. Evid. 606(b)(2).

Without such evidence, the Casey affidavit must be rejected along with Hinkson's

corresponding juror misconduct claim.

### G.    Claim Seven: Misconduct Surrounding Hoyt's Withdrawal

In April 2005, months after the jury in the second trial had convicted

Hinkson of murder solicitation and only four days before Hinkson's scheduled

consolidated sentencing in both cases, Hinkson's attorney Wesley Hoyt moved to

withdraw as Hinkson's counsel.  Case No. 1:04-cr-127-RCT, Doc. No. 242,

Motion to Withdraw.  After soliciting the views of all parties, the Court reluctantly

accepted the withdrawal.  Doc. No. 249.  Hinkson now asserts that, although Hoyt

himself moved to withdraw, and although the government opposed the withdrawal,

the withdrawal was actually the result of a convoluted government scheme to

deprive Hinkson of his chosen counsel.  This argument is frivolous and is rejected.

The circumstances of Hoyt's withdrawal stem from statements of a defense

witness, Frank Nicolai.  At Hinkson's solicitation trial, the prosecution presented

testimony from Chad Croner, one of Hinkson's cellmates at Boise's Ada County

Jail, where Hinkson was housed by the United States Marshal during his trial.  Tr.

1149.  Croner testified that, while he and Hinkson were cellmates, Hinkson had

attempted to hire Croner to kill Judge Lodge, AUSA Cook, and IRS Agent Hines.

Tr. 1156 (Croner: "[Hinkson] said I would be worth $30,000 if I could eliminate

Lodge, Cook, or Hines.").  To rebut Croner's testimony, Hinkson relied on

testimony from other cellmates, including Frank Nicolai, who stated that he never

heard Hinkson solicit Croner or anyone else to commit the killings.  Tr. 1315.

Nicolai's testimony, however, was in turn rebutted by FBI Special Agent

Mary Martin ("Agent Martin"), Tr. 2649, who testified that Nicolai had previously

written a letter to the FBI explaining that Hinkson had solicited him to commit a

number of murders.  Tr. 2658.  Agent Martin explained to the jury that, after

receipt of Nicolai's letter, and based on her interview with Nicolai, Hinkson had

offered Nicolai money and future employment in exchange for the murders.  Tr.

2659–60.

On the eve of closing arguments, Hoyt reviewed the FBI's "302 statements"

summarizing Agent Martin's interviews with Nicolai.  Hoyt was shocked to learn

that, according to the statements, Nicolai directly implicated him (Hoyt) in

Hinkson's latest murder-for-hire scheme.  The statements alleged that Hoyt had

begun legal work on Nicolai's behalf as a down payment on the eventual bounty

Hinkson promised to pay Nicolai as partial compensation for murdering the federal

officials.  Case No. 1:04-cr-127-RCT, Doc. No. 242, Motion to Withdraw,

Attachment 1 at 2 ("Nicolai advised Hinkson's attorney, Wesley Hoyt, has started

working on Nicolai's case, as partial payment for Nicolai to kill people for

Hinkson.").  Hoyt apparently set the 302 statements aside for the time being, and

waited until after the jury returned its verdict to consult with the Idaho State Bar

Association about the proper course of action.  Hoyt ultimately concluded that

Nicolai's allegations created an "irreconcilable conflict" necessitating withdrawal.

Motion to Withdraw at 1.  Recognizing that Hoyt would have to vouch for

Nicolai's credibility as a defense witness while at the same time hoping to discredit

Nicolai's allegations against Hoyt personally, this Court granted the withdrawal motion.  Doc. No. 249 at 10.

Hinkson now argues that (1) The Hoyt-Nicolai quid pro quo arrangement summarized in the 302 statements was "concocted" by the government; and (2) this Court's ruling on Hoyt's withdrawal motion deprived Hinkson "of the adequate or competent representation of the counsel of my choice."  Both arguments are rejected.

As to the first argument, there is not a shred of evidence that Nicolai's statements to Agent Martin were falsely manufactured by the government, and Hinkson offers no evidence supporting this theory.  Rather, Nicolai's hand-written letter to the FBI explains Hinkson's ongoing murder-for-hire schemes and indicates Nicolai's personal fear of retribution for revealing the information.  Motion to Withdraw, Attachment 1 at 10 (Nicolai, pleading with agents after revealing Hinkson's murder solicitations, to "[p]lease [not] compromise my safety . . . .").  This language is evidence of a prisoner deeply frightened by the violent musings of his cellmate, not of an "over the top" FBI conspiracy.  *See* Motion in Support of Ground Seven.

As to the second argument, Hinkson was not prejudiced by Hoyt's

withdrawal.  By the time of the withdrawal, the trial had concluded and the jury had returned its verdict.  All that remained was Hinkson's sentencing, and Hoyt himself conceded that he suffered from a "lack of experience in federal criminal sentencing matters."  Doc. No. 250, Defense Counsel's Status Report Regarding Motion to Withdraw at 2.  Hoyt admitted that "it would be in Mr. Hinkson's best interest to be represented by an experienced criminal attorney as lead counsel to argue the sentencing issues . . . ."  *Id.*  Based on these representations, this Court allowed Hoyt's withdrawal, but only after making a factual finding that "any claimed conflict that now exists between Mr. Hoyt and Defendant Hinkson did not have any effect whatsoever on the trial proceedings."  *See* Doc. No. 249 at 7.

Moreover, Hinkson cannot show prejudice because Hoyt has quite clearly continued to work on Hinkson's behalf notwithstanding this Court's withdrawal order.  The filings in this habeas proceeding, while ostensibly pro se, have in fact included Hoyt's declarations and electronic service address.  In addition, several sections of Hoyt's personal affidavits appended to Hinkson's pro se habeas petition are verbatim restatements of Hinkson's pro se filings.  *Compare* Hinkson's pro se Memorandum in Support of Ground Four at 5 ("Nolan mentions as if it was an important issue that he could not establish a financial interest in WaterOz for either

Bellon or Swisher with which to impeach them because neither witness would admit it on the witness stand.  But, although Nolan was told about the Bellon/Swisher takeover of WaterOz by Temporary Restraining Order, attorney Nolan refused to use that highly damaging information showing the use of force to take what was not theirs in order to impeach them."), *with* Affidavit of Wesley Hoyt, Exhibit A-1 at 7, Memorandum in Support of Ground One ("Nolan mentions as if it was an important issue that he could not establish a financial interest in WaterOz for either Bellon or Swisher with which to impeach them because neither witness wouldn't [sic] admit it on the witness stand.  But, although Nolan was told about the Bellon/Swisher takeover of WaterOz by Temporary Restraining Order, attorney Nolan refused to use that highly damaging information, showing the used [sic] of force to take what was not theirs, in order to impeach them.").  Thus, the Court rejects this unfounded claim.

## CONCLUSION

The Court finds that Hinkson has failed to establish entitlement to habeas relief because of: (1) prior resolution of claims on direct appeal, *see Odom*, 455 F.2d at 160; (2) procedural default in failing to pursue claims on direct appeal, *see Bousley*, 523 U.S. at 622; (3) failure to timely raise the claims, *see Mayle*, 545 U.S.

at 650; or (4) to the extent not subject to the "law of the case" doctrine, defaulted, or untimely, for lack of merit. The Court further finds that additional evidentiary development in this matter is neither required nor warranted. *See* 28 U.S.C. § 2255(a); *United States v. Howard*, 381 F.3d 873, 877 (9th Cir. 2004) (explaining that, for an evidentiary hearing to be required, "the petition, files and record of the case cannot conclusively show that [petitioner] is entitled to no relief.").

## CERTIFICATE OF APPEALABILITY

In conformance with Rule 11(a) of the Rules Governing Section 2255 Proceedings in United States District Court, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Anticipating Hinkson's appeal of this Court's judgment, the Court has evaluated the claims within the petition against the statutory requirements for the issuance of a certificate of appealability under 28 U.S.C. § 2253(c). Under this standard, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253 (c)(2). The United States Supreme Court has interpreted this statutory language to require:

> [A] petitioner [to] make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot* [*v. Estelle*,

**HINKSON V. UNITED STATES, 3:02-CR-142-RCT;**
**1:04-CR-127-RCT; 1:12-CV-196-RCT**
**MEMORANDUM DECISION          54**

463 U.S. 880 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot*, 463 U.S. at 893).

Having previously litigated and lost on many of the claims he renews in his habeas petition, and for the reasons stated above, this Court finds that no reasonable jurist could debate its resolution of any of Hinkson's habeas claims. Thus, the Court **DECLINES** to issue a certificate of appealability with respect to any of them.

Based on the foregoing,

**IT IS HEREBY ORDERED** that the petition for writ of habeas corpus (Doc. No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that Hinkson's Motions for Discovery and to Expand the Record (Case No. 1:04-cr-127-RCT, Doc. Nos. 320, 321) are **DENIED**.  Hinkson's Motion for Default Judgment, Doc. No. 6, is **DENIED** as moot.  Alternatively, it is denied on the merits.  *See Gordon v. Duran*, 895 F.2 610, 612 (9th Cir. 1990) ("The failure to respond to claims raised in a petition for habeas corpus does not entitle the petitioner to a default judgment.").

The Clerk of Court shall enter judgment accordingly.

SO ORDERED this 28th day of August, 2012.

RICHARD C. TALLMAN
United States Circuit Judge
Sitting by designation

**HINKSON V. UNITED STATES, 3:02-CR-142-RCT;**
**1:04-CR-127-RCT; 1:12-CV-196-RCT**
**MEMORANDUM DECISION                 56**